ORIGINAL

JUDGE DAVID BRIONES

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

2010 JUN 1    AM 11: 45

| | | |
|---|---|---|
| JUSTEN GRANT HALL, | § | CASE NO. |
| | § | 3:10-cv-00213 |
| Petitioner, | § | |
| | § | |
| v. | § | Related Case No. |
| | § | 3:10-cv-00135-FM |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

EP10CV0213

# MEMORANDUM IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

June 10, 2010

A/73401003.1

## TABLE OF CONTENTS

Page

I.    SUMMARY OF ARGUMENT .................................................................. 1

II.   STATEMENT OF FACTS .................................................................... 5

III.  PROCEDURAL HISTORY .................................................................. 13

      A.    PRETRIAL PROCEEDINGS .................................................... 13

      B.    TRIAL .......................................................................................... 14

      C.    POST-TRIAL PROCEEDINGS ............................................... 14

            1.    Direct Appeal ................................................................. 15

            2.    State Habeas Proceeding ............................................. 15

IV.   ARGUMENT ...................................................................................... 17

      A.    PETITIONER'S RIGHTS UNDER THE FOURTEENTH AMENDMENT
            WERE VIOLATED BY THE STATE'S MISCOUNDUCT IN FAILING
            TO DISCLOSE MATERIAL EVIDENCE FAVORABLE TO HIM IN
            VIOLATION OF BRADY .................................................................. 17

            1.    The Supreme Court Has Repeatedly Held That The Law Requires
                  the State to Disclose Evidence Favorable to the Accused ...................... 18

            2.    The Brady Doctrine Requires The State To Disclose Tacit
                  Agreements With Witnesses .................................................... 20

            3.    The State's Misconduct In Failing To Disclose Brady Evidence
                  Requires That The Petitioner Be Granted A New Trial ........................... 23

                  a.    The State Withheld Material Evidence of Immunity
                        Agreements With Two Of The State's Key Witnesses ................ 24

                  b.    The State's Key Witnesses Testified Under Oath To A
                        Number of Crimes, Yet Were Never Charged, Thereby
                        Demonstrating The Existence Of Undisclosed Agreements
                        With The State .......................................................... 26

            4.    The State's Further Failure To Disclose Possible Evidence Of
                  Deals Offered By The Police Requires That The Petitioner Be
                  Granted A New Trial ............................................................. 34

            5.    The State Failed To Disclose Correspondence With One Of The
                  State's Key Witnesses That Demonstrates The Witness's True
                  Motivation For Testifying Against The Petitioner .................................. 37

      B.    PETITIONER'S CONVICTION VIOLATES THE FIFTH AND
            FOURTEENTH AMENDMENTS TO THE UNITED STATES
            CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN
            DENYING THE MOTION TO SUPPRESS PETITIONER'S
            INVOLUNTARY CONFESSION. .................................................... 39

i

TABLE OF CONTENTS
(continued)

Page

1.      Relevant Circumstances for Determining Voluntariness Under
        Governing Law. ..................................................................................... 40

2.      The Record Evidence Establishes That The Petitioner Was Not
        Capable Of A Knowing, Intelligent, And Voluntary Waiver Of His
        Rights At The Time He Was Interrogated By Detective
        Samaniego. ............................................................................................. 41

3.      Detective Samaniego's Interrogation of the Petitioner ............................ 44

4.      Detective Samaniego Coerced The Petitioner Into Providing A
        Statement In Violation Of The Petitioner's Fifth And Fourteenth
        Amendment Rights. ................................................................................ 45

C.  PETITIONER'S CONVICTION VIOLATES THE SIXTH
    AMENDMENT TO THE UNITED STATES CONSTITUTION
    BECAUSE THE PETITIONER'S LEAD TRIAL COUNSEL SLEPT
    DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL. ...................... 49

D.  PETITIONER'S CONVICTION VIOLATES THE FIFTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES
    CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN
    DENYING THE PETITIONER'S MOTION FOR A CONTINUANCE. .......... 55

E.  PETITIONER'S CONVICTION AND SENTENCE OF DEATH
    VIOLATE THE DUE PROCESS CLAUSE OF THE UNITED STATES
    CONSTITUTION BECAUSE THE EVIDENCE ADDUCED AT TRIAL
    WAS INSUFFICIENT TO PROVE THAT THE PETITIONER
    MURDERED THE VICTIM IN THE COURSE OF COMMITTING OR
    ATTEMPTING TO COMMIT THE OFFENSE OF RETALIATION. .............. 57

F.  PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH
    AMENDMENT TO THE UNITED STATES CONSTITUTION
    BECAUSE TRIAL COUNSEL FAILED TO INVESTIGATE AND
    PRESENT SUBSTANTIAL, READILY AVAILABLE EVIDENCE IN
    MITIGATION OF THE DEATH PENALTY. .................................................. 61

    1.  The Supreme Court's Strickland Decision Established a Nuanced
        Standard to Evaluate Ineffective Assistance of Counsel ........................ 61

        a.      Strickland Prong One: Deficient Investigation ............................ 61

        b.      Strickland Prong Two: Prejudice ................................................. 63

    2.  Strickland's Progeny Demonstrate the Breadth of Viable
        Ineffective Assistance of Counsel Claims, with a Focus on
        Fundamental Fairness ........................................................................... 65

    3.  The Petitioner's Trial Counsel Failed to Present a Sufficient
        Mitigation Defense to the Jury ............................................................. 68

TABLE OF CONTENTS
(continued)

Page

    a.    Trial Counsel's Mitigation Case was Constitutionally Deficient ..................................................................... 68

    b.    Substantial And Compelling Mitigation Evidence Could Have Been Uncovered and Presented ........................................ 70

G.    PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL ARGUED TO THE JURY, WITHOUT ANY PLAUSIBLE TACTICAL REASON AND CONTRARY TO EVIDENT DEFENSIVE STRATEGY, THAT PETITIONER DESERVED TO DIE FOR HIS ALLEGED CRIME. ......................................... 76

    1.    The Supreme Court's Strickland Decision Established the Standard to Evaluate Ineffective Assistance of Counsel: Fundamental Fairness ................................................................... 77

    2.    Fundamental Fairness Requires a Finding that the Petitioner's Trial Counsel Offered an Ineffective Defense by Advocating for the Death Penalty ................................................................ 77

H.    PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL RELINQUISHED TWO PEREMPTORY CHALLENGES AGAINST OBJECTIONABLE JURORS BY FAILING TO REQUIRE THAT EACH ELIGIBLE JUROR BE PASSED FOR PREEMPTORY CHALLENGE FIRST BY THE PROSECUTION. ........................................... 80

    1.    Article 35.13 Provides Capital Defendants with an Important Strategic Advantage in Jury Selection Proceedings .............................. 81

    2.    Mr. Macias Lost Two Peremptory Strikes Against Potential Jurors by Failing to Require That Each Eligible Juror Be Passed for Peremptory Challenge First by the Prosecution As Prescribed by Article 35.13. ......................................................... 83

    3.    Mr. Macias's Forfeit of Mr. Hall's Article 35.13 Strategic Advantage in Jury Selection Caused At Least Two Biased Jurors to Serve on the Panel That Delivered The Petitioner's Death Sentence ...... 84

    4.    Mr. Macias Had No Strategic or Reasonable Explanation For Failing To Require That Each Eligible Juror Be Passed for Preemptory Challenge First by the Prosecution As Set Forth In Article 35.13. ......................................................... 88

I.    PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL AGREED TO EXCUSE DEATH-QUALIFIED VENIRE MEMBERS WHO WERE OPPOSED TO CAPITAL PUNISHMENT WITHOUT QUESTIONING THEM. .............. 92

A/73401003.1

TABLE OF CONTENTS
(continued)

Page

J.    PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH
      AMENDMENT TO THE UNITED STATES CONSTITUTION
      BECAUSE TRIAL COUNSEL FAILED TO OBJECT TO THE
      COURT'S FAILURE TO INSTRUCT NUMEROUS VENIRE
      MEMBERS AS REQUIRED BY TEXAS CODE OF CRIMINAL
      PROCEDURE ART. 35.17(2). ........................................................ 95

      1.    Judge Woodard Did Not Comply With the Article 35.17(2)
            Requirements. ................................................................ 96

      2.    Mr. Macias Had No Tactical or Strategic Reasoning For Failing to
            Raise An Objection To the Omission of the Article 35.17(2)
            Requirements. ................................................................ 97

      3.    Mr. Hall Suffered Substantial Prejudice From Mr. Macias's Failure
            to Object Regarding The Improperly Omitted Article 35.17(2)
            Principles. ..................................................................... 99

V.    PRAYER FOR RELIEF ................................................................ 102

iv

# TABLE OF AUTHORITIES

Page(s)

CASES

*Adams v. Quarterman,*
324 Fed. App'x 340 (5th Cir. 2009) ...................................................67

*Adams v. Texas,*
448 U.S. 38 (1980)..........................................................................84

*Ainsworth v. Woodford,*
268 F.3d 868 (9th Cir. 2001) ...........................................................67

*Alcorta v. Texas,*
355 U.S. 28 (1957)..........................................................................18

*Anderson v. State,*
633 S.W.2d 851 (Tex. Crim. App. 1982)...........................................84

*Arizona v. Fulminante,*
499 U.S. 279 (1991)........................................................................40

*Bell v. Bell,*
512 F.3d 223 (6th Cir. 2008) ......................................................20, 22

*Bigby v. Dretke,*
402 F.3d 551 (5th Cir. 2005) ......................................................64, 65

