crimes. Despite these facts, the State maintained that these witnesses took the stand to "do what was right," and ran the risk that they could face serious criminal liability for admitting to additional crimes under oath, all without at least some tacit agreement in place. The Petitioner is entitled to a new trial during which he will have the opportunity to fully investigate and learn the truth about why these witnesses took the stand and admitted to these crimes, yet were never charged by the State.

### 4.   The State's Further Failure To Disclose Possible Evidence Of Deals Offered By The Police Requires That The Petitioner Be Granted A New Trial

Under the *Brady* line of cases, the prosecutor is responsible for disclosing not only the existence of any deals offered by the prosecutor's office, but also any deals offered to witnesses by the police. *See, e.g., Kyles*, 514 U.S. at 438 ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police"); *see also Strickler*, 527 U.S. at 280-81 ("Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.'"). The Fifth Circuit has also stated "that when an investigating officer willfully and intentionally conceals material information, regardless of his motivation and the otherwise proper conduct of the state attorney, the policeman's conduct must be imputed to the state as part of the prosecution team." *Freeman v. Georgia*, 599 F.2d 65, 69 (5th Cir. 1979).

Chase Hale, who was the first person to inform the El Paso Police Department that Justen Hall had allegedly killed Melanie Billhartz, testified:

Q   Okay. Now, unlike the prosecution, when the El Paso Police Department spoke with you, they promised you things, didn't they?
A   Yes, they did.
Q   Tell the jury what the El Paso Police Department promised you for your testimony.
A   They *promised they would drop my charges.*

> Q      And we're talking about that 54 pounds of marijuana?
> A      Yes.

(RR v68 at 153) (emphasis added).

Mr. Hale proceeded to testify:

> Q.     And so [the police] talked to you that first time and you gave them information?
> A.     Yes.
> Q.     And they made promises to you?
> A.     Yes.
> Q.     Now, you were asked whether they made some promises to you. And did they make some promises to you?
> A.     Yes, they did.
> Q.     And did they follow through?
> A.     No, they did not.
> Q.     Did you think they were going to work out a deal for you?
> …
> A.     Yeah, they told me they were going to.
> Q.     Okay. As a matter of fact, Mr. Hale, did you receive any deals as a result of giving that information?
> A.     No, ma'am, I did not.
> Q.     And right now, are you receiving any deals for you to testify?
> A.     No, ma'am, I'm not.

(*Id.*).

Mr. Hale gave additional testimony that the El Paso Police Department offered him a deal

in exchange for information:

> Q.     And when Detective Samaniego told you "Hey, we'll get the charges dropped," how did you feel?
> A.     Well, a little better, you know. That, and that I wouldn't be brought up on anything.
> Q.     On anything at all?
> A.     Yeah.
> Q.     Not even the marijuana?
> A.     That's right.

(*Id.* at 154).

However when Detective Samaniego was asked under oath if he ever offered Mr. Hale

any deals, he testified:

| Q. | As part of Mr. Hale giving you that information, did you strike any sort of a deal with Mr. Hale? |
|----|----|
| A. | No. |
| Q. | And did he want you to? |
| A. | He wanted us to, but I told him I did not have that authority to do so. |

(RR v73 at 9-10).

Despite the fact that they both testified that Mr. Hale was not testifying pursuant to a deal, Mr. Hale and Detective Samaniego directly contradicted one another in their testimony as to whether the El Paso Police Department <u>ever</u> offered Mr. Hale a deal.  Mr. Hale had no reason to fabricate an answer that he was originally offered a deal by the El Paso Police Department.  In addition, although Mr. Hale was arrested with a companion, Donald Erick Frank, and similarly charged with unlawful delivery of marijuana and conspiracy to commit delivery of marijuana, Mr. Hale received a lighter sentence.  (*See* Exhibit 7; *see also* Exhibit 5, Notice of Prior Convictions).  The State was obligated to disclose what the El Paso Police Department originally offered Mr. Hale and whether he received a lighter sentence in exchange for his testimony against the Petitioner.  As such, the Petitioner is entitled to a new trial.

> **5.      The State Failed To Disclose Correspondence With One Of The State's Key Witnesses That Demonstrates The Witness's True Motivation For Testifying Against The Petitioner**

As the Court explained in *Stickler*, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching."   527 U.S. at 281-82.  Evidence demonstrating the true motivation for a witness providing testimony may be used for impeachment and must be disclosed to the defense.

In *United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004), the court affirmed the district court's holding that undisclosed evidence, including evidence of benefits provided to witnesses, constituted *Brady* evidence and warranted a new trial.  The Court found that the undisclosed

-37-

benefits, including allowing the witnesses who were illegal aliens to visit with family members in Mexico, went to the reliability of the witnesses and should have been disclosed at trial.

In the present case, one of the State's key witnesses against the Petitioner wrote a letter to the El Paso District Attorney's office in which he referenced the ability to visit his family in El Paso in connection with his testimony against the Petitioner. There is no indication that the letter was ever produced to the defense, but it was located in the El Paso District Attorney's files well after the trial had ended.[16]   The defense was entitled to know of this correspondence and investigate whether Jesse Eddy had an ulterior motive in agreeing to testify against the Petitioner.

On April 12, 2004, Mr. Eddy began serving an eight-year sentence at the Correctional Industrial Facility in Pendleton, Indiana. In an undated letter from Mr. Eddy to Assistant District Attorney Bill Hicks, Mr. Eddy informed the State that he was in possession of additional information regarding Justen Hall that he had never disclosed to the El Paso Police Department. (Exhibit 11). Mr. Eddy further inquired if he was "really going to EPT because i [sic] do not want to get my hopes up about seing [sic] family and then not going to EPT." (*Id.*).