*Bigby v. State,*
892 S.W.2d 864 (Tex. Crim. App. 1994), *denial of habeas corpus aff'd in part, rev'd in part on other grounds, Bigby v. State,* 340 F.3d 259 (5th Cir. 2003)...........................82, 89

*Bouchillon v. Collins,*
907 F.2d 589 (5th Cir. 1990) ...........................................................64

*Brady v. Maryland,*
373 U.S. 83 (1963)....................................................................18, 19

*Cannan v. McBride,*
395 F.3d 376 (7th Cir. 2005) ...........................................................67

*Clay v. Bowersox,*
367 F.3d 993 (8th Cir. 2004) ...........................................................20

*Colorado v. Connelly,*
479 U.S. 157 (1986)........................................................................40

*Cronic v. United States,*
   466 U.S. 648 (1984) ...........................................................................................49

*Diaz v. Quarterman,*
   228 Fed. App'x 417 (5th Cir. 2007) .................................................................88

*Dobbs v. Turpin,*
   142 F.3d 1383 (11th Cir. 1998) .......................................................................67

*Douglas v. Workman,*
   560 F.3d 1156 (10th Cir. 2009) .................................................................21, 22

*Dowthitt v. State,*
   931 S.W.2d 244 (Tex. Crim. App. 1996) .........................................................89

*DuBose v. Leferve,*
   619 F.2d 973 (2nd Cir. 1980) ...........................................................................21

*Freeman v. Georgia,*
   599 F.2d 65 (5th Cir. 1979) .......................................................................35, 36

*Giglio v. United States,*
   405 U.S. 150 (1971) .............................................................................20, 26, 27

*Ex parte Gonzales,*
   204 S.W.3d 391 (Tex. Crim. App. 2006) ........................................................64

*Graves v. Dretke,*
   442 F.3d 334 (5th Cir. 2006) ...........................................................................24

*Greenwald v. Wisconsin,*
   390 U.S. 519 (1968) (per curiam) ....................................................................47

*Haber v. Wainwright,*
   756 F.2d 1520 (11th Cir. 1985) .......................................................................20

*Hatten v. Quarterman,*
   570 F.3d 595 (5th Cir. 2009) ...........................................................................84

*Haynes v. Washington,*
   373 U.S. 503 (1963) ..........................................................................................39

*Hernandez v. State,*
   563 S.W.2d 947 (Tex. Crim. App. 1978) .........................................................85

*Herrara v. Collins,*
   506 U.S. 390 (1993) ..........................................................................................58

*Hughes v. State,*
24 S.W.3d 833 (Tex. Crim. App. 2000)..................................................................82, 83, 89

*Jackson v. Virginia,*
443 U.S. 307 (1979)..................................................................57, 58

*Janecka v. State,*
739 S.W.2d 813 (Tex. Crim. App. 1987)..................................................................81, 89

*Knox v. Collins,*
928 F.2d 657 (5th Cir. 1991) ..................................................................96

*Kyles v. Whitely,*
514 U.S. 419 (1995)..................................................................19, 20, 24, 34

*Lewis v. Dretke,*
355 F.3d 364 (5th Cir. 2003) ..................................................................64

*Loyd v. Whitley,*
977 F.2d 149 (5th Cir. 1992) ..................................................................79

*Mallet v. State,*
65 S.W.3d 59 (Tex. Crim. App. 2001)..................................................................96

*Maryland v. Shatzer,*
130 S.Ct. 1213 (2010)..................................................................40

*Mayfield v. Woodford,*
270 F.3d 915 (9th Cir. 2001) ..................................................................67

*Miranda v. Arizona,*
384 U.S. 436 (1966)..................................................................40

*Missouri v. Seibert,*
542 U.S. 600 (2004)..................................................................41, 45, 48

*Mooney v. Holohan,*
294 U.S. 103 (1935)..................................................................18

*Moore v. Johnson,*
194 F.3d 586 (5th Cir. 1999) .................................................................. passim

*Napue v. Illinois,*
360 U.S. 264 (1959)..................................................................18, 19, 23

*Neal v. Puckett,*
286 F.3d 230 (5th Cir. 2002) ..................................................................62, 77

A/73401003.1

*Neder v. United States,*
    527 U.S. 1 (1999)................................................................................84

*Oregon v. Elstad,*
    470 U.S. 298 (1985)...........................................................................48

*Payne v. Arkansas,*
    356 U.S. 560 (1958)...........................................................................40

*Pierce v. Thaler,*
    355 Fed. App'x 784 (5th Cir. 2009) ...................................................65

*Pyle v. Kansas,*
    317 U.S. 213 (1942)...........................................................................18

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009) .......................................................78, 79

*Riles v. McCotter,*
    799 F.2d 947 (5th Cir. 1986) .............................................................95

*Rompilla v. Beard,*
    125 S.Ct. 2456 (2005).................................................................. passim

*S.D.G. v. State,*
    936 S.W.2d 371 (Tex. Ct. App. 1996) ...............................................96

*Soffar v. Dretke,*
    368 F.3d 441 (5th Cir. 2004) .............................................................67

*Strickland v. Washington,*
    466 U.S. 668 (1984).....................................................................61, 77

*Strickler v. Greene,*
    527 U.S. 263 (1999).............................................................19, 34, 37

*Tassin v. Cain,*
    517 F.3d 770 (5th Cir. 2008) .......................................................20, 21

*Tennard v. Dretke,*
    542 U.S. 274 (2004)...........................................................................65

*Tong v. State,*
    25 S.W.3d 707 (Tex. Crim. App. 2000)..............................................49

*Ungar v. Sarafite,*
    376 U.S. 575 (1964).....................................................................55, 56

A/73401003.1

*United States v. Bagley,*
    473 U.S. 667 (1985) .................................................................19

*United States v. Pennington,*
    20 F.3d 593 (5th Cir. 1994) ......................................................58

*United States v. Rusmisel,*
    716 F.2d 301 (5th Cir. 1983) ..........................................78, 79, 80

*United States v. Shaffer,*
    789 F.2d 682 (9th Cir. 1986) ....................................................20

*United States v. Sipe,*
    388 F.3d 471 (5th Cir. 2004) ....................................................37

*United States v. Vasquez,*
    889 F.Supp. 171 (M.D. Pa. 1995) .............................................46

*Washington v. State,*
    388 U.S. 14 (1967) ...................................................................55

*Ex parte Welborn,*
    785 S.W.2d 391 (Tex. Crim. App. 1990) ..................................63

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ........................................................ passim

*Williams v. Brown,*
    609 F.2d 216 (5th Cir. 1980) ....................................................27

*Williams v. Taylor,*
    529 U.S. 362 (2000) ................................................61, 64, 65, 66

*Wilson v. United States,*
    162 U.S. 613 (1896) .................................................................39

*In re Winship,*
    397 U.S. 358 (1970) .................................................................57

*Wisehart v. Davis,*
    408 F.3d 321 (7th Cir. 2005) ....................................................20

*Witherspoon v. Illinois,*
    391 U.S. 510 (1968) .................................................................92

*Withrow v. Wilson,*
    507 U.S. 680 (1993) .................................................................40

A/73401003.1

*Wyrick v. Fields,*
    459 U.S. 42 (1982)..................................................................................46

*Yanez v. State,*
    677 S.W.2d 62 (Tex. Crim. App. 1986).................................................99

**STATUTES**

28 U.S.C. § 2254................................................................................1, 102

Texas Code Crim. Proc. Article 35.13.....................................................84

Texas Code Crim. Proc. Article 35.16.....................................................84

Texas Code Crim. Proc. Article 35.17(2) ......................................... passim

Texas Code Crim. Proc. Article 37.071 § 2(e)(1)....................................64

Texas Code Crim. Proc. Article 11.071 § 2(c) .......................................14

Texas Penal Code Ann. § 36.06.........................................................3, 58

Texas Penal Code § 37.09.....................................................................29

**OTHER AUTHORITIES**

Texas Rule of Evidence 609 ............................................................23, 34

A/73401003.1

This Memorandum in Support of Petition for Writ of Habeas corpus is submitted pursuant to 28 U.S.C. § 2254, and challenges Petitioner Justen Grant Hall's conviction for capital murder and sentence of death in cause No. 20030D00505 in the 34th Judicial District Court, El Paso, Texas.

## I.    SUMMARY OF ARGUMENT

Petitioner's conviction and sentence of death are based on numerous and egregious violations of his constitutional rights.  These violations were caused by errors of the trial court (failure to exclude the Petitioner's involuntary statement); misconduct by the State (failure to disclose tacit offers of immunity to key fact witnesses); and by the stunningly ineffective (and affirmatively prejudicial) performance of the Petitioner's lead trial counsel, Frank Macias. Among other examples, Mr. Macias slept during portions of the trial, relinquished critical statutory advantages during jury selection, without any reasoned basis or even explanation, and inexplicably argued to the jury during the punishment phase of the trial that his own client deserved to die.   Individually or as a whole these errors deprived the Petitioner of his constitutional rights, and require redress by this Court.

*First,* the Petitioner's due process rights under the Fourteenth Amendment were violated by the State's failure to disclose critical information concerning fact witnesses who testified against him.  Specifically, the State withheld material information concerning offers of immunity made to witnesses by both prosecutors and police officers in exchange for testimony against the Petitioner at trial.   The suppression of these tacit agreements deprived the defense of the opportunity properly to impeach those witnesses.  As such, the Petitioner is entitled to a new trial.