---

[16] The El Paso District Attorney's Office granted access to its files on April 7, 2010. The above-referenced correspondence was located in those files. A letter was sent to Tom Darnold, Chief of Appeals of the El Paso District Attorney's Office, on April 14, 2010 asking as to whether additional correspondence existed between the State's witnesses and the El Paso District Attorney's Office in any of the folders that were removed from the files prior to inspection (according to the District Attorney's Office, at least five folders were removed from the files.) (*See* Exhibit 8). Mr. Darnold responded via email on April 26, 2010 acknowledging receipt of the letter and advising that he would look into the request. Mr. Darnold failed to follow up on his initial email, so an email was sent to him on May 21, 2010 asking for a status on the Petitioner's request. (*See* Exhibit 9). On May 27, 2010, Mr. Darnold responded via letter. (*See* Exhibit 10). With respect to the Petitioner's request as to whether additional correspondence with witnesses existed, the letter simply stated "our file was made available for your review and remains available for your review in our office." Since the District Attorney's Office indicated that a number of files had been removed from the State's files prior to allowing inspection and the response letter does not address the files that were removed, the Petitioner is unaware whether additional correspondence with the State's witnesses exists in any of those files.

A/73401003.1

A second letter, dated November 30, 2004, from Mr. Hicks to Mr. Eddy was also located in the El Paso District Attorney's files. (Exhibit 12). In the letter, Mr. Hicks informed Mr. Eddy that the State intended to bring him back "to El Paso sometime shortly before Christmas to allow us plenty of time to meet with you to discuss what you know of Justen Hall. We anticipate your return to Indian [sic] sometime in early February, 2005." Mr. Hicks' letter indicates that Mr. Eddy was able to convince the State to bring him home for approximately a six-week period, which encompassed the Christmas holiday, thereby allowing him to be closer to his family during that lengthy time period. In addition, it appears from Mr. Hicks' letter that Mr. Hicks believed that Mr. Eddy had indeed withheld information from the El Paso Police Department.

Had the State turned this letter over to the defense, Mr. Eddy would have been impeached as to whether his true motivation in testifying against the Petitioner at trial was simply to get the El Paso District Attorney's Office to bring him back to El Paso, Texas from his prison cell in Indiana so that he could see his family over the holidays. The defense would also have been in a position to ask Mr. Eddy exactly what additional information he originally withheld from the El Paso Police Department. Mr. Eddy could also have been cross-examined as to whether he told Mr. Hicks that he had additional information simply to entice Mr. Hicks to bring him back to El Paso to see his family, and thereby gave false testimony. Additionally, if the State had disclosed the existence of the draft immunity agreement for Mr. Eddy, the defense could have questioned Mr. Eddy as to whether the immunity agreement was in any way tied to the additional information he allegedly withheld from the El Paso Police Department.

Had the jury known of both Mr. Eddy's letter and the draft immunity agreement, the jurors would have been able to weigh these material pieces of  information in assessing

-39-

Mr. Eddy's credibility and motivation for testifying.  The State's failure to disclose this material evidence thus requires that the Petitioner be granted a new trial.

    **B.**    **PETITIONER'S CONVICTION VIOLATES THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS PETITIONER'S INVOLUNTARY CONFESSION.**

In determining whether an accused's confession was involuntary, and thus obtained in violation of the Fifth and Fourteenth Amendments, "the question in each case is whether the defendant's will was overborne at the time he confessed." *Haynes v. Washington,* 373 U.S. 503, 513-14 (1963), *quoting Lynumn v. Illinois,* 372 U.S. 528, 534 (1963).  The basic requirement at the heart of this inquiry is that the confession be "made freely, voluntarily, and without compulsion or inducement of any sort." *Haynes v. Washington,* 373 U.S. at 513-14, *quoting Wilson v. United States,* 162 U.S. 613, 623 (1896).  This can be determined "only by an examination of all the attendant circumstances. *Haynes,* 373 U.S. at 513-14.  Here, the record evidence leaves no doubt that the Petitioner's confession was obtained under a totality of circumstances evidencing an involuntary admission of guilt. *Id.*  As a result, the trial court erred in denying the Petitioner's motion to suppress the confession.

    **1.**    **Relevant Circumstances for Determining Voluntariness Under Governing Law.**

The potential circumstances relevant to a determination that a confession was obtained in violation of an accused's due process rights include: "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Wilson,* 507 U.S. 680, 693 (1993) (internal citations omitted).  Although a defendant's mental condition by itself "and apart from its relation

to official coercion" is not dispositive, it is nonetheless a relevant factor in the "'voluntariness' calculus." *Colorado v. Connelly,* 479 U.S. 157, 164 (1986).  Specifically, evidence of mental health issues, substance abuse, and cognitive function may all be relevant in determining whether a particular defendant was subject to coercion – whether his or her "will has been overborne." *Arizona v. Fulminante,* 499 U.S. 279, 286 n.2 (1991) (defendant's low intelligence, upbringing, and even his subjective feeling of stress and intimidation in prison were all relevant factors that helped establish that his confession was coerced); *see also Payne v. Arkansas,* 356 U.S. 560, 567 (1958) (lack of education was relevant factor).

For a confession to be voluntary it is also necessary for the defendant to have a clear awareness of his rights at the time the confession is made.  No statement by a defendant should be admitted unless the State can establish that the defendant knowingly and intelligently waived his Fifth Amendment rights prior to making the statement at issue.  *Miranda v. Arizona,* 384 U.S. 436 (1966).  The Supreme Court has "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation."  *Maryland v. Shatzer,* 130 S.Ct. 1213, 1219 (2010), *quoting* 384 U.S. at 467. These include a requirement that police officers must "warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney."  130 S.Ct. at 1219, *citing* 384 U.S. at 467.  Although a defendant can waive these rights, it is the State's burden to establish that a waiver was knowing, intelligent, and voluntary.  *Missouri v. Seibert,* 542 U.S. 600, 608 n.1 (2004) (government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary).