*Second,* the Petitioner's conviction violates the Fifth and Fourteenth Amendments because the trial court erred in denying the motion to suppress the Petitioner's involuntary confession. The record evidence in this case leaves no doubt that the Petitioner's confession was obtained under a totality of circumstances evidencing an involuntary admission of guilt. At the time his statement was coerced, the police had deliberately withheld prescription medications needed to treat the symptoms of his mental illness, including schizophrenia, depression, and anxiety disorders. The Petitioner was also suicidal, had not slept in days, and was experiencing the after effects of a weeks-long methamphetamine binge. Despite knowledge of the Petitioner's state of mind, the police proceeded to engage him in casual conversation, without any *Miranda* warnings, before asking the Petitioner directly if he had committed the murder. Only then, after obtaining the answer he had sought, did the detective conducting the interrogation advise the Petitioner of his *Miranda* rights and proceed to extract a detailed statement. Such deliberate and coercive circumvention of the Petitioner's rights is not permitted under the Fifth and Fourteenth Amendments.

*Third,* the Petitioner's conviction violates the Sixth Amendment guarantee of effective assistance of counsel in light of uncontroverted evidence that the Petitioner's lead trial counsel slept during portions of the guilt/innocence phase of the trial. Several jurors noted that Petitioner's lead counsel, Frank Macias, slept during the examination of witnesses. Jurors even discussed the "spectacle" of Petitioner's sleeping counsel amongst themselves. This "spectacle" not only deprived the Petitioner of his counsel's assistance during the trial, it also left the jurors with the highly prejudicial impression that the Petitioner's own lawyer was not engaged or interested in the defense of his client. Mr. Macias's sleeping violated the fundamental principle

A/73401003.1

of fairness in the adversarial process and is *per se* ineffective under the governing law of this Circuit.

*Fourth,* the Petitioner's conviction violates his constitutional right to due process because the trial court arbitrarily denied the Petitioner's request for a short continuance before trial. The Petitioner sought a continuance of less than a month in order to: 1) undergo evaluation by an expert addictionologist; 2) conduct DNA testing of physical evidence that the State had not tested; and 3) conduct interviews with fact witnesses who were called to testify against the Petitioner. The trial court's denial of the continuance prevented the Petitioner from taking these steps, and thus prevented him from being able to prepare his defense, which is a fundamental element of due process.

*Fifth,* the Petitioner's conviction and sentence of death violate the due process clause because the evidence at trial was insufficient to prove that the Petitioner murdered the victim in the course of committing or attempting to commit the offense of retaliation. Indeed, the testimony of the State's own witnesses clearly demonstrates the lack of evidence sufficient for a rational jury to find beyond a reasonable doubt that the Petitioner killed Melanie Billhartz in order to prevent her from reporting the occurrence of a crime to the authorities, as required by Texas Penal Code Ann. § 36.06.

*Sixth,* the Petitioner's sentence of death violates the Sixth Amendment because trial counsel failed to investigate and present substantial, readily available evidence in mitigation of the death penalty. Specifically, trial counsel failed to investigate and present overwhelming and powerful evidence of childhood abuse, neglect, and mental illness. Such evidence was material, and would have caused at least one juror to have decided the Petitioner's fate differently had she been informed of the Petitioner's compelling, tragic, and sympathetic personal story.

A/73401003.1

*Seventh,* the Petitioner's death sentence violates the Sixth Amendment because Petitioner was deprived of the effective assistance of counsel at the punishment phase of his trial when trial counsel argued to the jury that the Petitioner deserved to die. Trial counsel's bizarre and highly prejudicial comments to the jury completely sabotaged any opportunity for effective assistance of counsel during the punishment phase of his trial, and undermined even the poor mitigation case that trial counsel had presented. The Petitioner was thus prejudiced by his counsel's unprofessional performance, and in accordance with *Strickland* principles, his petition for relief should be granted.

*Eighth,* the Petitioner's sentence of death violates the Sixth Amendment because trial counsel inexplicably relinquished two preemptory challenges against objectionable jurors by failing to follow the procedures set forth in Article 35.13 of the Texas Code of Criminal Procedure. Under that provision, the State is required to exercise challenges for cause and peremptory strikes to potential jurors *before* a capital defendant exercises his. This allows the defendant to maximize his use of peremptory strikes by only having to strike objectionable jurors who cannot be challenged for cause, but who the State has accepted. Petitioner's trial counsel, however, unreasonably, and without any strategic or tactical motive, made an agreement with the State to exercise simultaneous and independent peremptory strikes. As a result of this agreement, at least two jurors who demonstrated improper bias were permitted to serve on the panel that delivered the Petitioner's death sentence.

*Ninth,* the Petitioner's death sentence violates the Sixth Amendment because trial counsel agreed to excuse without questioning death-qualified venire members who had indicated opposition to capital punishment. This decision was by no means required – the law permits individuals opposed to the death penalty to serve as long as they are able to obey the oath they

-4-

must take as jurors.  Thus, the venire members in question were not *per se* unqualified.  Yet, without any reasonable explanation or justification, the Petitioner's trial counsel agreed to excuse, without questioning, numerous potential jurors who were opposed to the death penalty. Taken in tandem with the fact that trial counsel was later denied nine challenges for cause and a motion for a mistrial based on the lack of qualified jurors, it is clear that this decision was both unreasonable and highly prejudicial.

*Tenth,* the Petitioner's sentence of death violates the Sixth Amendment because trial counsel failed to object to the trial court's failure to instruct numerous venire members as required by Texas Code of Criminal Procedure Article 35.17(2).  Under that provision, a capital trial court is required to "propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion."  A court's failure to administer such questions constitutes reversible error when a capital defendant is denied a federal right as a result.  In the instant case, the judge presiding over voir dire examinations failed to question the jury regarding the Article 35.17(2) principles before allowing the State and the Petitioner's trial counsel to proceed with their voir dire examinations.  Petitioner's trial counsel failed to object to the deviation from statutory procedure.  As a result, at least one juror with questions regarding the principle of reasonable doubt was seated on the jury that delivered Mr. Hall's death sentence.

## II.      STATEMENT OF FACTS

The victim, Melanie Billhartz, left her grandfather's home at 6:00 p.m. on the evening of

October 28, 2002. (RR v68 at 59).[1]  The victim's grandfather, F.O. Rountree, expected her home

that evening at around 8:00 p.m., but she never returned.  (*Id*. at 61-62).  Mr. Rountree searched

for Ms. Billhartz the following morning.  When he was unable to find her, he contacted the El

Paso Police Department and filed a missing persons report.  (*Id*. at 66).  Detective Chavarria of

the El Paso Police Department was assigned the case regarding Ms. Billhartz's disappearance,

but the investigation made little headway over the next four weeks. (*Id*. at 58).

The El Paso Police Department received the first potential lead in Ms. Billhartz's

disappearance on November 20, 2002.  Chase Hale, who had just been arrested by the El Paso

Police Department for unlawful delivery of marijuana and conspiracy to deliver marijuana,

informed the arresting officers that he had information relating to a murder and asked to speak

with El Paso detectives.  (*Id*. at 155).  Mr. Hale met with detectives from the Crimes Against

Persons unit and proceeded to relate to them his version of the events of October 28, 2002.  (*Id*.

at 131).  Mr. Hale not only told the police that he knew what happened to Ms. Billhartz that

evening, but also that he could lead them to her body.  (*Id*. at 131-32).

According to Mr. Hale, he was living at a house located at 5608 Melody in El Paso at the

time of Ms. Billhartz's disappearance.  (*Id*. at 122).  Ms. Billhartz arrived at the house on the

evening of October 28, 2002, visibly upset after an altercation she had just had with her

boyfriend, Ted Murgatroyd, who was also at the house on Melody.  (*Id*. at 124).  Mr. Hale

testified at trial that the Petitioner, Justen Grant Hall, who was also at the house, called a meeting

---

[1] References herein to the court reporter's transcripts from the trial are designated "RR" followed
by the volume and page numbers.  References to the transcripts from the state habeas proceeding are
designated "S.H.," and references to the clerk's record are designated "C.R."

of some of those present to discuss the incident.  (*Id.* at 127).   According to Mr. Hale, he was asked to leave the shed where the meeting took place (along with other individuals including Hector Lopez, Nicole Kays and Kelly Mancha), however he recalls walking past Ms. Billhartz who was outside the house next to her pickup truck.  (*Id.* at 128).   That was the last time Mr. Hale ever saw Ms. Billhartz. (*Id.*)

Mr. Hale returned to the house after a period of approximately twenty to thirty minutes. (*Id.* at 128).[2]  Mr. Hale testified that he returned to the house with his friend, Hector Lopez, who told Mr. Hale he had left a tote bag in Ms. Billhartz's truck and needed to retrieve it.  (*Id.* at 194-95).[3]  Mr. Hale testified that as he and Mr. Lopez approached Ms. Billhartz's pickup truck to retrieve the bag, the Petitioner came running outside and told them not to get near the truck because he "just killed that bitch Melanie."  (*Id.* at 129).[4]   Mr. Hale left the house shortly thereafter. (*Id.* at 137).

Mr. Hale told the detectives that he knew Ms. Billhartz's body was in the desert because that was "where Ted [Murgatroyd] thought of taking her." (*Id.* at 132).[5]   Mr. Hale led the police

---

[2] Mr. Hale also said in his witness statement taken by the El Paso Police Department on December 3, 2002, approximately five weeks after the events in question took place, that he was gone from the house for approximately 20 minutes and that Ms. Billhartz was killed during that time period.

[3] Mr, Hale later testified that Mr. Lopez returned to the house separately from Mr. Hale, approximately one-half hour later, at which point Mr. Hale said they tried to approach Ms. Billhartz's vehicle. (*Id.* at 209-210).   Under either timeline of events, Mr. Hale's testimony is inconsistent with the testimony of others present at the house that evening.