**2.**     **The Record Evidence Establishes That The Petitioner Was Not Capable Of A Knowing, Intelligent, And Voluntary Waiver Of His Rights At The Time He Was Interrogated By Detective Samaniego.**

To fully understand the Petitioner's physical and mental state at the time of his interrogation – as well as his interrogators' full knowledge of that state – it is necessary to begin several months before the interrogation at issue.

The Petitioner made his alleged confession in this case to Detective David Samaniego – a detective with the El Paso Police Department.  The interrogation in Plainview on November 25, 2002, however, was not the first time that Detective Samaniego had encountered and interrogated the Petitioner.  Rather, in April 2002 – six months earlier – Detective Samaniego and his partner Detective Pantoja, interrogated the Petitioner and extracted a confession from him in a completely unrelated case.  The Petitioner was indicted for that unrelated offense, and was released on bond several weeks later on June 15, 2002.  (RR v46 at 45).

While he was awaiting his release on bond, the Petitioner attempted suicide and was admitted to the psychiatric ward in the El Paso jail for several weeks.  Detective Samaniego admits that he was aware of this suicide attempt.  (RR v5 at 172).  While in custody, and following his suicide attempt, the Petitioner was seen by a psychiatrist, Dr. Vanderpool, who prescribed a number of psychotropic drugs for the Petitioner's mental illness, including Zyprexa for schizophrenia, Zoloft for his depression, lithium and Trazodone for mood control, and Clonazepam for his anxiety disorder.  (RR v46 at 6-7, 42-43).

When he was released on bond on June 15, the Petitioner was not given any information on how to secure continuing care for his mental illness.  (RR v46 at 8).  He took it upon himself after his release to go the Life Management center and obtain prescriptions from Dr. Vanderpool for the same medications he had been prescribed while in custody following his suicide attempt.  (RR v46 at 8-9).

-42-

When deprived of his medications, the Petitioner loses touch with reality. (RR v46 at 9). Also, while under the influence of methamphetamine (which he used heavily between his release on June 15 and his arrest in Plainview on November 23, 2002), the Petitioner experiences extreme paranoia, hallucinations, and blackouts. (RR v46 at 10).

In late October or early November of 2002, the Petitioner traveled to Carlsbad, New Mexico to join two other individuals, Jesse Eddy and Aimme Quintela. (RR v67 at 13-14). While there, the Petitioner continued using large amounts of methamphetamine – approximately four grams every day. (RR v67 at 15-16). During that time he rarely slept. (RR v67 at 16-17).

On approximately November 22, 2002, the Petitioner, Mr. Eddy, and Ms. Quintela left New Mexico for Indiana. At that point, according to Ms. Quintela's testimony, the Petitioner had not really slept at all in almost a week. (RR v67 at 18-19). When the Petitioner was stopped in the early morning of November 23, he had pulled over to the side of the highway and fallen asleep, crashing from the effects of his weeks-long methamphetamine binge. (RR v67 at 18-19). When coming off a methamphetamine binge, the Petitioner is dazed and unable to focus. (RR v46 at 40).

When he was taken into custody in Plainview, Mr. Hall was determined by officers there to be a suicide risk and he was placed in observation for that reason. (RR v5 at 108-09). By November 24, 2002, just prior to the interrogation, Mr. Hall had been in custody for more than twenty-four hours, held alone in an observation room and without access to his prescription medications. It was at that point that Detectives Samaniego, Pantoja, and Cooper arrived from El Paso to interrogate him.

The Petitioner was first interrogated for an hour and a half by Detectives Pantoja and Cooper. During that interrogation, Mr. Hall denied any involvement in the murder. (RR v5 at

A/73401003.1

121).  Detective Pantoja then showed Mr. Hall several witness statements that implicated him in

the murder of Melanie Billhartz.  (RR v45 at 97-99).  After being confronted with these

statements, Mr. Hall continued to maintain his innocence.  (RR v45 at 98).  He also became

visibly upset as the interrogation continued, and asked for access to his medications:

> Q.  Now, after reading the statements, he became very upset and he talked about
> being on medication or wanting to know where his medication was; isn't that
> correct?
> A.  Yes, sir.

(RR v45 at 99).

The two detectives made no attempt to obtain Petitioner's medications for him.  They

told him he would have to ask the jail staff in Plainview, but they gave him no opportunity to do

so.  (RR v45 at 131).  They did not even ask what medications he was taking.  (RR v45 at 131-

32):

> Q.  What did he say about his medication?
> A.  Said that he had medication with him, and I believe he asked if he was going to be
> able to get it.  And my response to him – and I responded.  I said, "we have to
> check with the jail."  Because jails – each jail has a policy about accepting outside
> medication or prescription medication, so you would have to talk to them about it.
> Q.  That's what you told him?
> A.  Yes, sir.

(RR v45 at 131-32).

### 3.    Detective Samaniego's Interrogation of the Petitioner

Detective Samaniego claims that when he first entered the interview room where the

other two officers were interrogating the Petitioner, the Petitioner recognized him from the

previous, unrelated case, and asked to speak with him alone.  (RR v5 at 161).  Attempting to take

advantage of that misplaced trust, the other two detectives left the room at 11:25 a.m., and

Detective Samaniego began his interrogation of the Petitioner alone, without any witnesses or

recording devices.

Detective Samaniego did not provide any *Miranda* warnings to the Petitioner at the beginning of his interrogation.  Instead, he offered the Petitioner something to eat, and allegedly engaged the Petitioner in small talk about Plainview.  (RR v5 at 161-62).  This odd choice of conversation topic is Detective Samaniego's only excuse for his failure to provide the Petitioner with *Miranda* warnings – he did not believe it was necessary because he "didn't start off talking about the case," although he admits he had every intention of doing so eventually:

> Q.    And my question to you, sir, is very specific.  Why did you not – in the initial conversation when you introduced yourself, why did you delay in having him sign the Miranda warning card that's in front of you?
> A.    Because we didn't start off talking about the case.
> Q.    Sir, you understand that that's where you were heading?
> A.    Well, that's where I was heading, yeah.