[4] Mr. Lopez testified during the trial that contrary to Mr. Hale's testimony about their alleged encounter with the Petitioner, not only did he not leave a tote bag in Ms. Billhartz's truck, he never returned to the house that evening. (RR v75 at 93).   Mr. Lopez gave a statement to the El Paso Police on December 14, 2002 in which he also stated he never returned to the house. *See* Exhibit 1.

[5] Although Mr. Hale never mentioned this during the trial, his December 3, 2002 witness statement reflects that he had a conversation with Mr. Murgatroyd during which Mr. Murgatroyd allegedly told him that the Petitioner had killed Ms. Billhartz and he was forcing Mr. Murgatroyd to help him dispose of the body.   Any mention of this conversation is conspicuously absent from both Mr. Murgatroyd's trial testimony (RR v72 at 27-28), and his two witness statements from November 2002.

into the New Mexico desert in search of Ms. Billhartz's body, but he was unable to lead the detectives to the location where he believed Ms. Billhartz was buried. (*Id.* at 133).

The next day, November 22, 2002, El Paso detectives met with Mr. Murgatroyd to question him about the events of October 28, 2002. According to Mr. Murgatroyd, he had accompanied Ms. Billhartz to the store that evening. (RR v72 at 16). On their way back to the house from the store, Mr. Murgatroyd and Ms. Billhartz got into a fight in Ms. Billhartz's pickup truck after Mr. Murgatroyd made a "sarcastic comment" to her. (*Id.* at 18). Ms. Billhartz pushed Mr. Murgatroyd out of the vehicle and drove to the 5608 Melody address on her own, allegedly bleeding as a result of Mr. Murgatroyd hitting her as he was getting out of the truck. (*Id.*).

By the time Mr. Murgatroyd arrived at the 5608 Melody address on foot, some of the other men at the house were waiting for him and confronted him to find out why he had struck Ms. Billhartz. (*Id.* at 20). Ms. Billhartz had allegedly been threatening to call the police to report that Mr. Murgatroyd had assaulted her. (*Id.* at 24). After Mr. Murgatroyd explained that he had only struck Ms. Billhartz in self-defense, the group met to discuss how to best handle Ms. Billhartz. (*Id.* at 22). Those participating in the meeting included the Petitioner, Mr. Murgatroyd, Tim Ray Davis, Jesse Eddy and James Eaton, all of whom were associated with an organization known as the Aryan Circle. (*Id.*).

While Mr. Murgatroyd's two witness statements and trial testimony contained numerous inconsistencies, he testified at trial that Mr. Hall asked for a shotgun and garbage bags in order to kill Ms. Billhartz and dispose of her body. (*Id.* at 23).[6] Mr. Murgatroyd testified that Ms. Billhartz could normally be "calmed down" with some "speed" (methamphetamine),

---

[6] Of all the individuals present at that meeting, Mr. Murgatroyd is the only one who testified that the Petitioner asked for a shotgun.

however no one had any on hand to give her.[7]   Mr. Murgatroyd testified that the Petitioner

proceeded to take Ms. Billhartz for a ride in her pickup truck to try to calm her down, and that

when he returned Ms. Billhartz had been strangled by the Petitioner and was dead.[8]

Mr. Murgatroyd testified that the Petitioner then threatened him and forced him to assist in

disposing of Ms. Billhartz's body.  (*Id.* at 28).  Mr. Murgatroyd stated that he picked up a shovel

and machete and got into Ms. Billhartz's pickup truck with the Petitioner, and that

Ms. Billhartz's body lay on the floor in the back of the cab.  (*Id.* at 27-29).  Mr. Murgatroyd

testified that the two of them drove to a location in the New Mexico desert called "Kilbourne's

Hole" where they removed Ms. Billhartz's body and threw it into a crevice.  (*Id.* at 31).[9]

According to Mr. Murgatroyd, the Petitioner then directed him to cut off Ms. Billhartz's fingers

because Ms. Billhartz had Mr. Murgatroyd's DNA on her fingers.  (*Id.* at 30).[10]

---

[7] Mr. Murgatroyd's statement is also inconsistent with testimony of others present in the shed during the meeting as to whether there was any "speed" to give to Ms. Billhartz to calm her down.  Jesse Eddy and Tim Ray Davis both testified that Mr. Eddy was in the process of preparing a "batch" of methamphetamine at the time the meeting was taking place. (RR v74 at 90-91; RR v73 at 138). Mr. Eddy testified, in fact, that he was preparing some of the methamphetamine specifically for Ms. Billhartz. (RR v73 at 160). The State alleged during the trial that the whole reason the Petitioner allegedly killed Ms. Billhartz was to prevent her from calling the police and having them locate the "meth lab" (*i.e.*, the dish and burner that Mr. Eddy kept in his backpack.) (RR v79 at 95).

[8] In another significant inconsistency among the State's witnesses, Mr. Murgatroyd testified at trial that the Petitioner and Ms. Billhartz were gone "three, maybe five hours."  In his statement to the police, however, he said it was a "couple of hours."  On both occasions Mr. Murgatroyd's testimony was inconsistent with Mr. Hale's December 2002 statement to the police, and later testimony at trial, when he stated that Ms. Billhartz was killed during a thirty minute time window.

[9] Mr. Murgatroyd testified at trial that Ms. Billhartz "appeared to be naked," however when the body was eventually located by El Paso and Doa Ana County police, she was clothed.  (*Id.* at 29).

[10] Mr. Murgatroyd omitted the fact that he cut off Ms. Billhartz's fingers when he first gave a statement to the police on November 22, 2002.   El Paso detectives re-interviewed him on November 26, 2002, at which time he admitted to doing so.

A/73401003.1

Mr. Murgatroyd testified that he and the Petitioner then returned to El Paso and went their separate ways. (*Id*. at 34). Mr. Murgatroyd claims that he only saw the Petitioner one time after that, approximately two days later when he came by Mr. Murgatroyd's house. (*Id*.).

After giving the El Paso Police a statement on November 22, 2002, Mr. Murgatroyd then led them into the desert to search for Ms. Billhartz's body. By the time they reached the Kilbourne's Hole area, it was already early morning of November 23, 2002. Mr. Murgatroyd was able to lead the detectives to the body after searching for approximately forty-five minutes to an hour. (*Id*.).

At approximately the same time Mr. Murgatroyd was leading the El Paso detectives to Ms. Billhartz's body, Detective Tommy Baker of the Hale County Sheriff's Office encountered a white pickup truck pulled over on the side of the highway outside of Plainview, Texas. (RR v69 at 67). Deputy Baker called in his location and the truck's license plate number. (*Id*. at 68). He then approached the driver's side of the truck and noticed that the occupants were asleep. (*Id*. at 69). Deputy Baker woke the occupants and spoke briefly to them, instructing them to move further up the highway to a lit area. (*Id*.)

When he returned to his patrol car, Deputy Baker heard an emergency tone coming over his radio alerting him to the fact that there was a missing person's alert for the owner of the pickup truck. (*Id*. at 70). As Deputy Baker was rechecking the tag number, the truck drove off so he turned on his lights and pulled it over. (*Id*. at 71).

Deputy Baker approached the truck again, asked the occupants for identification, and identified the driver as the Petitioner, Justen Grant Hall. Deputy Baker identified the other occupants of the vehicle as Jesse Eddy, his girlfriend, Aimee Quintela, and their infant daughter. (*Id*. at 73-75). Other officers arrived on the scene and conducted a search of the vehicle. During

-10-

the search the officers came across a bag of white powder, and believing it to contain narcotics, they placed both Mr. Hall and Mr. Eddy in handcuffs. (*Id.* at 78). The officers proceeded to conduct field tests on the substance in the bag and concluded that it was in fact laundry detergent. (*Id.* at 79).

At approximately the same time that the officers were concluding their field tests on the laundry detergent, Deputy Baker received a call from his dispatch telling him to treat the pickup as a homicide scene. (*Id.* at 80). The information had come from the El Paso detectives who had just discovered Ms. Billhartz's body in the New Mexico desert. The officers in Plainview placed the three adults under arrest for unauthorized use of a motor vehicle and transported them back to the Hale County's Sheriff's Office.

Later that same morning, the Petitioner was brought before the local magistrate in Hale County, Texas. When he was taken into custody in Plainview, the Petitioner – who had a long history of mental illness, drug abuse, and suicide attempts – was determined by officers there to be a suicide risk and he was placed in observation for that reason. (RR v5 at 108-09).

At approximately the same time, El Paso detectives obtained a warrant against the Petitioner for capital murder. Detectives Samaniego and Pantoja from the El Paso Police Department and Detective Cooper from the Doa Ana Sheriff's Office flew to Hale County that evening in order to interview the Petitioner and the other individuals who were in the vehicle with him.

The detectives first met with Ms. Quintela, who, according to the detectives' notes, stated she had no knowledge of any murder and only knew that the Petitioner had arrived in Carlsbad, New Mexico approximately two to three weeks earlier along with Mr. Eddy. She further stated that the Petitioner had left Carlsbad for a brief period of time, but had returned. The Petitioner

-11-

was driving Mr. Eddy, Ms. Quintela and their daughter to Indiana in order to start a new life when they were stopped in Plainview.

On November 24, the detectives then interviewed Mr. Eddy who agreed to give a statement implicating the Petitioner in the murder of Ms. Billhartz. Detective Samaniego stayed behind to write up Mr. Eddy's statement while Detectives Pantoja and Cooper went to interview the Petitioner. According to Mr. Eddy's statement as written up by Detective Samaniego, Mr. Eddy confirmed the events of that evening with respect to Ms. Billhartz arriving at the house in a "hysterical" state, stating that Ted Murgatroyd had struck her and that she was going to have him arrested. Mr. Eddy also alleged that the Petitioner had threatened to kill Ms. Billhartz shortly before Mr. Eddy left the shed.[11] According to Mr. Eddy's statement, the first time he learned of Ms. Billhartz's death was around 6:00 a.m. the next morning when Mr. Murgatroyd showed up and told him Ms. Billhartz was dead and that he and the Petitioner had just dumped her body in the desert.