(RR v5 at 176-77).

This tactic might have been permissible if Detective Samaniego had then provided the warnings after he finished his small talk but before he reached the topic of the case, but that is not what he did.  Rather, taking full advantage of the Petitioner's weakened, paranoid, and anxious state of mind – and still without giving him any *Miranda* warnings at all – Detective Samaniego began working his way around to the case, ultimately asking the Petitioner directly whether he had committed the murder:

> Q.    And at this point is it just small talk, or at any point did you start talking about the capital murder?
> A.    At one point.  Initially, he denied it.  Then when he implicated Ted Murgatroyd –
> Q.    And then what happened when he did that?
> A.    *We started discussing about, you know, how wrong it was to implicate somebody that didn't do it.  I asked him if he did it, and he nodded his head.  And that's when I then Mirandized him.*

(RR v5 at 162) (emphasis added).

Only after he had gotten the answer he was seeking did Detective Samaniego read the Petitioner his rights and proceed to coach him through a full statement that conveniently mirrors

much of the language contained in statements that Detective Samaniego obtained from other fact witnesses prior to interrogating the Petitioner (and which were shown to the Petitioner during his prior interrogation by Detectives Pantoja and Cooper).

**4.   Detective Samaniego Coerced The Petitioner Into Providing A Statement In Violation Of The Petitioner's Fifth And Fourteenth Amendment Rights.**

Investigators are not permitted intentionally to withhold *Miranda* warnings until after a defendant has made admissions, and only then provide such warnings before obtaining a full written confession. *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality).[17] That, however, is precisely what Detective Samaniego did in this case.

At the time Detective Samaniego entered the interview room, he knew that the Petitioner was suicidal, and that he had in fact made a serious suicide attempt just several months earlier. His colleagues, who had just interrogated the Petitioner without success for an hour and a half, had also refused the Petitioner's request for his medications – telling the Petitioner that he would have to seek his medications from the local jail staff (which the Petitioner was in no position to do while he was being interrogated in a closed interview room).

The Petitioner was thus in an extremely vulnerable position – mentally ill, deprived of his medications, sleep-deprived, and suicidal. Knowing the Petitioner's vulnerable state, Detective Samaniego was reluctant to risk losing the Petitioner's misplaced trust by warning him of his Fifth Amendment rights at the outset of his solo interrogation. Instead, he began the

---

[17] In *Seibert,* the suspect was intentionally interrogated without the benefit of *Miranda* warnings until she confessed. There, unlike here, she was then at least provided with a short break before the investigators resumed the interrogation, provided the warnings, and then elicited the same confession. Here, Detective Samaniego did not even pause – he simply provided the warnings and then picked up where he had left off, displaying the same "psychological skill" demonstrated by the investigator in *Seibert,* and the same deficient attention to his suspect's constitutional rights.

-46-

interrogation with a casual and entirely pretextual conversion about the Petitioner's stay in Plainview, which he later used as an excuse for failing to provide the warnings required by the Fifth Amendment. (RR v5 at 161-62; 176-77). He then worked his way back to a discussion of the case and asked the Petitioner point blank whether he had committed the crime, all without providing any warnings.[18] (RR v5 at 162).

There can be no doubt that the circumstances of this interrogation establish that it did not result in a voluntary confession. Indeed, the totality of circumstances in this case bears a striking resemblance to those in *Greenwald v. Wisconsin,* 390 U.S. 519, 519-21 (1968) (per curiam). In *Greenwald,* the defendant was arrested and held in custody for approximately twelve hours before he was interrogated – during which time he did not sleep, and was not given access to his prescription medications. *Id.* When officers began to interview him, they failed to provide him with any warnings of his rights until *after* he had made oral admissions of guilt. *Id.* at 519-20.

Here, the circumstances are similar, but even more egregious. In *Greenwald* there was no indication that the defendant expressly requested his medications and was refused, whereas

---

[18] The State will likely try to argue that because Detectives Pantoja and Cooper provided *Miranda* warnings at the beginning of their interrogation, and because Detective Samaniego's interrogation followed immediately thereafter, this should suffice as a voluntary waiver for purposes of the Petitioner's statements to Detective Samaniego. The totality of the circumstances, however, refutes that argument. Although it may be true there is no *per se* requirement that an accused be continually reminded of his rights once he has intelligently waived them, that begs the question whether a prior warning provides a knowing waiver for a subsequent interview. That question is decided by examining the totality of circumstances, not simply how much time elapses between the two interrogations. *Wyrick v. Fields,* 459 U.S. 42, 47 (1982). Here, the circumstances clearly negate the sufficiency of any initial warning. First, the officer who conducted the second interrogation was not the same officer who gave the warnings in the prior interrogation. Second, Detective Samaniego deliberately changed the tone and nature of the interrogation in a deceptive and dramatic way when he took over from Detectives Pantoja and Cooper – switching from an accusatorial style to a casual style calculated to make the Petitioner forget that he was being interrogated. Third, the Petitioner's state of mind – sleep-deprived, mentally ill, and without his prescription medications – was not such as to permit a knowing waiver even for the first interrogation with Detectives Pantoja and Cooper. Finally, the statement elicited by Detective Samaniego differed significantly from the statements that the Petitioner gave to Detectives Cooper and Pantoja – a fact that helps show that a second warning was required. *United States v. Vasquez,* 889 F.Supp. 171, 177 (M.D. Pa. 1995).

here the Petitioner clearly asked how he could obtain his medications while being interrogated by Detectives Cooper and Pantoja. (RR v45 at 131). Instead of stopping the interrogation and obtaining his medications, they shrugged it off and told the Petitioner he would have to ask the staff at the Plainview jail. (*Id.*). While being interrogated in an isolated interview room, however, the Petitioner clearly did not have an opportunity to do that – nor did Detectives Cooper and Pantoja provide him such an opportunity before handing him off to Detective Samaniego for a second interrogation.