Detectives Pantoja and Cooper interrogated the Petitioner for approximately an hour and twenty minutes on November 24, 2002. They showed him witness statements they had obtained implicating him in Ms. Billhartz's death. (RR v69 at 219). Despite the detectives' efforts, the Petitioner steadfastly denied any involvement in Ms. Billhartz's murder. During this initial interrogation, the Petitioner asked the detectives how he could obtain the prescription medications he needed to control the symptoms of his mental illness, but the detectives made no attempt to obtain the medications for him. (RR v45 at 131).

---

[11] During the trial, Mr. Eddy testified that he walked past Ms. Billhartz on his way out and told her she should leave. (RR v73 at 146). According to Detective Cooper's notes of the interview with Mr. Eddy in the Hale County jail in November 2002, however, Mr. Eddy stated that after leaving the shed he walked right past Ms. Billhartz but did not tell her to leave.

At approximately 11:20 a.m., after concluding his interview with Mr. Eddy, Detective Samaniego entered the interview room where the Petitioner was being interrogated.   (*Id.*) Detectives Pantoja and Cooper left the room to allow Detective Samaniego to conduct the next interrogation alone, without any witnesses or recording devices.   (*Id.* at 220).   After approximately thirty-five minutes, Detective Samaniego emerged from the room and told the other detectives that Mr. Hall had agreed to give a statement admitting to his involvement in Ms. Billhartz's murder.[12]

### III.   PROCEDURAL HISTORY

### A.   PRETRIAL PROCEEDINGS

The Petitioner was indicted for capital murder in the 34th District Court, El Paso County, Texas, Judge William Moody presiding.  (RR v1 at 3).

Mr. Jaime Olivas was appointed on February 19, 2003 to represent the Petitioner in his capital murder trial.  (RR v1 at 28).  Mr. Charles McDonald subsequently noticed his appearance as co-counsel on September 6, 2004.  (RR v2 at 239).

On September 20, 2004, the court questioned the Petitioner's attorneys regarding the Petitioner's desire to replace Mr. Olivas with Mr. McDonald.  (RR v7 at 5-26).  In particular, the court questioned the attorneys regarding their relative levels of experience.  (*Id.*).   The questioning revealed that Mr. McDonald had never worked on a death penalty case, and his education in the area was entirely self-study.  (*Id.* at 16).  Mr. McDonald was also not at that

---

[12] Although there are serious questions as to the tactics used by Detective Samaniego to obtain the Petitioner's "confession" which are discussed herein, it is also noteworthy that the "confession" is to a large extent a combination of the other witness statements that the detectives had in their possession and showed Mr. Hall that morning.  (RR v69 at 219).  To the extent the "confession" contained additional statements which did not fit into the State's later-developed trial theories and timeline of events or were contradicted by the testimony of the State's own witnesses, those statements  were conveniently ignored during the Petitioner's trial.

-13-

time on the list for appointment in capital litigation, and had participated as second chair in a murder case for the first time only that year. (*Id.* at 17).

After noting his concerns about replacing Mr. Olivas, the court allowed Mr. Olivas to withdraw as counsel, and appointed Mr. Frank Macias as lead counsel, with Mr. McDonald as co-counsel. (RR v7 at 22-25). Even after he had rendered his decision, however, the judge expressed concern regarding Mr. McDonald's level of experience. (RR v7 at 27-28).

The Petitioner filed two pretrial motions to suppress his involuntary statement, first on February 2, 2004 and again on September 9, 2004. (RR v1 at 56-64). Both motions were denied, following evidentiary hearings.

On January 11, 2005, the Petitioner also moved for a short continuance – seeking to move the trial date from January 24, 2005 to February 21, 2005. (RR v65 at 4-5). The Petitioner sought the continuance in order to: 1) allow the Petitioner to be evaluated by an expert addictionologist in order to further support the argument that the confession was not knowing and voluntary (RR v65 at 16); 2) allow the Petitioner to conduct DNA testing of physical evidence that the State had not tested (RR v65 at 17-20); and 3) conduct interviews with fact witnesses who the State planned to call to testify against the Petitioner (*id.*). The following day, the court denied the motion. (RR v66 at 28).

**B.     TRIAL**

On March 22, 2005, after 12 days of trial, the jury found the Petitioner guilty of capital murder (CR IV at 1162). After a subsequent punishment phase of the trial, the jury then answered the first and second special issues "yes" and "no," respectively, and the court sentenced the Petitioner to death (CR IV at 1184-1185). The Petitioner filed a motion for new trial (CR IV, at 1196) which was denied (RR v89 at 17, 22).

A/73401003.1

## C.    POST-TRIAL PROCEEDINGS

Although the Petitioner expressed a preference for his trial counsel, Mr. Macias and Mr. McDonald, to continue to represent him in his direct appeal and his state habeas proceeding, the trial court expressed apprehension regarding their qualifications and objectivity (RR v88 at 4-6), and appointed Mr. Robin Norris to represent the Petitioner in his state habeas proceedings pursuant to Texas Code of Criminal Procedure Article 11.071, §2(c).   Mr. Louis Lopez was appointed to represent the Petitioner in his automatic appeal to the Court of Criminal Appeals.

Mr. Norris and Mr. Lopez each contacted Mr. Macias, lead trial counsel, in order to obtain Mr. Hall's files.   Mr. Macias, however, informed them that Mr. McDonald had kept the files.   Tragically, Mr. McDonald committed suicide on June 2, 2005, and the files were never found.   (S.H. Tr. at 4-6, 97-100).   As a result, Mr. Norris and Mr. Lopez were forced to rely entirely on the trial record and files provided by the district attorney.

### 1.    Direct Appeal

Mr. Lopez filed the Petitioner's direct appeal on May 30, 2006.   The appeal raised sixteen points of error, including:

- that the verdict was not supported by evidence, either legally or factually, that the Petitioner committed murder in the course of retaliation;

- that the evidence obtained after the stop of the Petitioner's vehicle should have been suppressed;

- that the Petitioner's statement to the police was not voluntary and should have been excluded;

- that the court erroneously prevented the questioning of venire persons;

- that the court did not grant additional preemptory strikes to the Petitioner which resulted in the seating of three objectionable jurors;

- that the court did not grant a pre-trial motion for a continuance;

-15-

- that the court denied the Petitioner's motion to suppress DNA results;

- that the court should have given the jury an instruction on the lesser included offense of murder; and

- that the court should have impaneled a new jury to hear punishment;

On June 27, 2005, the Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. *Hall v. State,* No. AP-75,121 (Tex. Crim. App. June 27, 2007) (not designated for publication).

### 2.    State Habeas Proceeding

Mr. Norris timely filed an Application for Writ of Habeas Corpus on the Petitioner's behalf in State court on March 18, 2007. (Exhibit 2, State Habeas Application). The application raised seven claims, including a *Brady* claim, and several ineffective assistance of counsel claims. *Id.* A hearing on the state habeas application was held on July 2, 2008. The witnesses called included the district attorneys who had tried the case and Frank Macias, the Petitioner's surviving trial attorney.

In late August 2008, Mr. Hall wrote a letter to the trial court requesting that he be allowed to "drop all his remaining appeals." On September 29, 2008, Mr. Norris filed a Motion to Dismiss Application for Writ of Habeas Corpus and for Competency Evaluation based on that request.   Pursuant to that motion, the trial court appointed two experts who evaluated the Petitioner at the Polunsky Unit to determine whether he was competent to waive his state habeas proceedings. A hearing was scheduled to consider the motion and Mr. Hall's competency.

At the March 6, 2009 hearing on that motion, however, the Petitioner informed the judge that he no longer wanted to drop his appeals, and that he instead wanted to represent himself *pro se,* and dismiss his existing state habeas application so that he could file a new one. (March 6, 2009 S.H. Tr. at 8-10).

-16-

Because of the Petitioner's last-minute change of heart, the court did not explore the issue of competency at the hearing, but instead attempted to advise the Petitioner of the consequences of dismissing the application filed by Mr. Norris. The advice given by the court, however, was ambiguous and misleading. When the court asked Mr. Hall whether he understood the potential procedural consequences of what he was attempting to do, Mr. Hall's response clearly indicated that he did not, as he responded by stating, "I'll be filing a motion to get a printed copy of the whole case file and everything." (March 9, 2009 S.H. Tr. at 39:6)

Although it was clear that Mr. Hall did not understand the potential procedural consequences of his request, the trial court entered Findings of Fact and Conclusions of Law recommending that the Court of Criminal Appeals dismiss Mr. Hall's then-pending state habeas application, allow Mr. Norris to withdraw, and allow Mr. Hall to proceed *pro se* in his state habeas proceedings, with Mr. Norris available to assist him as stand-by counsel. (*Ex parte Hall*, No. 20030D00505-34-1, Findings of Fact, Recommendation, and Order (March 9, 2009)).