Also, whereas in *Greenwald* the medications at issue were not psychotropic, the medications that Mr. Hall was deprived of were necessary to treat the symptoms of his schizophrenia, anxiety disorders, depression, and other mental illness. (RR v46 at 6-7, 42-43). Without them, he was incapable of providing a knowing and voluntary waiver or his rights, or a knowing and voluntary confession.

Also, whereas in *Greenwald* the defendant was kept in custody and did not sleep for just twelve to eighteen hours before his interrogation, here the Petitioner was taken into custody more than twenty-four hours before he was first interrogated, and had not slept for days even before he was taken into custody.

Finally, as in *Greenwald*, Detective Samaniego carefully refrained from issuing a *Miranda* warning to the Petitioner until *after* he had obtained oral admissions. In light of the other circumstances described above, it is clear that this was a deliberate, calculated and coercive circumvention of *Miranda* intended specifically to obtain an involuntary confession.[19]

---

[19] Although a *Miranda* warning delivered between two separate interrogations may in some circumstances be adequate to render a subsequent statement admissible, that is not the case where, as here, the warning comes in "the midst of coordinated and continuing interrogation" by the same interrogator. *Seibert,* 542 U.S. at 613-14. In that circumstance, the warnings is likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id.* (*quoting Moran v. Burbine,* 475 U.S. 412, 424 (1986)). It is

In sum, the totality of the circumstances clearly indicates that the Petitioner's statement was involuntary, and obtained in violation of his Fifth and Fourteenth Amendment rights. As a result, the trial court erred in admitting the statement at trial. For the same reasons, the Court of Criminal Appeals' terse and summary rejection of this claim on the Petitioner's direct appeal was unreasonable, contrary to established Federal law, and also based on factual determinations that were unreasonable in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2). Given the critical role that the statement played in the State's case, that error by the trial court and the Court of Criminal Appeals was clearly prejudicial, and the Petitioner is entitled to a new trial on that basis.

### C.   PETITIONER'S CONVICTION VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE THE PETITIONER'S LEAD TRIAL COUNSEL SLEPT DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL.

Generally, when a defendant alleges he has been deprived of effective assistance of counsel he must show, in addition to the fact that counsel's performance was deficient, that he was prejudiced by counsel's conduct. *Strickland*, 466 U.S. at 688-89. Prejudice occurs when a defendant demonstrates that "but for counsel's unprofessional errors," there is a "reasonable probability" that the jury would have decided his case differently. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* However, there are some circumstances where harm to the defendant will be "so likely that a case-by-case inquiry into

---

simply "unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id. See also Oregon v. Elstad,* 470 U.S. 298, 309-10 (noting that in deciding whether a defendant's second confession is the product of a coerced first confession, courts should look at circumstances that show a break in the causal link between the initial and subsequent confessions, including passage of time, change in venue, change in interrogators and use of *Miranda*).

prejudice is not worth the cost." *Strickland*, 466 U.S. at 692.  Where trial counsel is totally absent during a critical stage of the trial, or present but prevented from providing effective assistance, prejudice is presumed, and a defendant's Sixth Amendment right to counsel is violated. *Cronic v. United States*, 466 U.S. 648, 659 n.25 (1984).

In 2001, the Fifth Circuit held that where trial counsel sleeps during "critical" or "not insubstantial portions" of the guilt-innocence phase of trial, he is in effect absent and thus unable to provide effective assistance to the defendant, and prejudice to the defendant is presumed. *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001).  "Critical" or "not-insubstantial" portions of trial are occasions when evidence is being presented against the defendant. *Id.* at 347 (court will presume prejudice when state court makes factual finding defense counsel slept during introduction of evidence against defendant).

In *Burdine*, three jurors and the deputy clerk of the court testified during Petitioner Burdine's state habeas hearing that they observed defense counsel sleeping during the guilt-innocence phase of Burdine's six day capital trial. *Id.* at 339.  One juror stated that he witnessed counsel nod off at least twice while the prosecution questioned a witness. *Id.*  Another juror recalled "being struck by the spectacle of [trial counsel's] sleeping on the second day of trial," stating that counsel would "nod his head down on his chest with his eyes closed" while a witness was being questioned. *Id.*  Still another juror attested that counsel would "nod his head down, bob it, with his eyes closed . . .," sleeping "for a good probably ten minutes" during witness questioning. *Id.*

Mr. Hall finds himself in a circumstance strikingly similar to that of the petitioner in *Burdine*.  Multiple jurors observed the Petitioner's lead attorney, Mr. Frank Macias, sleeping during the guilt-innocence phase of Mr. Hall's trial.  (*See* Exhibit 13, Affidavit of Irene

Rodriguez at 2; Exhibit 14, Affidavit of Gloria Lopez).   Juror Irene Rodriguez observed

Mr. Macias with "his head down for a while" while one witness was being questioned:

> I noticed that the lead trial attorney, Frank Macias, was sleeping during one part of the guilt-innocence phase.  Do you know how you nod off sometimes?  This wasn't just nodding off.  He had his head down for a while.  It was while a witness was being questioned.

*Id.*  In addition, Ms. Rodriguez stated that "the other jurors brought [Macias's sleeping] up later."

*Id.*  She recalls that one juror was so struck by the spectacle of Macias asleep during trial, that it

caused the juror to comment "[p]oor kid.  His life's on the line and his lawyer's sleeping."  *Id.*

Juror Gloria Lopez also observed Mr. Macias sleeping on multiple occasions during trial.

According to Ms. Lopez, Mr. Macias would "put his head down on his chest," during the

questioning of a witness, to the point that "there would be no motion for several minutes."