After returning to the Polunsky Unit, Mr. Hall was visited by an attorney from the Texas Defender Service, who explained to Mr. Hall the potential significance of his request to dismiss his then-pending state application. Mr. Hall immediately submitted a motion in the form of letter to the Court of Criminal Appeals asking that his pending application for writ of habeas corpus *not* be dismissed. (*Ex parte Hall*, No. 20030D00505-34-1, Letter from Justen Hall (March 31, 2009)). Despite receipt of this motion expressly withdrawing Mr. Hall's previous request to dismiss his state application, the Court of Criminal Appeals inexplicably proceeded to dismiss the application on June 10, 2009 - in the absence of any pending motion to do so. (*Ex parte Hall*, No. WR-70, 824-01 (Tex. Crim. App. 2009)).

-17-

The Court of Criminal Appeals ignored the Petitioner's subsequent "Suggestion that the Court, on Its Own Motion, Reconsider Its June 10, 2009 Order Dismissing Mr. Hall's Application for Post-Conviction Writ of Habeas Corpus" filed on July 16, 2009.

## IV.   ARGUMENT

**A.   PETITIONER'S RIGHTS UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED BY THE STATE'S MISCOUNDUCT IN FAILING TO DISCLOSE MATERIAL EVIDENCE FAVORABLE TO HIM IN VIOLATION OF *BRADY***

The Petitioner's conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the State of Texas failed to disclose material evidence of tacit offers of immunity made to witnesses by both prosecutors and police officers in exchange for testimony against the Petitioner at trial.   The Supreme Court has interpreted Fourteenth Amendment due process violations to require a new trial when convictions are obtained through the suppression of material evidence.   *See, e.g., Brady v. Maryland*, 373 U.S. 83, 87 (1963).   As such, the Petitioner is entitled to a new trial.

**1.   The Supreme Court Has Repeatedly Held That The Law Requires the State to Disclose Evidence Favorable to the Accused**

The Supreme Court has issued a number of opinions dating back to the 1930's which have served to identify an important class of due process rights commonly referred to simply as the *Brady* doctrine.   The *Brady* doctrine prohibits the State from presenting false evidence to the court, presenting evidence which the State knows will create a false impression in the mind of the fact finder, or withholding exculpatory evidence from the defense.

In *Mooney v. Holohan*, 294 U.S. 103 (1935), the first decision dealing with this issue, the Court held that a defendant's due process rights are violated when the "state has contrived a conviction...through a deliberate deception of court and jury by the presentation of testimony

A/73401003.1

known to be perjured." 294 U.S. at 112.  The Court extended this principle in *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) to include "the deliberate suppression by those same authorities of evidence favorable to [the accused]."

The Court was faced with a similar issue in *Alcorta v. Texas*, 355 U.S. 28 (1957) (per curium).  In *Alcorta*, the prosecution told a witness not to volunteer specific information but to be truthful if asked about it by the defense.  *Id.* at 31.  The Court found the prosecution's actions to have served to suppress evidence favorable to the defense since the evidence in question corroborated the defendant's theory of the case.  As a result, the prosecution's conduct violated due process as set forth under *Mooney* and *Pyle*.

In *Napue v. Illinois*, 360 U.S. 264 (1959), the Court held that false evidence that is left "uncorrected when it appears" is equivalent to the state offering false evidence.  360 U.S. at 268. The Court held that under the rule in *Mooney*, the prosecution's obligation extends beyond evidence going just to the credibility of the witness.  The Court stated "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  *Id.* at 269.

In the landmark decision of *Brady v. Maryland*, the Court brought together the principles set forth in all the decisions discussed above to form a broad doctrine applicable to the State's obligation to disclose evidence.  The Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.

-19-

The Court in *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) identified what it referred to "as the three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." The Court went on to explain that prejudice occurs under the third element "when the suppressed evidence is material for *Brady* purposes." *Id.* at 282.

Under *United States v. Bagley*, 473 U.S. 667, 682 (1985), evidence is material for *Brady* purposes if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The Court in *Kyles v. Whitely*, 514 U.S. 419 (1995), further examined the aspects of materiality under *Bagley*. The Court stated that "a showing of materiality does not require demonstration of a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant.)" *Id.* at 434. The Court further noted that under *Bagley* it is "not a sufficiency of the evidence test" and "a defendant need not demonstrate that after discounting the inculpatory evidence, there would not have been enough left to convict." *Id.* The Court also observed that in determining whether a *Brady* violation exists, the evidence that the prosecution failed to disclose at trial is viewed collectively rather than on a case-by-case basis. *Id.* at 436-37.

> **2.    The *Brady* Doctrine Requires The State To Disclose Tacit Agreements With Witnesses**

The prosecution is required to disclose evidence of any deals it makes with witnesses where the credibility of the witness is material. *Giglio v. United States*, 405 U.S. 150 (1972). It

A/73401003.1

is immaterial whether the prosecution's nondisclosure is intentional or simply negligent. *Id.* at 154.

Many circuits, including the Fifth Circuit, have extended *Giglio* to recognize that the State is required to disclose evidence regarding tacit agreements with witnesses. *See, e.g., Tassin v. Cain*, 517 F.3d 770, 777 (5th Cir. 2008) (jury entitled to know about "evidence of any understanding or agreement as to a future prosecution"); *United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986) (evidence that witness was paid in the form of leniency for his cooperation was material); *Wisehart v. Davis*, 408 F.3d 321, 324 (7th Cir. 2005) ("Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense"); *Clay v. Bowersox*, 367 F.3d 993 (8th Cir. 2004) (noting that due process requires a prosecutor to disclose any promise that a key witness will not be prosecuted if he testifies for the state); *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (stating that less formal, unwritten, or tacit agreements are also subject to *Brady's* disclosure mandate); *Haber v. Wainwright*, 756 F.2d 1520, 1523-24 (11th Cir. 1985) (even a prosecutor's "advice" can violate *Brady* "since it could constitute an informal understanding which could directly affect the witness's credibility before the jury"); *DuBose v. Leferve*, 619 F.2d 973, 979 (2nd Cir. 1980) (noting that *Brady* may not be avoided by keeping a deal "general in language or tone"); and *Douglas v. Workman*, 560 F.3d. 1156, 1186 (10th Cir. 2009).

In *Tassin*, the defense asked the State to disclose any information it had regarding leniency for the State's main witness. 517 F.3d at 773. The State responded that it had no information regarding any deal. The witness testified during the course of the trial that she faced a possible sentence between five and ninety-nine years for armed robbery, and that no deals had been made relating to her testimony. *Id.* However the judge presiding over her case had already

indicated that he would sentence her to between twenty and thirty years, or possibly as low as fifteen years, if she waived the marital privilege and testified against her husband, and as low as ten years if her testimony was consistent with her statement to the police. *Id.* at 774. The district court overruled the state court in finding that the suppressed bargain between the State and the witness did not need to be "a firm 'promise' in order to mislead the jury with respect to the [witness's] credibility." Rather, the "State was 'Constitutionally required' to 'reveal its deal with the witness to the jury.'" *Id.* at 776, *citing Tassin v. Cain*, 482 F.Supp.2d 764, 773, 775 (E.D. La. 2007).

The State appealed the district court's decision, and the Fifth Circuit affirmed, noting that "[a]lthough *Giglio* and *Napue* use the term 'promise' in referring to covered-up deals, they establish that the crux of a Fourteenth Amendment violation is deception…" and "a promise is unnecessary." *Id.* at 778. The Fifth Circuit went on to note that "[w]here, as here, the witness's credibility 'was…an important issue in the case…evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it." *Id. citing Giglio*, 405 U.S. at 154-55 (emphasis in the original). The court looked to the Supreme Court's holding in *United States v. Bagley* in emphasizing that "the fact that the *stake was not guaranteed through a promise or binding contract*, but was expressly contingent on the Government's satisfaction with the end result, *served only to strengthen any incentive to testify falsely* in order to secure a conviction." *Id. citing* 473 U.S. at 683 (emphasis in the original).

Similarly in *Douglas v. Workman*, two defendants were convicted and sentenced to death based upon, among other evidence, the eyewitness testimony of one of the individuals present at the scene of the murder. 560 F.3d at 1163. The witness later recanted his testimony identifying the defendants, and alleged that not only had the prosecutor suborned perjured testimony from

him concerning the identification of the defendants, the prosecutor had also elicited false testimony from him denying the existence of any deal in exchange for his testimony. *Id.* at 1167.

The court in *Douglas* held that the *Brady* doctrine requires the disclosure of any deal between the State and a witness, be it explicit or tacit. *Id.* at 1186. The court, in reaching its conclusion, quoted from the dissent in *Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008), which observed that tacit agreements, similar to explicit agreements, are relevant to credibility, and in some cases may be more likely to skew the witness's testimony because the witness may believe that the more valuable his or her testimony, the more valuable the reward will be in the end.[13] The dissent in *Bell* went on to note that tacit agreements are additionally harmful in that a prosecutor may argue that the witness is disinterested which may increase the witness's credibility with the jury, yet that underlying premise would be false. *Id.*

Even in instances in which the State makes some type of disclosure which could call the credibility of the witness into question (*e.g.*, disclosing that the testifying witness is a convicted felon), the State is still required to disclose the existence of any other motivating factor, especially that of a tacit agreement tied to the witness's testimony. "[T]he fact that the jury was apprised of other grounds for believing that the witness ... may have had an interest in testifying against petitioner [does not turn] what was otherwise a tainted trial into a fair one." *Napue v. Illinois,* 360 U.S. at 270.

---

[13] The majority in *Bell* agreed that a tacit agreement or "understanding" was subject to disclosure under *Brady*, however the court was unable to conclude that such a tacit agreement existed in that specific case.