(Exhibit 14, Affidavit of Gloria Lopez).  Ms. Lopez stated that she believed "this happened more

than once."  *Id.*[20]

A sleeping lawyer cannot "analyze, object, listen or in any way exercise judgment on

behalf of a client" and therefore cannot provide competent counsel.  *Burdine*, 262 F.3d at 349.

By sleeping through portions of witness testimony Mr. Macias failed to: (1) provide ongoing

consultation with Mr. Hall; (2) formulate and adhere to a trial strategy; and (3) fulfill his

responsibilities as trial counsel.  *Id.*; *see also Javor v. United States*, 724 F.2d 831, 834 (9th Cir.

1984) (counsel who is asleep cannot "confer about testimony or evidence adduced at trial and . . .

evaluate its impact.").   Moreover, the *Strickland* presumption "that counsel is present and

conscious to exercise judgment on behalf of his client" does not apply.  *Id.*  Instead, counsel's

---

[20] Alternate Juror William Harmond also noticed the trial judge himself dozing off.  (Exhibit 26, Declaration of William Harmond).  This may give rise to an independent claim that the Petitioner was deprived of a fair trial.

lack of participation leaves the court with an "insufficient basis for trusting the fairness of that trial," and the court must presume prejudice. *Id.*

At least two other circuits follow the same *per se* ineffective rule for sleeping counsel that the Fifth Circuit announced in *Burdine. See Tippins v. Walker*, 77 F.3d 682 (2nd Cir. 1996) (granting writ where counsel slept during the testimony for a critical State witness, and during "damaging" testimony by a co-defendant); *Javor*, 724 F.2d 831.   The Ninth Circuit has held that the *per se* ineffective standard applies even when the lower court finds that counsel's sleeping was rare and that counsel rendered effective assistance to his client while awake. *Javor*, 724 F.2d at 932.

The State will likely try to argue that the *per se* rule announced in *Burdine* is not applicable here because Mr. Hall was represented by two lawyers, Mr. Macias and Mr. McDonald. As a result, the State may argue, Mr. McDonald was presumably available to make proper objections and exercise judgment on Mr. Hall's behalf while Mr. Macias slept.

The Supreme Court has made clear, however, that the mere physical presence of counsel (even conscious counsel) in the courtroom does not cure the absence of adequate representation. *Strickland*, 466 U.S. at 685 ("That a person who happens to be a lawyer is present at trial and alongside the accused, however, is not enough to satisfy the constitutional demand."); *Evitts v. Lucey*, 469 U.S. 387, 395 ("The Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision on the merits."). Here, the record is clear that Mr. McDonald lacked the experience necessary to render effective counsel independent of Mr. Macias.   Mr. Macias was appointed as lead counsel because Mr. McDonald was not on the list for appointment in capital cases, and had never served as lead counsel in a murder trial. (RR v7 at 17). Indeed, given Mr. McDonald's inexperience, the trial

judge instructed Mr. McDonald explicitly to follow Mr. Macias's lead. (RR v7 at 26). Moreover the judge made clear that Mr. McDonald should defer to Mr. Macias's judgment at all times. (*Id.* at 28). To find, therefore, that Mr. McDonald's mere presence in the courtroom could otherwise cure Mr. Macias's *per se* ineffective representation would be "contrary to" and an "unreasonable application of" the Sixth Amendment right to counsel as set forth in *Cronic.*

In any case, the core of Mr. Hall's argument is "not that his lawyer should have taken any particular initiative" but that "at critical times, [Mr. Hall] had no counsel to sort out what initiatives were open." *Tippin*, 77 F.3d at 687. By sleeping through portions of witness testimony, Mr. Macias failed to: (1) provide ongoing consultation with Mr. Hall; (2) formulate and adhere to a trial strategy; and (3) fulfill his penalty phase responsibilities. *See Burdine*, 262 F.3d at 349 (a sleeping lawyer cannot "analyze, object, listen or in any way exercise judgment on behalf of a client" and therefore cannot provide competent counsel); *Javor v. United States*, 724 F.2d 831, 834 (9th Cir. 1984) (counsel who is asleep cannot "confer about testimony or evidence adduced at trial and . . . evaluate its impact").

As lead counsel, Mr. Macias bore sole responsibility for providing Mr. Hall with effective counsel during his trial. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688) ("Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with [the ABA] Guidelines and professional standards."). "An unconscious attorney does not, indeed cannot, perform at all," and Mr. Macias's sleeping during trial prevented him from fulfilling his responsibility. *Burdine*, 262 F.3d at 349. As such, Mr. Macias's sleeping per trial was *per se* ineffective.

Even if the *Strickland* test of prejudice were applicable, however, there is a "reasonable probability" that, but for Mr. Macias's sleeping, the jury would have decided Mr. Hall's case differently. *Tong*, 25 S.W.3d at 712 (*citing Strickland*, 466 U.S. at 694). Indeed, perhaps the most damaging and prejudicial aspect of Mr. Macias's sleeping was the message it sent to the jury concerning the evidence being presented, and concerning Mr. Macias's interest and engagement in his own client's fate. For example, Ms. Lopez stated that Mr. Macias's sleeping influenced her ability to give proper weight to the testimony of one of the witnesses. (Exhibit 14, Affidavit of Gloria Lopez). The spectacle of Mr. Macias sleeping during the testimony of a witness, made it extremely difficult for her to appreciate the relevance of that witness's testimony. *Id.* If the testimony did not interest the Petitioner's own lawyer, why should the jury give it any weight?

> There was testimony during the guilt-innocence phase that was a little hard to follow, and it was difficult for me to see the relevance of the testimony. When Mr. Macias would fall asleep, I got the impression that he felt the same way about the testimony that I did. Seeing Mr. Macias asleep made it more difficult for me to appreciate the relevance of the testimony being presented.