A/73401003.1

3.    **The State's Misconduct In Failing To Disclose *Brady* Evidence Requires That The Petitioner Be Granted A New Trial**

In the present case, the Petitioner made a Motion For Discovery And Inspection on January 6, 2005. (*See* January 6, 2005 Motion for Discovery and Inspection). The Motion asked the trial court to compel the District Attorney to disclose evidence which would serve to impeach any potential prosecution witness, including evidence of "deals, agreements, offers of immunity, or the like given or offered to any witness or potential witness," which the State was in possession of at the time the Motion was filed or learned of in the future. (*Id.*). Although the State did disclose criminal convictions of certain witnesses as it was required to do under Tex. R. Evid. 609, the State failed to comply with the Motion in that it failed to disclose the existence of tacit agreements with key witnesses who testified against the Petitioner, and whose testimony was fundamental to the jury's decision.

The undisclosed *Brady* evidence consisted of promises or tacit agreements made with the State's key witnesses who testified against the Petitioner. The suppression of these tacit agreements deprived the defense of the opportunity properly to impeach those witnesses. As such, the Petitioner is entitled to a new trial.

a.    **The State Withheld Material Evidence of Immunity Agreements With Two Of The State's Key Witnesses**

Undisclosed *Brady* evidence is material if there is a reasonable probability that had the evidence been disclosed by the State, the results of the trial would have been different. *Kyles*, 514 U.S. at 434. "A 'reasonable probability of a different result' is shown when the suppression 'undermines confidence in the outcome of the trial.'" *Graves v. Dretke*, 442 F.3d 334, 340 (5th Cir. 2006) (quoting *Kyles*, 514 U.S. at 434). The State's suppression of draft immunity

-24-

agreements prepared for two key witnesses clearly undermines confidence in the jury verdict of guilt against the Petitioner.

The State relied heavily on the testimony of Ted Murgatroyd and Jesse Eddy to obtain the Petitioner's conviction.  Mr. Murgatroyd testified that the Petitioner killed Ms. Billhartz and disposed of her body in New Mexico.  (RR v72 at 31).  Mr. Eddy testified that he heard the Petitioner say he was going to kill Ms. Billhartz.  (RR v73 at 143).  What the State failed to disclose was that it prepared draft immunity agreements for both of these key witnesses which granted them immunity from prosecution for the very serious crimes they admitted to on the stand while under oath.[14]  (*See* Exhibits 3 and 4, Draft Immunity Agreements).

Of all the witnesses the State called to testify during the trial, the State only felt the need to prepare immunity agreements for Mr. Murgatroyd and Mr. Eddy.  This demonstrates the importance the State placed upon the testimony of these two witnesses:  apparently the prosecution felt the need to draft explicit agreements either to show to the witnesses to secure their testimony or in case either witness threatened to back out of testifying.  The State's suppression of these immunity agreements deprived the defense of the ability to impeach the witnesses in front of the jury, clearly undermining confidence in the outcome of the trial.  If the immunity agreements had been disclosed to the defense and defense counsel had been able to confront the witnesses with the agreements in order to impeach their credibility, there is a reasonable probability a different result would have occurred at trial, given the importance of their proffered testimony.

---

[14] There is no evidence that the State ever disclosed the draft agreements to the Petitioner's trial counsel.  The prosecutors, Ms. Meraz and Mr. Hicks, were both asked about the draft agreements after the attorney handling Mr. Hall's state habeas proceedings first discovered them in the El Paso District Attorney's files.  Neither Ms. Meraz nor Mr. Hicks gave any indication that they were disclosed to the defense and there is no mention of the immunity agreements in the trial record.

Significantly, the testimony of the lead prosecutor concerning offers of immunity is inconsistent with the facts.   Assistant District Attorney Meraz, the lead prosecutor at the Petitioner's trial, testified during the state habeas hearing in July 2008: "I know from the get-go we told [the witnesses] that we weren't going to make any deals that we were interested in them just testifying truthfully, *but that as far as any deals we weren't cutting any.*"   (S.H. Tr. at 102 (emphasis added)).   Ms. Meraz further testified that Ted Murgatroyd was the only one of the witnesses to even bring up the possibility of cutting a deal in exchange for his testimony (*Id.* at 109).   Ms. Meraz later contradicted her earlier testimony, however, when she stated that Chase Hale also inquired about the possibility of a deal but was told that the State was not offering any. (*Id.* at 124).

Despite her emphatic insistence that she made it clear to the witnesses that no deals would be offered, the State obviously prepared immunity agreements for at least Mr. Murgatroyd and Jesse Eddy.   When Mr. Murgatroyd and Mr. Eddy were both asked on the stand whether they were testifying pursuant to a deal with the State, they both denied that they were.   (RR v72 at 38, RR v73 at 135).   Because the State failed to disclose the draft immunity agreements, the Petitioner's trial counsel was unable to impeach that testimony and further explore the tacit agreements clearly represented by the drafts.   The agreements would have served as a significant factor for the jury to consider as they weighed the credibility of Mr. Murgatroyd and Mr. Eddy.

When Ms. Meraz was questioned about the draft agreements during the state habeas hearing in July 2008, she testified that the agreements were prepared in case one of the witnesses tried to "wiggle out" of giving testimony during the course of the trial.   (S.H. Tr. at  131). Ms. Meraz further testified that she did not believe the trial attorneys even spoke with the El Paso District Attorney, Jaime Esparza, about getting his approval for offering the immunity

agreement – approval that she testified she thought was required in order to make the offers. Her recollection on that point was clearly incorrect, however, as the immunity agreements for Mr. Eddy, a key witness for the State, was in fact *signed by the District Attorney himself.* (*See* Exhibit 4, Signed Immunity Agreement).

Whether the State intentionally suppressed the existence of the draft immunity agreements or did so out of negligence is immaterial. *Giglio*, 405 U.S. at 154. Because the State failed to disclose the existence of the immunity agreements, the defense was deprived of the ability to probe the extent and scope of any alleged understanding between Mr. Murgatroyd, Mr. Eddy and the State concerning leniency for pending or prior crimes. Due to the State's suppression of this material evidence, the Petitioner is entitled to a new trial.

> **b.    The State's Key Witnesses Testified Under Oath To A Number of Crimes, Yet Were Never Charged, Thereby Demonstrating The Existence Of Undisclosed Agreements With The State**

The State relied heavily on the testimony of a number of witnesses with lengthy criminal records in order to convict the Petitioner. (*See* Exhibit 5, Notice of Prior Convictions). While on the stand, many of these witnesses testified under oath to committing crimes, including felonies during the time period when the murder was committed and immediately thereafter, yet none of them was charged. The State's failure to prosecute these individuals demonstrates the existence of tacit agreements providing the witnesses with immunity for their crimes in exchange for their testimony.

In *Williams v. Brown*, evidence of possible tacit agreements with two key witnesses who testified against the defendant was uncovered after trial. 609 F.2d 216 (5th Cir. 1980). One of the key witnesses confessed to committing forty-eight burglaries, yet he was only charged with fourteen and sentenced to ten years imprisonment with only one year to serve. *Id.* at 221. The

other witness had a twenty-year sentence later reduced to nine years to run concurrently with a federal sentence.  *Id.*  The State failed to disclose the existence of any tacit agreements prior to trial.  The Fifth Circuit remanded the case to the district court to resolve the factual dispute as to whether any "promises, understandings, or agreements" were made with one of the witnesses.  *Id.* at 222.

Similar to the witnesses in *Williams v. Brown*, the witnesses against the Petitioner admitted committing serious crimes for which they were never charged.  Ted Murgatroyd, one of the State's key witnesses, testified to mutilating the body of the victim, Melanie Billhartz:

> A.    I swung the machete, ma'am. I wasn't really looking at where I swung it, and I got nauseous. And I told him, "No, I can't do it." And he goes, "No, that's not good enough."
> Q.    What did you chop off?
> A.    I didn't even look. It was part of her fingers.

(RR v72 at 31).

The State even elicited testimony from Mr. Murgatroyd as to the potential penalties he faced for his crimes:

> Q.    Now, when you were providing this information to the police, you were on parole, weren't you?
> A.    Yes, ma'am.
> Q.    Did you have a deal with the police that your parole wouldn't be revoked if you talked.
> A.    No, ma'am.
> Q.    Have we offered you any deals to testify here today?
> A.    No, ma'am.
> Q.    Are you aware that, under New Mexico law, you could be charged with the mutilation of a body?
> A.    Yes, ma'am.
> Q.    And here in Texas, you could be charged with tampering with evidence and receive two to ten?
> A.    Yes, ma'am. But I've got to do what's right.
> Q.    And are you aware, since there are no deals, you could still be charged?
> A.    Yes.

(RR v72 at 38).

A/73401003.1

Despite Mr. Murgatroyd's testimony that there was no deal in place, the very nature of the questions in this exchange between the State and one of its key witnesses indicates the existence of a tacit agreement.  Ms. Meraz testified during the state habeas hearing on July 2, 2008 that Mr. Murgatroyd was already aware that he could face charges in New Mexico when she first questioned him, and that she also informed him that he could be charged in Texas.  (S.H. Tr. at 109-110).  Ms. Meraz further testified in response to questioning from Robin Norris:

Q.   So and -- and do you recall Ted Murgatroyd expressing any other concern about being prosecuted?

A.   No. Just those two things. I know he brought that up, and -- and he was scared about  that, about being prosecuted for those two offenses. And I said that was a possibility,     but I didn't know if they would do anything about it. I said it could happen but I -- I don't know.

Q.   I can't help you out here. Is that it?

A.   Right.

Q.   And as far as you know, he didn't express any concern about being prosecuted by you for anything here in Texas. You said tampering with -- with evidence he could be prosecuted for here?