*Id.* Such prejudice caused by the sight of the Petitioner's sleeping attorney is "sufficient to undermine confidence in the outcome" of this case, and satisfies the *Strickland* standard for harm.

In any case, whether appointed one lawyer or two, Mr. Hall was entitled to "the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69 (1932). The purpose of the Sixth Amendment is to "assure assistance at trial, when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States v. Ash*, 413 U.S. 300, 309 (1973). Accordingly, the core of the right to counsel is the fair opportunity to fully present both sides of an argument. *See Cronic*, 466

U.S. at 656 ("[The Sixth Amendment right to counsel] is meant to assure fairness in the adversary criminal process.").

As lead counsel, Mr. Macias was responsible for giving Mr. Hall the fair opportunity to confront the arguments presented against him.  By sleeping during the trial, he failed to fulfill that responsibility, and his conduct violated the fundamental principle of fairness in the adversarial process.   To the extent that *Strickland* applies, the statements of Ms. Lopez that Macias's sleeping affected her consideration of the evidence being presented, and the statements of Ms. Rodriguez that multiple jurors were distracted by the spectacle of Mr. Macias's sleeping, are sufficient to undermine confidence in the jury's verdict.  "Under these circumstances . . . there is little difference between saying that prejudice will be presumed and saying that prejudice has been demonstrated.  *Tippins*, 77 F.3d at 687 (holding Petitioner "suffered prejudice, by presumption or otherwise," where his counsel repeatedly slept during periods where Petitioner's interests were at stake).  Therefore this court should find that Mr. Hall's Sixth Amendment right to counsel was violated.

**D.    PETITIONER'S CONVICTION VIOLATES THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE TRIAL COURT ERRED IN DENYING THE PETITIONER'S MOTION FOR A CONTINUANCE.**

The right of an accused to present a defense is a "a fundamental element of due process." *Washington v. State*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).  As a result, the denial of a motion for a continuance can serve as a basis for federal habeas relief where the trial court's action "is so arbitrary as to violate due process" by depriving the defendant of his right to present a defense. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  Here, the trial court's denial of the Petitioner's motion for a continuance deprived the Petitioner of the opportunity to present a defense because Petitioner was unable to develop expert evidence to support his motion to

suppress his involuntary statement, perform critical DNA testing, and interview the State's key fact witnesses.

There are no "mechanical tests" for deciding when a denial of a continuance is so arbitrary as to violate due process. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Rather, a court must analyze "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.*

On January 11, 2005, the Petitioner sought a short continuance of less than a month – to move the trial date from January 24, 2005 to February 21, 2005. (RR v65 at 4-5). The Petitioner sought the continuance in order to: 1) allow the Petitioner to be evaluated by an expert addictionologist in order to further support the argument that the confession was not knowing and voluntary (RR v65 at 16); 2) allow the Petitioner to conduct DNA testing of physical evidence that the State had not tested (RR v65 at 17-20); and 3) conduct interviews with fact witnesses who the State planned to call to testify against the Petitioner (*id.*). The following day, January 12, 2005, the Court denied the motion. (RR v66 at 28).

Here, the evidence that the Petitioner would have developed if the continuance had been granted was critical to his defense. In particular, the medical evaluation of the Petitioner that would have been conducted if a continuance had been granted would have established without any possible doubt that the Petitioner's statement to the police was involuntary and therefore inadmissible.[21]

An expert evaluation of the Petitioner would have shown, inter alia, that the Petitioner suffers from a cognitive disorder with impaired functioning of the frontal lobes of the brain due

---

[21] As explained in Part B above, the existing record evidence already establishes that the statement was involuntary, and the trial court erred in denying the motion to suppress. The additional expert testimony concerning the Petitioner's state of mind, however, would have removed any possibility that the trial court would have erred in denying the motion to suppress.

to a number of factors. (Exhibit 15, Martinez Report). As a result, the Petitioner's "emotional and cognitive functioning is likely to fluctuate significantly based on medication efficacy and the presence of acute stressors. His coping skills are limited and he is likely to exhibit episodes of acute emotional and cognitive decompensation if he is overwhelmed by stressors or if there are changes to his psychotropic medication regimen." (*Id*.). Both factors were in play during the Petitioner's interrogation in that: 1) he was deprived of his prescribed psychotropic medications; and 2) he was experiencing the acute stress of a custodial interrogation. In short, his statement resulted from acute emotional and cognitive decompensation, and was manifestly involuntary.

Because the trial court denied the motion for a continuance, however, the Petitioner was unable to develop this evidence to support his motion to suppress. Given the small amount of time that the Petitioner requested to complete this evaluation, and the importance of the evaluation to the Petitioner's defense, the trial court's denial of the motion for a continuance was so arbitrary as to deny the Petitioner his right to present a defense. The Court of Criminal Appeals' failure to correct this error on the Petitioner's direct appeal was unreasonable and contrary to established Federal law, and was also based on factual determinations that were unreasonable in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2).

**E.     PETITIONER'S CONVICTION AND SENTENCE OF DEATH VIOLATE THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION BECAUSE THE EVIDENCE ADDUCED AT TRIAL WAS INSUFFICIENT TO PROVE THAT THE PETITIONER MURDERED THE VICTIM IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT THE OFFENSE OF RETALIATION.**

Section 1 of the Fourteenth Amendment of the U.S. Constitution prevents any State from depriving "any person of life, liberty, or property, without due process of law." A defendant may not be convicted of any crime except upon proof beyond a reasonable doubt of every element of

the crime with which the individual has been charged. *In re Winship*, 397 U.S. 358 (1970); *Jackson v. Virginia*, 443 U.S. 307 (1979).

The Court in *Jackson* noted that under the *Winship* decision, "it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." 443 U.S. at 321. If a prisoner has exhausted all state remedies and there is no independent and adequate state grounds which stand as a bar, the prisoner's claim is cognizable as a federal habeas corpus proceeding. *Id.* This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324, n.16.