A.   Right.

Q.   That would probably be your decision or the decision of your office whether to seek - -

A.   That's true.

Q.   An indictment for that. And he was concerned about that?

A.   Well --

Q.   You don't let him walk when it came to that.

A.   I just said it could happen and that we couldn't make any deals with him.

Q.   So you're just going to have to take your chances, Ted, whether I prosecute you for     this or not?

A.   That's what I told him.

(S.H. Tr. at 116-17).  In addition, Mr. Murgatroyd testified that he could still face charges even though the crime he admitted to happened in October 2003, almost fifteen months prior to his testimony.  (RR v72 at 38).

Mr. Murgatroyd's testimony indicates that the State was still threatening (implicitly or otherwise) to charge him with a felony for tampering with evidence unless he testified favorably for the State during Mr. Hall's trial.  Paired with the fact that the State withheld the existence of

the draft immunity agreement Mr. Murgatroyd, this constitutes significant evidence of a tacit agreement. In fact, the draft agreement for Mr. Murgatroyd specifically referenced "the offenses committed during the months of September, October, and November, 2002, involving narcotic possession, consumption and distribution or *the tampering with physical evidence as a party*." Exhibit 3 (emphasis added).

The State contends that Mr. Murgatroyd, who was out on parole at the time, took the stand under his own free will and admitted to a third degree felony charge under Tex. Penal Code § 37.09. Not only did Mr. Murgatroyd admit to a felony, but he did so to the very prosecutor who herself testified that she informed Mr. Murgatroyd prior to his testimony that she could charge him with that crime and he could face a prison sentence of up to ten years. Furthermore, the State contends that Mr. Murgatroyd made these admissions in order to "do what's right" despite the fact that he admitted to complicity in disposing of Ms. Billhartz's body, to cutting off her fingers with a machete, and never telling the police about the murder until he was picked up for questioning more than three weeks later, knowing all the while that Ms. Billhartz's body lay in a shallow hole exposed to the elements in the New Mexico desert. The State would have the Court believe that Mr. Murgatroyd's sudden bout of guilt superseded any concern he had of a lengthy prison sentence, and that he gave his testimony without any tacit agreement in place. Under the totality of the circumstances, that explanation simply is not credible.

Ms. Meraz was also questioned at the state habeas hearing in July 2008 regarding admissions that other witnesses made on the stand regarding their own criminal activities. Ms. Meraz testified that none of these witnesses, who according to their own testimony elicited by the State were essentially career criminals, expressed any concern about admitting to additional crimes while under oath. Ms. Meraz stated, in response to Mr. Norris' questioning:

Q.  Now, also their testimony at trial involved a good deal of testimony about the kind of activities that had been going on out there, as I mentioned, not necessarily connected with the murder itself or in assisting with the murder or failure to report the intention of somebody to commit murder but the manufacture and use of methamphetamine, the association with people who are on parole with others that would be a violation of their parole. Were any of them concerned about that?

A.  No.

Q.  None of them brought it up with you, look, I'm worried that the testimony I might give at trial could be used as a basis to revoke my parole, send me back to prison?

A.  No, they didn't bring it up.

Q.  None of them brought it up at all?

A.  Not that I remember. I -- you know, and I don't remember if at this point they were -- what was going on exactly prior to the murder, if they had been involved in manufacturing methamphetamine. And if they were, I don't remember any of them coming out and saying that that's what they had been doing.

Q.  Well, in particular the --

A.  -- prior to --

Q.  -- the Eddy testimony, I mean the whole reason he was there --

A.  Yes.

Q.  -- was because people wanted him to come over and make some meth for everybody. That's why everybody was there, in fact?

A.  Right. And I don't remember specifically if anyone actually came out and said they had been cooking.

Q.  You mean during there testimony at trial?

A.  Right.

Q.  Or in --

A.  Or in the statement. I don't remember reading that specifically.

(S.H. Tr. at 128 – 29) (emphasis added).

Ms. Meraz apparently forgot that *two* witnesses testified under oath that methamphetamine was being manufactured at the house on the night of the murder, including the "cook" himself. Specifically, Jesse Eddy, one of the State's key witnesses, testified:

Q.  What were you doing within the Aryan Circle, within that group, at that time, in regards to methamphetamine?

A.  I was cooking methamphetamine, making it, dealing it.

...

Q.  While you were at the Melody address, what were you doing?

A.  I was drawing up a plate of methamphetamine.

(RR v. 73 at 138). Mr. Eddy further testified:

Q.  (BY MR. MACIAS)  And why did you not want the police?

A.  Because I was cooking down meth.

-31-

Q.      Excuse me?

A.      Because I was cooking down methamphetamine.

Q.      And what -- why were you cooking down the meth, specifically? Who were you
        going to sell it to?

A.      To Melanie and Ted.

(*Id.* at 160).  Although Mr. Eddy testified to being the main methamphetamine "cook" for the group, and further testified that he was cooking methamphetamine to sell to two individuals that evening, Mr. Eddy was never charged in connection with these crimes.  (*Id.* at 152).

As noted above, Mr. Eddy was the other individual for whom the State had drafted up an immunity agreement and had gone as far as to have the El Paso District Attorney sign the agreement. Mr. Eddy's Agreement For Honest Testimony specifically referenced "the offenses committed during the months of September, October, and November, 2002, involving narcotic possession, consumption and distribution."  (*See* Exhibit 4).  Despite the fact that the draft immunity agreement specifically covered charges relating to distribution of methamphetamine, Ms. Meraz claimed not to recall that Mr. Eddy had admitted that he was at the house manufacturing methamphetamine that evening or that he was the "cook" for the Aryan Circle during any of his witness preparation for the trial.

As with Mr. Murgatroyd, the defense had no knowledge of the existence of this immunity agreement at the time Mr. Eddy testified to his crimes and testified that there was no deal in place.  Assuming, arguendo, that Mr. Eddy was truthful when he stated he was not testifying pursuant to an explicit deal with the state (*i.e.*, that he had not signed the immunity agreement), the defense was entitled to know of its existence and its specific terms as evidence of a tacit agreement. The defense was entitled to question Mr. Eddy under oath whether he negotiated the terms of the agreement, whether he disclosed to the State that he was at the house that night committing the crimes listed in the draft immunity agreement, and if the agreement was in any

-32-

way linked to Mr. Eddy's willingness to give the State the testimony it desired against the Petitioner.

A third key witness for the State, Tim Ray Davis, one of the individual's living at the 5608 Melody address, further corroborated Mr. Eddy's testimony about manufacturing drugs at the time of the murder, and further testified that Mr. Eddy was manufacturing the drugs partially for Mr. Davis. Mr. Davis also identified another of the State's key witnesses as being at the house manufacturing methamphetamine the evening Ms. Billhartz was killed:

> Q. Okay. So people would come to your house to cook the meth?
> A. Yeah. And they would give me a little off the top, just -- you know, for putting my house in jeopardy.
> Q. Okay. Now, that night, October 28th, 2002, at that Melody address, did anyone come over to cook meth?
> A. Yes, ma'am.
> Q. Who was that?
> A. Jesse Eddy -- Eddy came over to cook, to finish up some dope that he had, and to give me what he owed me from a day previous. And I - I think Chase was there. I mean, Chase had something going. I'm not sure if anyone else, but I think that's the only two that had something going that night.

(RR v74 at 90-91). Mr. Davis further admitted to attempting to "corner" the methamphetamine business in El Paso:

> A. In all honesty, I was trying to take over the meth business, to be in the middle of the meth business, to have whatever proceeds and whatever comes with that, coming to me and my -- my gang, my boys.
> ...
> Q. ...Now if you corner the market in meth, is there some violence involved in it?
> A. Yes, there is.
> Q. Okay. And you were willing to take on that violence in order to corner the meth market?
> ...
> A. ...Yes, sir. To a degree, yes, sir.

(*Id.* at 123-24). Mr. Davis also stated that he was not testifying pursuant to an agreement, however he was never charged in connection with his testimony despite the fact that he was on probation at the time he testified to attempting to "take over the meth business" and allowing

-33-

people to come over to his house to cook methamphetamine and give him some in exchange "for putting [his] house in jeopardy." (*Id.* at 88).

Although Mr. Davis was never charged in connection with his attempt to corner the El Paso methamphetamine market, he was charged by the El Paso Police Department on November 21, 2002, for violating Tex. HS Code 481.124, Possession or Transport of Certain Chemicals With Intent to Manufacture Controlled Substance, yet the police apparently dropped the charges. (*See* Exhibit 6). Mr. Davis was charged on the same day that Chase Hale first informed the El Paso Police Department that the Petitioner allegedly killed Ms. Billhartz. The defense never knew of this arrest, however, because the State repeatedly refused to turn over any of the witnesses' National Crime Information Center (NCIC) reports during the trial, including the NCIC report for Mr. Davis.[15] Although the State was not required to disclose the arrest under Texas Rule of Evidence 609, if the El Paso Police Department or El Paso District Attorney dropped the charge against Mr. Davis in return for his testimony against Mr. Hall, the defense could have questioned him about that in the presence of the jury. The jury would then have been able to take that information into account in weighing Mr. Davis's credibility and his motive for testifying against the Petitioner.

All of these witnesses testified under direct examination to a long list of past convictions as well as to the fact that some of them were on parole at the time they committed additional

---

[15] Although the State refused on numerous occasions to turn over NCIC reports, the following exchange took place specifically regarding Mr. Davis's NCIC report:

MR. MACIAS: Your Honor, I need the NCIC report.

MS. MERAZ:  No. I mean, he's not entitled to see the NCIC report. I mean, we gave him the notice of the prior convictions.

(RR v74 at 126).  The Petitioner obtained the partial excerpt of Mr. Davis's NCIC Report during the State Habeas proceedings.