Under *Jackson*, the reviewing court must view the evidence in the light most favorable to the prosecution in order to determine if any rationale trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319. The standard under *Jackson* does not focus on whether the trier of fact made the correct determination on guilt or innocence, but rather whether the trier of fact made a rationale decision with respect to guilt or innocence. *Herrara v. Collins*, 506 U.S. 390, 402 (1993). However the Fifth Circuit has stated that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed." *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994). If the reviewing court finds that no rational trier of fact could have found proof of guilt beyond a reasonable doubt, the petitioner is entitled to habeas relief. *Jackson*, 443 U.S. at 324.

In the present case, the State's evidence was insufficient for a rational jury to find beyond a reasonable doubt that Mr. Hall killed Melanie Billhartz in order to prevent her from reporting

the occurrence of a crime to the authorities.  The testimony of the State's own witnesses clearly demonstrates this.

The Petitioner was charged with intentionally causing the death of an individual in the course of committing and attempting to commit the offense of obstruction and retaliation.  Texas Penal Code Ann. § 36.06: Obstruction or Retaliation, provides in part:

(a)     A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:

(1)     in retaliation for or on account of the service or status of another as a:

(B)     person who has reported or who the actor knows intends to report the occurrence of a crime.

The State was required to prove beyond a reasonable doubt that the Petitioner killed Ms. Billhartz in order to prevent her from reporting the occurrence of a crime.  The State's theory, as stated in its closing argument, was that "[t]he only reason [the Petitioner] killed [Melanie Billhartz] was so that she wouldn't report a crime, so that she wouldn't call the cops. Because, why? Because they had a meth lab going. *There was no other reason for him to kill Melanie but that*." (RR v79 at 95) (emphasis added).  The State, however, failed to demonstrate the essential elements of the offense of retaliation beyond a reasonable doubt.

Contrary to the State's contention, one of the State's key witnesses testified that not only was there not a methamphetamine "lab" at the house, but that even if the police did show up at the scene, they would not have discovered any evidence that methamphetamine had been manufactured at the house.  No rationale trier of fact could have found that Mr. Hall killed Melanie Billhartz to prevent her from reporting the existence of the methamphetamine "lab" as the State contended.

-59-

Specifically, Mr. Eddy, the individual who was manufacturing methamphetamine on the evening of October 28, 2002, testified:

Q.   Okay. You're the cook?
A.   Yes, sir.
Q.   And you didn't have a lab down there, did you?
A.   No, it was with me. I mean, my stuff stays with me.
        …
Q.   Okay. Now, when Melody [sic] came over complaining that Ted hit her and she was going to call the police, all you had to do was turn off the heat, take your pan, and carefully -- because you didn't want to spill any of that stuff, do you?
A.   No, I could have -- I could have put it in a -- I could have still put it in a container.
Q.   And then just walked off?
A.   Yeah.
Q.   *And as far as finding a meth lab at that address, the police were not going to find a meth lab?*
A.   *Not mine, no. I mean, not that I know of.*

(RR v73 at 158-59) (emphasis added).

Mr. Eddy also testified that the Petitioner was aware of the fact that Mr. Eddy was finished cooking his "batch" of methamphetamine. Mr. Eddy testified:

Q.   Now, in fact, once Justen called the meeting, you did pack that methamphetamine away in a bottle and walk away, didn't you.
A.   When he called the meeting, I was in -- I was in the back room of the house. And he called the meeting to the garage. I moved -- I did take the pan out, went to the garage, fired up the heater, just --
Q.   Kept on cooking?
A.   -- finished the plate up.
Q.   And you did actually finish?
A.   Yes, I did.

(*Id.* at 164).  Mr. Eddy further testified:

Q.   Okay. Did you stay in the shed or did you leave?
A.   No. A little bit after that I left.
Q.   What was the state of the meth that had been drying at the point that you left?
A.   It was finished. I went inside and gave it to Tim.

(*Id.* at 146) (emphasis added).  The State's own witness testified <u>unequivocally</u> that contrary to the State's theory: 1) there was no "meth" lab to speak of at the house; 2) to the extent Mr. Eddy

A/73401003.1

had materials to manufacture methamphetamine, he could quickly pack those materials up and walk away at a moment's notice; and 3) the Petitioner knew that Mr. Eddy was done "cooking" his batch of methamphetamine and had already given it to Mr. Davis.  No rational trier of fact could have found proof of guilt beyond a reasonable doubt that the Petitioner killed Ms. Billhartz in order to prevent her from reporting the commission of a crime, namely the existence of a methamphetamine lab.  The Court of Criminal Appeals, however, failed to correct this error when the Petitioner raised it on direct appeal.  That failure resulted from an unreasonable application of established Federal law, and an unreasonable determination of the facts in the record before the state court.  28 U.S.C. § 2254(d)(1)-(2).  Thus, Petitioner is entitled to habeas relief and should be granted a new trial. *Jackson*, 443 U.S. at 324.

> **F.**   **PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT SUBSTANTIAL, READILY AVAILABLE EVIDENCE IN MITIGATION OF THE DEATH PENALTY.**

The Petitioner's death sentence violates the Sixth Amendment to the U.S. Constitution because he was deprived of the effective assistance of counsel at the punishment phase of his trial in that trial counsel failed to investigate and present substantial, readily available evidence, including evidence of childhood abuse and neglect, and mental illness, in mitigation of the death penalty.

> **1.**   **The Supreme Court's *Strickland* Decision Established a Nuanced Standard to Evaluate Ineffective Assistance of Counsel**

The Supreme Court established the modern legal principles governing claims of ineffective assistance of counsel under the Sixth Amendment in the seminal case of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, ineffective assistance of counsel is defined

-61-