as the deficient performance by counsel that results in prejudice against the petitioner, with counsel's performance judged objectively "under prevailing professional norms." *Id.* at 688*; see also Wiggins v. Smith,* 539 U.S. 510, 521 (2003). In *Williams v. Taylor,* 529 U.S. 362, 391 (2000), the Supreme Court made clear that *Strickland* qualifies as clearly established Federal law as determined by the Supreme Court.

### a.    *Strickland* **Prong One: Deficient Investigation**

*Strickland* offers a two-part test to determine whether a defendant has suffered a constitutional violation based on the ineffective performance of his counsel.   466 U.S. 668 (1984).   The first requirement is that the petitioner show his counsel's performance was deficient, based on the totality of the representation.  *Id.*  This is measured against an "objective standard of reasonableness."   *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002), *citing Strickland,* at 689.

In the context of capital cases, Supreme Court decisions have looked to "norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence of mitigation." *Rompilla v. Beard,* 125 S.Ct. 2456, 2462 (2005).  These norms include the standard practices in the state in capital cases at the time of the trial at issue, as well as American Bar Association (ABA) standards, which serve as guides for determining what is reasonable. *Wiggins*, 539 U.S. at 524.

The ABA Standards for Criminal Justice in circulation at the time of the Petitioner's trial, which set forth the minimum required standards for performance of counsel, describe defense counsel's general duty to investigate as follows: "Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to

A/73401003.1

the merits of the case and the penalty in the event of conviction. . . .  The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *ABA Standards for Criminal Justice*, Standard 4-4.1(a) (3rd ed. 1993).  The Standards go on to explain that, "since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making *extraordinary efforts* on behalf of the accused." *Id.* at 4-1.2(c) (emphasis added).

The ABA's Guidelines tailored specifically to the performance of defense counsel in capital cases set forth these expectations in greater detail.  *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989).  "The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered.  This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 11.4.1(C).  Further, these guidelines recommend as a standard practice the creation of a social history, which involves obtaining virtually every document relating to the client's life, examining the accused's medical and education records, and interviewing family members as well as the defendant's doctors, teachers, pastors, neighbors, and friends. *See id.* at 11.4.1(D)2 & 11.8.3.

### b.    *Strickland* Prong Two: Prejudice

To meet the second prong of the *Strickland* test, a petitioner must show that his counsel's failures prejudiced his defense: that there is a "reasonable probability" the result of the proceedings would have been different, but for counsel's unprofessional performance. *Strickland*, 466 U.S. at 692.  A "reasonable probability" is one that is "sufficient to undermine

A/73401003.1

confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 694. Additionally, the cumulative impact of counsel's errors should be considered. *Ex parte Welborn*, 785 S.W.2d 391 (Tex. Crim. App. 1990).

This test of "reasonable probability" is not outcome determinative. Indeed, the *Strickland* Court expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. Thus, the "reasonable probability" standard is a less onerous burden than even the preponderance of the evidence standard. This "lower burden of proof" was recognized by the Fifth Circuit in *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990). Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id*.

In assessing prejudice, the Supreme Court requires the reviewing court to reevaluate "the evidence in aggravation against the totality of available mitigating evidence," both the evidence adduced at trial and at the habeas proceeding. *Wiggins*, 539 U.S. at 534; *Williams*, 529 U.S. at 397-98. [22] Additionally, in cases where the state court did not reach the prejudice prong of the

---

[22] In many states that have the death penalty, sentencing laws require the sentence in a capital case to be determined by weighing the aggravating factors against the mitigating factors found to exist by the decisionmaker. Thus, in accordance with *Strickland*, a court reviewing such judgments would assess the balance of these circumstances. The sentencing laws governing Texas capital trials do not require the decisionmaker to weigh aggravating factors and mitigating factors when deciding what penalty to assess. Instead, Texas asks jurors to answer two "special issues," the second of which asks them to consider mitigating circumstances that could warrant a sentence of life imprisonment rather than death. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1). Thus, a Court reviewing a judgment imposing death from Texas must consider whether there is a reasonable probability that, absent counsel's errors, the jury would have answered the mitigation special issue differently. *See Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003)

-64-

*Strickland* standard in rejecting the petitioner's ineffectiveness claim, the federal court's "review is not circumscribed by a state court conclusion with respect to prejudice." *Wiggins,* 539 U.S. at 534.

The scope of information considered relevant mitigating evidence is extremely broad. "The Supreme Court recently held that a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death . . . Virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Bigby v. Dretke*, 402 F.3d 551, 565 (5th Cir. 2005) (internal citations omitted); *see also Pierce v. Thaler*, 355 Fed. App'x 784, 795 (5th Cir. 2009) ("[petitioner's] low intelligence, his poor health as a child, the physical abuse he suffered at the hands of his father, the extreme poverty in which he grew up, and other evidence of a similar nature - is all general mitigation evidence, i.e., evidence that might have elicited sympathy or reduced his general moral culpability").  In addition to difficult or sympathetic circumstances that may affect a jury's perspective, evidence of deficient intellect and/or mental illness may also be considered mitigating, and the petitioner is "not required to show that his condition be somehow linked to his conduct, only that it existed, and that it could lead a jury to find that a sentence other than death is warranted." *Id.* at 566; *see also Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("impaired intellectual functioning is inherently mitigating").

---

(relevant question is whether totality of evidence "would have affected the sentencing decision of at least one juror"); *Ex parte Gonzales*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006) ("We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently.").

### 2. *Strickland's* Progeny Demonstrate the Breadth of Viable Ineffective Assistance of Counsel Claims, with a Focus on Fundamental Fairness

In *Strickland,* the Supreme Court adopted a particularized, case-by-case approach focusing on the totality of the evidence, and held that reviewing courts should not apply the *Strickland* standard in a mechanical fashion, but rather should focus on the fundamental fairness of the proceedings being challenged. 466 U.S. at 693-96.

The Court expanded on these concepts in three subsequent decisions: *Williams v. Taylor, Wiggins v. Smith,* and *Rompilla v. Beard.* 529 U.S. at 397-98; 539 U.S. at 534-38; 125 S.Ct. at 2469. These cases established that reviewing courts must evaluate the totality of the available mitigating evidence, which includes the evidence presented at trial and that adduced in habeas, and rebalance it against the aggravating evidence presented by the state. *Rompilla,* 125 S.Ct. at 2469; *Wiggins,* 539 U.S. at 534-38; *Williams,* 529 U.S. at 397-98.

In *Williams,* the Supreme Court applied *Strickland* and found that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not fulfilled its obligation to conduct a thorough investigation of the defendant's background. 529 U.S. at 396.

In *Wiggins,* petitioner's capital defense counsel hired a psychologist to evaluate petitioner and review petitioner's life history and department of social service records documenting his foster care placements and difficult childhood. Nonetheless, the Supreme Court concluded that counsel was ineffective because "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989," which included the preparation of a social history report. 539 U.S. at 524. The Court also concluded that counsel's failure to expand the investigation into petitioner's life history also

"fell short of the standards for capital defense work articulated by the American Bar Association (ABA) standards to which we long have referred as 'guides to determining what is reasonable.'" *Id.*, *quoting Strickland*, 466 U.S. at 688.  According to the Supreme Court, "[d]espite these well-defined norms," counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524.

Finally, in *Rompilla*, the Supreme Court found meritorious a capital habeas petitioner's claim of ineffective assistance of counsel because "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 125 S.Ct. at 2460.

The *Strickland* standard is obviously case specific, and persuasive evidence does not need to comport precisely with the evidence presented in the above cases to be sufficient to show prejudice.  Prejudice is shown if the mitigating evidence that was unavailable to the jury, compared to the evidence presented to the jury, might have influenced the jury's appraisal of the defendant and therefore offered the possibility of a different result. *See Rompilla*, 125 S.Ct. at 2469.  Indeed, other federal courts have found prejudice in other cases with evidence less severe than that presented in *Williams* and *Wiggins*. *See, e.g., Cannan v. McBride*, 395 F.3d 376, 386-87 (7th Cir. 2005); *Mayfield v. Woodford*, 270 F.3d 915, 927-28 (9th Cir. 2001); *Ainsworth v. Woodford*, 268 F.3d 868, 875-76, 78 (9th Cir. 2001); and *Dobbs v. Turpin*, 142 F.3d 1383, 1390 (11th Cir. 1998).

-67-

This is particularly true in the Fifth Circuit.  For example, in *Adams v. Quarterman*, the Fifth Circuit affirmed a limited grant of habeas corpus relief.  324 Fed. App'x 340 (5th Cir. 2009).  With regard to mitigation, the Court found that defense counsel did not sufficiently explore all avenues of mitigating evidence.  *Id.* at 347.  Similarly, in *Soffar v. Dretke,* the Court held, in accordance with *Strickland* principles, that counsel's failure to interview eyewitnesses to a charged crime constitutes constitutionally deficient representation.  368 F.3d 441, 474-75 (5th Cir. 2004) (while "a lack of credibility might support a strategic decision not to call a witness to testify at trial," nevertheless, "a witness's character flaws cannot support a failure to investigate") (citations omitted).  Further, in *Moore v. Johnson*, the court found the petitioner's trial counsel ineffective because counsel failed to investigate, develop, and present evidence of the petitioner's organic brain damage.  194 F.3d 586, 618 (5th Cir. 1999).

**3.     The Petitioner's Trial Counsel Failed to Present a Sufficient Mitigation Defense to the Jury**

**a.     Trial Counsel's Mitigation Case was Constitutionally Deficient**

Trial counsel's investigation into available evidence in mitigation of the death penalty in this case was constitutionally deficient because trial counsel failed to discover and present the testimony of at least seven individuals – Marilu Folmer, Becky Garcia, Gloria Meinert, Ted Meinert, Jane Morgan, Susan Wohleking and Deborah Hall – who have knowledge of the Petitioner's horrific childhood and difficult past and who would have been willing to testify as effective mitigation witnesses during the punishment phase of the trial.  (*See* Declarations attached at Exhibits 16-22).  Trial counsel also failed to uncover and offer evidence of Mr. Hall's cognitive and emotional deficiencies, which could have been readily diagnosed and presented to the jury through the use of a neuropsychologist such as Dr. Martinez, whose report is attached at Exhibit 15.

Effective representation can only be built upon a foundation of adequate pretrial investigation. In a death-penalty case, this must include investigation of all circumstances that a jury might consider mitigating. Yet counsel failed to perform anything more than a cursory mitigation investigation. Indeed, surviving trial counsel testified during the state habeas proceedings regarding his lack of engagement and commitment with respect to the mitigation investigation before trial, admitting that he did not "remember much" about even the interview with Mr. Hall's mother, Deborah Hall, or even whether he asked her to testify (he did not). (S.H. Tr. at 107-08 and Exhibit 22, Deborah Hall Decl.).

This lack of recollection is the defining feature of counsel's description of his initial mitigation investigation: he testified at least fifteen times in only five pages of testimony that he did not remember the answer to queries regarding those efforts. (S.H. Tr. at 107-11). In contrast to the broad mandate of a mitigation investigation outlined in applicable caselaw and the ABA standards discussed above, trial counsel apparently had a very limited – and erroneous – view of the work required: "The main thing I wanted Sam [Streep, the mitigation investigator] to do was find his mother and find his father and find out what happened to him as a child." (S.H. Tr. at 107). Mr. Streep did not even draft a report regarding any findings from his supposed investigation. (S.H. Tr. at 108).

The perfunctory mitigation case offered by counsel during the punishment phase of the trial confirms that counsel's mitigation investigation was inadequate. Counsel offered very few witnesses during the punishment phase, three of whom were relatives. Mr. Hall's mother was not among the relatives called to testify, only his father, step-mother, and step-sister were called, and they provided bare, cursory testimony. None of them described the difficult circumstances surrounding Mr. Hall's life and childhood. Indeed, although this phase of Mr. Hall's trial

spanned over 1,100 pages of testimony, counsel elicited a mere 17 pages of testimony from those three family members, who primarily provided "good character" evidence.

The other witnesses who testified on Mr. Hall's behalf did not provide helpful mitigation testimony either. For example, counsel offered one witness, Mr. Escobedo, seemingly for the primary purpose of addressing guilt, rather than mitigation. Specifically, counsel attempted to offer testimony supporting the theory that Mr. Murgatroyd was the murderer, saying that Escobedo's testimony was necessary to demonstrate that Murgatroyd was "always on the fringes of death." (RR v83 at 92). Another witness, Dr. Aeschbach, was apparently offered to provide an abstract philosophical perspective. A student of an Austrian branch of research called ethology, Dr. Aeschbach's testimony ranged from the three stages of moral development to the rise of the Third Reich in Germany to the concept of free will. (RR v 85 at 6-7, 10-12, 14-15, 18-22). Aeschbach's scant testimony regarding the Petitioner was at best peripheral to his lengthy explication of his philosophical beliefs.

Counsel's inept mitigation efforts were further compounded by counsel's own closing statements. As discussed further below, the closing was dominated by highly prejudicial statements about the Petitioner's own character – statements made by his own counsel. For example, Mr. Macias stated: "he's a poor representative of . . . what it means to be a human being." (RR v86 at 55). Clearly counsel was not convinced by the mitigation case he himself had developed, since he freely told the jury that Mr. Hall did not deserve to be kept alive. (RR v86 at 55-57).

Further, the declarations of six other individuals close to Mr. Hall indicate that none of them was contacted about Mr. Hall's childhood or background, nor were any of them asked to testify on his behalf, although all of them would have been willing, and all had knowledge of

facts that jurors would have found to be compelling mitigation evidence. (*See* Exhibits 16-21, Declarations).

Due to trial counsel's failure to pursue a proper investigation into the Petitioner's background, the Petitioner was denied the effective presentation of extensive mitigation experience that very likely would have persuaded the jury not to impose the ultimate penalty.

### b.      Substantial And Compelling Mitigation Evidence Could Have Been Uncovered and Presented

The mitigation evidence that trial counsel failed to find or present presents a chilling and horrifying picture of the Petitioner's childhood, in which he was forced essentially to raise himself in a household environment dominated by drug use, physical and psychological abuse, and neglect.   Three teachers and counselors of Mr. Hall's could have testified to the difficult circumstances of his childhood.  Ms. Folmer, Ms. Garcia, and Ms. Wohleking all knew Mr. Hall as a child in school, and their declarations reveal his troubled upbringing, as well as his learning disabilities and unmet need for counseling services. (*See, e.g.*, Exhibit 21, Wohleking Decl. at ¶¶ 7, 9-10).  All three of them express the view that Mr. Hall was a neglected child who appeared to be raising himself, getting himself to school without any help or involvement from his parents. (Exhibit 16, Folmer Decl. at ¶ 5; Exhibit 17, Garcia Decl. at ¶ 3; Exhibit 21, Wohleking Decl. at ¶ 7).

The jury was also denied the moving testimony of the Petitioner's mother, Deborah Hall, who provides a chilling account of the social environment that he experienced as a child. (*See* Exhibit 22, Deborah Hall Decl.).   Ms. Hall recounts overwhelming mitigating circumstances surrounding the Petitioner's life, including clear themes of violence, drug abuse, and neglect. She explains: the Petitioner's father "was physically abusive towards me and Justen.  Jimmy threatened to kill both Justen and me on numerous occasions. . . He often threatened to shoot me

-71-

or stab me." (*Id.* at ¶ 8). The Petitioner was wholly exposed to his father's unpredictable anger and violence: "Jimmy would simply go into rages due to his paranoia and jealousy. Justen was usually around when Jimmy started hitting me. Sometimes, Jimmy would lock Justen in his room while he beat me up. Jimmy would often have to drag Justen into his room to put him in there, as Justen always tried to jump in to protect me." (*Id.* at ¶ 9). "Any time I gave any indication that I wanted to take Justen with me, Jimmy would threaten to kill us both." (*Id.* at ¶ 22).

Mr. Hall was also exposed to drug abuse at a young age. He was two years old when his father began using cocaine. (Exhibit 22, Deborah Hall Decl. at ¶ 8). His father and step-mother's drug abuse was ever-present. On one occasion when Ms. Hall visited their house, she "observed drug paraphernalia, including needles and spoons, on the nightstand. Jimmy and Maggie were just lying in the bed." (*Id.* at ¶ 20). Ms. Hall also explained that "Jimmy was a long time drug dealer" and that he later hired Justen to work for him. (*Id.* at ¶ 29).

Had it been offered, the testimony of other relatives would have provided the jury with even more vivid details regarding the horrific conditions in which Mr. Hall was raised. His grandmother, Ms. Morgan, declares that his parents had a "very volatile relationship," were "never stable," were on drugs (father) or "not meant to be a parent" (mother), and abandoned Justen to "rais[e] himself." (Exhibit 20, Morgan Decl. at ¶¶ 5-9). She said: "I remember Justen just being shoved back and forth from pillar to post between Deborah and Jimmy." (*Id.* at ¶ 12).

Further, Justen's other relatives have detailed knowledge of his father's drug abuse and "uncontrollable rage," describing Jimmy as "always in a state of anger" and "very aggressive when he was on drugs." (Exhibit 19, T. Meinert Decl. at ¶ 5; Exhibit 18, G. Meinert Decl. at ¶ 7-9). These witnesses were also privy to the neglectful parenting and promiscuous behavior of

Justen's mother: as Mr. Meinert explained, "In my opinion, Deborah was not ready to be a mother when she had Justen. Whenever Jimmy was on the road, Deborah was out in the streets." (Exhibit 19, T. Meinert Decl. at ¶ 7).

Apparently, Justen's step-mother behaved similarly: "Maggie was known as a 'lot lizard' [prostitute] at the truck stops. . . I recall Jimmy bragging to me that Maggie had once been with over 40 men in a day, and now he had her as his wife." (*Id.* at ¶¶ 10-11). Mr. and Mrs. Meinert were never asked to be witnesses, but they would have been willing to testify to these circumstances on Mr. Hall's behalf if they had been asked. (Exhibit 19, T. Meinert Decl. at ¶ 15; Exhibit 18, G. Meinert Decl. at ¶ 16).

In many ways, Mr. Hall raised himself. His mother observed that Justen's home life with his father was an environment of filth and malnutrition: "I saw Justen leaving for school. He was wearing raggedy, wrinkled, dirty clothes that were much too large for him. He looked completely unkempt and disheveled. I also observed that he was extremely pale, appeared malnourished, and had dark circles under his eyes . . . . It was obvious to me that Justen was caring for himself." (Exhibit 22, Deborah Hall Decl. at ¶¶ 19-20).

This was echoed by others who actually tried to care for or educate for Mr. Hall. Ms. Folmer explains that she "tried to get in touch with Justen's parents on more than one occasion, but I was never able to get his parents to come to the school for a meeting. It seemed to me like there was no concern there whatsoever." (Exhibit 16, Folmer Decl. at ¶ 8). Ms. Wohleking reinforces this picture of neglect, remembering Justen "as a quiet child who was not very well kept. He had a shaggy appearance. It was almost as if he had just gotten up in the morning and gotten himself to school . . . . I had the impression that Justen was not a real high priority as home." (Exhibit 21, Wohleking Decl. at ¶ 7).

A parallel comment from Ms. Garcia is particularly vivid: "Justen seemed like a homeless kid." (Exhibit 17, Garcia Decl. at ¶ 3). She also recalls multiple instances of tangible neglect, noting that Justen was often punished at school when he could not get school supplies or signed permission slips from his parents, and often did not have money for breakfast, lunch, field trips, or special class events. (Exhibit 17, Garcia Decl. at ¶ 4-6, 10). She explained: "I would often pay for his lunch, just to make sure that he ate that day" (*Id.* at ¶ 4). Her comments on Mr. Hall's mood as a child are similarly telling: "Justen rarely smiled" and "he seemed sad." (*Id.* at ¶ 8). This is consistent with the downtrodden image of Mr. Hall that Ms. Folmer remembers: "Justen was not a bully;" "Justen was picked on by other students because of his appearance;" "His hair was never cut and his clothes were rarely clean." (Exhibit 16, Folmer decl. at ¶ 5-6).

An appropriate mitigation case would also have offered the jury comprehensive evidence of the Petitioner's substantial mental health issues. As a recent neuropsychological evaluation confirms, Mr. Hall suffers from a wide array of cognitive and intellectual deficits. (Exhibit 15, Martinez Report). Dr. Martinez concluded that Mr. Hall has "mild/moderate but substantial cognitive deficits that are likely related to the combined effects of his chronic affective disorder and other historical variables." (*Id.* at 13). Those historical factors include the "reasonable probability of childhood brain injury due to a serious traffic accident," childhood attention deficit/hyperactivity disorder, childhood abuse, and the contraction of Hepatitis C. (*Id.* at 13-14). He also notes that Mr. Hall has been diagnosed with "Major Depressive Disorder and Bipolar II Disorder since 2002, with acute episodes of disturbed thought that may have been related to a mood congruent psychotic disturbance." (*Id.* at 12). Testing revealed Mr. Hall's IQ to be 89, which Dr. Martinez explained further as follows:

> "His performance on a comprehensive measure of intelligence was
> in the average to low average range, with better scores on

nonverbal subtests.   However, there was significant scatter/fluctuation in subtest scores that was strongly suggestive of difficulty with thought and sustained attention.   These extreme fluctuations in cognitive subtest scores are consistent with *brain frontal lobe dysfunction* that is likely related to the combined effects of an *attention deficit disorder, possible childhood traumatic brain injury, a chronic mood disorder*, and a *history of acute polysubstance abuse*."

*Id.* at 13 (emphasis added).   And as Ms. Wohleking makes clear in her declaration, Mr. Hall's cognitive impairments are longstanding: he was coded as Learning Disabled in elementary school, and "slipped through the cracks," missing the Special Education and counseling services that he needed.  (Exhibit 21, Wohleking Decl. at ¶¶ 9, 16, and 20).

The failure of counsel to investigate and present this substantial mitigating evidence left the jury with only the barest understanding of the Petitioner's personal history and the challenges he faced throughout his life.  In fact, if anything, the testimony of many of the witnesses that trial counsel called during the punishment phase of the trial obscured the circumstances of the Petitioner's childhood.  Mr. Hall's step-mother, for example, provided only generic, positive remarks about her decade of interaction with Justen:

> Q.   You have gotten to know him well, haven't you?
> A.   Yes, during ten years.
> Q.   What kind of man is he?
> A.   He is not my son, but I see him as a son.
> Q.   Has he ever been disrespectful to you?
> A.   No, never.
> Q.   Has he ever hit you?
> A.   No.
> Q.   How has he treated your daughters?
> A.   Well, maybe even better than a normal brother.
> Q.   Is his life worth saving?
> A.   Yes.
> Q.   Why?
> A.   Because he is a good person.

(RR v81 at 40-41).  Nothing in her testimony suggests the challenges Justen faced while growing up in her care.  Justen's step-sister testified similarly, simply stating that Justen is a smart, hard-

-75-

working person who has always been nice to her. (RR v81 at 45). This testimony is equivalent to the "few naked pleas for mercy" that the *Rompilla* court found bearing "no relation" to the mitigation case that could have been built upon the evidence available. *Rompilla,* 125 S.Ct. at 2469.

A reasonable application of the law on ineffective assistance of counsel as determined by the Supreme Court in *Strickland* and its progeny makes clear that the evidence detailed above – that trial counsel could have discovered and presented, but did not - may well have influenced the jury's decision and should have been presented to them for consideration. *See Wiggins,* 123 S.Ct. at 2544 (the test is whether the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of the defendant's moral culpability).

Indeed, at least one juror who was interviewed after the trial indicated that if such mitigating evidence had been presented during the punishment phase of the trial, it would likely have caused her to decide against the death penalty. Irene Rodriguez reviewed the declarations discussed above, and offered her own declaration stating that she was not presented with this mitigating evidence during the punishment phase, though she wanted to know more then about who Justen was, and that "if I had heard the evidence in these declarations during the punishment phase, it would have changed my answer. I would have answered "yes," that *there was enough mitigation to warrant a life sentence."* (Exhibit 13, Rodriguez Decl. at ¶¶ 7-9) (emphasis added).

*     *     *

In short, trial counsel's failure to present key mitigating evidence in a death-penalty case necessarily meets the first prong of *Strickland.* Given the significance of the mitigating evidence existing in Petitioner's background that was not presented at trial, and the fact that this Court now has before it at least one member of the jury that would have been compelled to decide

Mr. Hall's fate differently had she been properly informed of Mr. Hall's tragic and sympathetic

personal story, Mr. Hall was severely prejudiced by his counsel's unprofessional and deficient

conduct. Thus, in accordance with *Strickland* principles, Mr. Hall's petition for relief should be

granted.

> **G.     PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL ARGUED TO THE JURY, WITHOUT ANY PLAUSIBLE TACTICAL REASON AND CONTRARY TO EVIDENT DEFENSIVE STRATEGY, THAT PETITIONER DESERVED TO DIE FOR HIS ALLEGED CRIME.**

Petitioner's death sentence violates the Sixth Amendment to the United States

Constitution because Petitioner was deprived of the effective assistance of counsel at the

punishment phase of his trial when trial counsel argued to the jury, without any plausible tactical

reason and contrary to the evident defensive strategy, that the Petitioner deserved to die.

> **1.     The Supreme Court's *Strickland* Decision Established the Standard to Evaluate Ineffective Assistance of Counsel: Fundamental Fairness**

As discussed in greater detail above, the Supreme Court set forth a two-part framework to

govern claims of ineffective assistance of counsel under the Sixth Amendment in *Strickland v.*

*Washington.*  466 U.S. 668 (1984).  To meet the first requirement of the *Strickland* test, the

petitioner must demonstrate that his counsel's performance was objectively deficient. *Id.* at 688-

89; *see also Neal v. Puckett*, 286 F. 3d 230, 236 (5th Cir. 2002).  The second requirement is that

the petitioner establish a "reasonable probability" that, if counsel had not performed

unprofessionally, the result of the proceedings would have been different. *Strickland*, 466 U.S.

at 692.

A/73401003.1

Importantly, the *Strickland* Court adopted an individualized approach to its evaluation of ineffective assistance claims, holding that reviewing courts should focus on the fundamental fairness of the proceedings being challenged.  466 U.S. at 693-96.

> **2.    Fundamental Fairness Requires a Finding that the Petitioner's Trial Counsel Offered an Ineffective Defense by Advocating for the Death Penalty**

*"He doesn't deserve not to be killed."*  (RR v86 at 55) (emphasis added).  This is a statement one might have expected from the State's attorneys prosecuting the case *against* the Petitioner.  In fact, however, these words were uttered during the punishment phase of Hall's trial by Hall's own lead trial counsel, Frank Macias.  This assertion, and many others like it, sabotaged any opportunity for effective assistance of counsel during the punishment phase of his trial.

When trial counsel's strategy is obviously flawed, courts are not reluctant to find that the defendant has been unconstitutionally denied the effective assistance of counsel.  *See Richards v. Quarterman*, 566 F. 3d 553 (5th Cir. 2009) (finding that defense counsel's failure to present certain evidence was objectively unreasonable under prevailing professional norms and was not product of conscious and informed decision on trial strategy); *Moore v. Johnson,* 194 F. 3d 586, 604 (5th Cir. 1999) ("The Court is . . . not required to condone unreasonable decisions parading under the umbrella of strategy."); *United States v. Rusmisel*, 716 F.2d 301, 310 (5th Cir. 1983) (even if an attorney's manner of conducting a trial is trial strategy, it can be so ill chosen as to constitute ineffective assistance).

There can be no question that the tactics of the Petitioner's trial counsel during the punishment phase of the trial were deeply and inexcusably flawed.  The statement referenced above was not the only example.  It was instead part of a larger and inexplicable theme that

-78-

Petitioner's counsel wove throughout his arguments.   Consider another statement defense counsel made to the jury charged with determining the Petitioner's fate: "Justen has killed; why shouldn't we will him?   Why shouldn't we kill him?   *He doesn't need your sympathy.*   He showed no sympathy for those two people.   Why shouldn't we kill him."   (RR v86 at 49) (emphasis added).   Arguing to the jury weighing the value of the defendant's life that the defendant does not warrant sympathy cannot be considered effective assistance of counsel under any standard.

This refrain – "why shouldn't you kill him?" – was apparently a key part of trial counsel's strategy, as the phrase was repeated at least ten times in a mere twenty minutes of closing argument before the jury.   (RR v86 at 46-50).   However, rather than offering the jury a convincing answer to this (presumably) rhetorical question, which would have been the only plausible explanation for this strategy, defense counsel proceeded to make further prejudicial statements about the Petitioner's character: "he's a poor representative of . . . what it means to be a human being,"  (RR v86 at 55); "Why shouldn't you kill him?  He has killed two people," (*Id.*); "[e]ach one of you have a conscience that Justen maybe hasn't yet developed," (*Id.* At 52); "[i]f Justen Hall truly was having a trial and judged by his peers . . . he should have been shot when he shot Hector Diaz." (RR v86 at 51).

Counsel's only attempt to advocate against imposition of the death penalty was in the abstract, essentially arguing that Justen did not deserve to live, but that the jury should keep him alive in order to protect the justice system from "Old Testament" "eye for an eye" retribution. (RR v86 at 57; *see also id.* at 56 ("There is something in Justen that's worth keeping alive.  Not because – not because he deserves it, because he doesn't.  It's because of something greater than Justen.  It's because our system of justice, it's because your moral development, gives you the

-79-

ability to make him stay alive, to hopefully learn what it's like to develop a conscience, because he does have that spark.  Death is too easy.  Death is too quick.").

An intellectual argument against the death penalty cannot be deemed an effective defense strategy in the face of other statements by defense counsel that his particular client deserves to die.  Indeed, defense counsel suggested on three separate occasions in his closing argument that the Petitioner did not deserve to be kept alive.  (RR v86 at 55-57).  As the *Richards* Court recently explained, whether counsel's decisions "were governed by a reasoned trial strategy is an important question."  566 F. 3d at 566; *see also Loyd v. Whitley,* 977 F.2d 149, 158 (5th Cir. 1992) (noting that "whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny" and that this "crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court.").

There is no way to describe what trial counsel did in this case as a "reasoned trial strategy."  Indeed, if trial counsel's only strategy during the punishment phase was to advocate against application of the death penalty in general, his statements that his own client *deserved* to die are in direct conflict with that alleged strategy.  Trial counsel's disastrous decision to marginalize the value of his client's own life entirely undermined the Petitioner's defense during the punishment phase of his capital trial.  Counsel's testimony was unprofessional by any standard, and epitomizes ineffective assistance of counsel, essentially aligning his position with that of the prosecution.

Without the unified encouragement from counsel on both sides that the Petitioner deserved to die, it is entirely possible that the jury would have returned a different sentence. This is especially true because a jury most expects to hear arguments in support of mercy from the defendant's own attorneys, yet trial counsel here failed to offer the jury anything but support

-80-

for the prosecution.   The Petitioner was thus prejudiced by his counsel's unprofessional performance, and in accordance with *Strickland* principles, his petition for relief should be granted.  *See Rusmisel*, 716 F.2d at 310 (finding that counsel's "strategy" was so ill chosen that it rendered the trial fundamentally unfair).

> **H.**     **PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL RELINQUISHED TWO PEREMPTORY CHALLENGES AGAINST OBJECTIONABLE JURORS BY FAILING TO REQUIRE THAT EACH ELIGIBLE JUROR BE PASSED FOR PREEMPTORY CHALLENGE FIRST BY THE PROSECUTION.**

Under Article 35.13 of the Texas Code of Criminal Procedure, the State is required to exercise challenges for cause and peremptory strikes to potential jurors *before* a capital defendant exercises his.  Mr. Macias violated the Petitioner's Sixth Amendment right to effective assistance of counsel when he unreasonably, and without any strategic or tactical motive, made an agreement with the State to exercise simultaneous and independent peremptory strikes.  (*See* Exhibit 23, Agreed Procedure for Jury Selection).  As a result of this agreement, at least two jurors who demonstrated improper bias were permitted to serve on the panel that delivered Mr. Hall's death sentence.

Mr. Macias's conduct violated the Petitioner's Sixth Amendment right to counsel in that (1) Macias's performance was objectively deficient; and (2) but for Macias's deficient performance, there is a reasonable probability that "the jury may have answered the special issues submitted in the punishment phase differently." *Moore*, 194 F.3d at 619 (5th Cir. 1999) (citations omitted); *see also Strickland*, 466 U.S. at 688-89 (1984).  In determining whether Mr. Hall has been prejudiced by his counsel's conduct, the Court should consider the cumulative effect of Macias's deficient performance during both the trial and punishment phase proceedings. *Moore*, 194 F.3d at 619 ("When, as here, the same jury considered guilt and punishment, the

question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable.") (*citing Strickland*, 466 U.S. at 687).

### 1. Article 35.13 Provides Capital Defendants with an Important Strategic Advantage in Jury Selection Proceedings.

Article 35.13 of the Texas Code of Criminal Procedure provides: "A juror in a capital case . . .held to be qualified, shall be passed for acceptance or challenge *first* to the State and *then* to the defendant.  Challenges to jurors are either peremptory or for cause."  (emphasis added). By requiring the State to exercise its peremptory strikes first, a capital defendant is benefited any time the State strikes a juror on whom the defendant intended to exercise one of his own strikes. *Janecka v. State*, 739 S.W.2d 813, 833 (Tex. Crim. App. 1987).  This advantage allows the defendant to maximize his use of peremptory strikes by only having to strike objectionable jurors who cannot be challenged for cause, but who the State has accepted.

By contrast, if a capital defendant and the State exercise strikes at the same time and independently, the defendant runs the risk of forfeiting any strikes he uses on jurors who are also stricken by the State.  Forfeited strikes are a lost opportunity to remove an objectionable juror who cannot successfully be challenged for cause.

The Texas Court of Criminal Appeals ("CCA") has adopted two challenge procedures that it has found to be statutorily compliant.  *Hughes v. State*, 24 S.W.3d 833, 841 (Tex. Crim. App. 2000) (citations omitted).  The first procedure provides that "the State must voice both a challenge for cause or a peremptory challenge before the defendant." *Id.*  The second provides "that both sides issue any challenges for cause before the State first lodges a peremptory challenge." *Id.*  Paramount under either of these methods is the principle that "Article 35.13 requires the State to act before the defendant and ensures that any strategic advantage benefits the defendant." *Id.* (*citing Janeck*, 739 S.W.2d at 834, which found that capital defendants do

not have to exercise a peremptory strike against a prospective juror until the State has decided whether to do so); *see also Bigby v. State*, 892 S.W.2d 864, 881 (Tex. Crim. App. 1994), *denial of habeas corpus aff'd in part, rev'd in part on other grounds*, *Bigby v. State*, 340 F.3d 259 (5th Cir. 2003) (finding Article 35.13 requires the State to exercise peremptory strikes and challenges for cause before a capital defendant).

When Mr. Macias entered into an agreement allowing the State to exercise peremptory challenges at the same time, and independent from, Mr. Hall, he deviated from the Article 35.13 challenge procedure, and unreasonably sacrificed Mr. Hall's critical statutory advantage in jury selection procedures.

> **2.     Mr. Macias Lost Two Peremptory Strikes Against Potential Jurors by Failing to Require That Each Eligible Juror Be Passed for Peremptory Challenge First by the Prosecution As Prescribed by Article 35.13.**

Article 35.13 "ensures that any strategic advantage [in jury selection] benefits the defendant." *Hughes*, 24 S.W.3d at 841 (*citing Janecka*, 739 S.W.2d at 834). Prior to trial, Mr. Macias and the State agreed that upon reaching 46 qualified jurors, the clerk of court would provide each side with a list of the qualified jurors on which they would make their peremptory strikes independently. (*See* Exhibit 23, Agreed Procedure for Jury Selection). Prior to qualifying 46 jurors, each juror would be individually questioned first by the State, then by Mr. Macias. (*Id.*). At the conclusion of each individual questioning, the State would raise any challenges for cause, followed by Mr. Macias if the State's challenge was denied. (*Id.*). The parties were not to make any peremptory challenges until at least 46 jurors were qualified. (*Id.*). Questioning was to continue until 46 jurors had been qualified. (*Id.*).

Pursuant to this agreement, upon qualifying 48 jurors, the court summoned all 48 to ensure they were still able to serve. (RR v66). After excusing two jurors by agreement,

-83-

Mr. Macias exercised nine challenges for cause and made nine requests for additional peremptory strikes with which to strike the challenged jurors. (RR v66 at 12, 15-18). The Court denied each of his challenges and requests. (*Id.*). Mr. Macias then unsuccessfully moved for a new trial, stating that some jurors were not properly qualified during voir dire. (*Id.*). Finally, and pursuant to their agreement, Mr. Macias and the State exercised all fifteen of their peremptory strikes *simultaneously* using two independent lists of the potential jurors provided by the Clerk of the Court. (RR v66 at 26).

Using this flawed procedure, Mr. Macias and the State each exercised a strike on jurors Edmundo Puga and Lucila Menchaca. (Exhibit 24, Petit Venire Listing for January 12, 2005). As a result, Mr. Macias lost two of Mr. Hall's peremptory strikes that would not have been used if Mr. Macias had followed the appropriate procedure.

### 3. Mr. Macias's Forfeit of Mr. Hall's Article 35.13 Strategic Advantage in Jury Selection Caused At Least Two Biased Jurors to Serve on the Panel That Delivered The Petitioner's Death Sentence

The Sixth Amendment guarantees the absolute right to trial by an impartial jury. U.S. CONST. amend. VI; *Neder v. United States*, 527 U.S. 1, 8 (1999) (holding the presence of a biased juror is a structural error "subject to automatic reversal."); *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009) ("the presence of a biased juror may require a new trial as a remedy"). Texas law grants a capital defendant an unlimited number of challenges for cause to remove a biased juror whose views or beliefs inhibit or prevent him from rendering an impartial decision. Tex. Code. Crim. Pro. art. 35.16; *Adams v. Texas*, 448 U.S. 38, 45 (1980) (finding a juror is biased when his views or beliefs "prevent or substantially impair the performance of his duties as a juror"). "Bias exists as a matter of law when a prospective juror admits that he is

biased for or against a defendant. . . ." *Anderson v. State*, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982).

During his individual voir dire examination, James Griffith repeatedly stated that he was biased in favor of police officers and against gang members.  (RR v15 at 112) ("Well, I think I may be influenced at the beginning, biased toward a police officer . . ."); *see also* (RR v15 at 114-15; RR v16 at 49-50).  Further, Mr. Griffith felt that police officers have "some leeway in obtaining a confession," such that a law enforcement officer is allowed, in his opinion, to "grill the individual" and "put him under pressure" to obtain a confession.  (RR v16 at 46).  He then stated that he would find it very difficult to consider anything less than physical stress as evidence of a coerced confession:

| | |
|---|---|
| Mr. McDonald: | the opinions that you have expressed and the opinions that you hold, do you automatically exclude certain types of evidence as showing duress or coercion?  I think you that, because you said that you can't see a situation where someone being continually questioned, you know, would voluntarily confess to something that they didn't do? |
| Mr. Griffith: | I find it hard to believe, yes. |
| Mr. McDonald: | Very hard to believe, wouldn't you? |
| Mr. Griffith: | Uh-huh |
| Mr. McDonald: | And you really can't -- you really cannot envision any circumstances where that would be adequate evidence of coercion, can you?  And that's your opinion; you're entitled to it. |
| Mr. Griffith: | Well, if the guy could show that, you know, three days and three nights he hadn't been able to sleep and he had been given little to eat, that type of thing, continually questioned and what have you, some extreme like that, I would think you would have to consider that that's bordering on physical coercion, you know because he's put under physical stress. |

(RR v16 at 46-48).

During the voir dire examination of Mr. Griffith, Mr. Macias asked: "in general, without taking into account what they say, police officers, law enforcement, is going to start out more

credible.  That accurately reflects your opinion?" Mr. Griffith responded "I am not sure you are ever going to get me to admit to that."  (RR v16 at 57).

When the case against a defendant is largely dependent upon the testimony of law enforcement officials, a juror who is biased in favor of police officers is necessarily biased against the defendant.  *Hernandez v. State*, 563 S.W.2d 947 (Tex. Crim. App. 1978).   In *Hernandez*, the CCA found that a juror's "predisposition to believe police officers . . . effectively demonstrated bias against the appellant," where "three of the four State's witnesses were police officers . . . ." *Id.* at 950 (finding juror's bias "would have prevented her from impartially judging the credibility" of other witnesses where she stated she felt police officers were always truthful).

As in *Hernandez*, the State's case against Mr. Hall was dependent upon the testimony of the three investigation police officers.  Indeed, the State's attorney testified that all six of the State's corroborating witnesses were dispensable.  (S.H. Tr. at 17-18).  Because the officers were critical to the State's case and their testimony concerned, in large part, the voluntariness of Mr. Hall's confession, Mr. Griffith's inability to consider anything less than physical force as coercive also necessarily biased him against Mr. Hall.

"When a prospective juror is shown to be biased as a matter of law, he must be excused when challenged . . . ." *Anderson*, 633 S.W.2d at 854.  "Where the juror states he believes that he can set aside any influences he may have, and the trial court overrules a challenge for cause, its decision will be reviewed in light of all of the answers the prospective juror gives." *Id.*  Mr. Griffith indicated several times in the record that he was biased in favor of police officers.  (RR v15 at 144-15; RR v16 at 49-50, 60).  Mr. McDonald challenged Mr. Griffith for cause on two occasions on the grounds that his bias in favor of law enforcement prevented him from

A/73401003.1

remaining impartial. (RR v16 at 71; RR v66 at 11-12). In addition to stating his bias explicitly, Mr. Griffith alluded to it several times stating, "what I would be afraid of is a juror would sit up here and make you believe that they would be impartial just to be able to sit on the jury;" and responding, "I am not sure you are ever going to get me to admit that" when asked whether he felt law enforcement officials were more credible than other witnesses. (RR v16 at 57, 60).

Similar to Mr. Griffith, during his individual voir dire, juror Kenneth Sudimack disclosed a bias which was relevant to the Petitioner's case. Specifically, he admitted that he was against life imprisonment for capital defendants accused of murders that he subjectively deemed "horrific":

| | |
|---|---|
| Mr. Macias: | Now, the fact that you have a problem as a taxpayer with giving someone a roof over their head and three meals a day for doing nothing in return to the state, does that make you predisposed toward the death penalty? |
| Mr. Sudimack: | People like Charles Manson, yes. That aggravates me that he's, you know, sitting in a jail in California after doing what he did. Cases like that, yeah, I have a problem supporting him. |
| Mr. Macias: | Is there any difference between who he killed and who someone else kills? |
| Mr. Sudimack: | No. |
| Mr. Macias: | So if -- |
| Mr. Sudimack: | But the circumstances involved in that case were pretty horrific. . . When somebody accidentally kills somebody, I don't necessarily want them to die for it. It depends on the circumstances. But in cases like Charles Manson, I don't like paying for that. |

(RR v39 at 101).

When asked whether that viewpoint left him predisposed to the death penalty, Mr. Sudimack could not provide a definitive response:

| | |
|---|---|
| Mr. Sudimack: | But my point is this: It depends on the circumstances, okay? It depends on the circumstances. You know, I'm not saying everyone that's in jail for murder ought to be, you know, shot because it would save the state a lot of money than keeping them in jail. I'm saying, in certain cases, obviously headline cases, whatever, I think it's, you know, not a good thing to keep these guys in jail for 40 years at taxpayer expense. |

A/73401003.1

| Mr. Macias: | And what I want to know is, how it affects you, as a juror, that you have that predisposition? |
| Mr. Sudimack: | I don't know.  That's up to you, I guess. |
| Mr. Sudimack: | I don't know what the circumstances of the case are.  I don't think I'm predisposed to saying anybody guilty ought to be -- whatever . . .Killed. |

(RR v39 at 104).

In *Diaz v. Quarterman*, the Fifth Circuit found that despite a juror's assertion that he was able to serve objectively on the panel, he had clearly demonstrated that his religious beliefs would prevent him from being unbiased:

> Although Albrecht may have equivocated about his position on capital punishment . . . he ultimately said that his religious beliefs would cause him to lean against the death penalty and that he would not be able to set aside those beliefs to render a decision based on the evidence.  For all intents and purposes, Albrecht stated that he would not be able to apply the law or view the facts impartially because of his religious beliefs.

*Diaz v. Quarterman*, 228 Fed. App'x 417, 426 (5th Cir. 2007).  Here, Mr. Sudimack ultimately stated that should he find Mr. Hall's murder to be "horrendous" or similar to those committed by Charles Manson, he was predisposed to delivering a death sentence.  Regardless of his own belief that he was able to sit impartially on the jury, Mr. Sudimack's voir dire examination demonstrated that he was not.  While Mr. Macias challenged Mr. Sudimack for cause, the challenge was denied, and the previous forfeit of two peremptory strikes prevented Mr. Macias from removing Mr. Sudimack from the jury.

The record shows juror Griffith's pro-law enforcement bias that limited his ability to follow the law and juror Sudimack's compulsion to return a death sentence based on his subjective view of the crime at issue.  Thus, each of these jurors was biased and should not have served on the jury that delivered Mr. Hall's sentence.  As such, Mr. Hall has suffered harm as he was not tried by an impartial jury, in violation of his Sixth Amendment rights.

A/73401003.1

**4.    Mr. Macias Had No Strategic or Reasonable Explanation For Failing To Require That Each Eligible Juror Be Passed for Preemptory Challenge First by the Prosecution As Set Forth In Article 35.13.**

To prove his ineffective assistance of counsel claim, the Petitioner must show that his counsel's performance was deficient and that the Petitioner suffered a substantial harm as a result. *Strickland*, 466 U.S. at 688-89.  Where it is apparent from the face of the record that trial counsel's decisions were not the result of any strategic or tactical reasoning, the Court is not required to accept his decisions as reasonable. *Moore*, 194 F. 3d at 604 ("The Court is, therefore, not required . . . to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decisions at all.").  The record in this case demonstrates that Mr. Macias's decision to allow the State to conduct simultaneous peremptory strikes was not driven by a tactical or strategic decision, as he did not ever understand the advantages provided by Article 35.13 to make an informed decision to forego them.

It is well settled that Article 35.13 affords capital defendants advantages in voir dire that non-capital challenge procedures do not. *See e.g.*, *Dowthitt v. State*, 931 S.W.2d 244, 251 (Tex. Crim. App. 1996) (listing individual juror voir dire, five additional peremptory strikes as examples of advantages of article 35.13 voir dire procedures); *Janecka*, 739 S.W.2d at 834 ("It can readily be seen that in many respects capital murder defendants have advantages in jury selection not enjoyed by non-capital felony defendants").  Texas courts have allowed for capital defendants to exercise their peremptory strikes retroactively after all jurors have been individually examined on voir dire. *See Bigby*, 892 S.W.2d 864.  However, where a defendant exercises challenges unnecessarily and to the advantage of the State, Article 35.13 is violated. *Hughes*, 24 S.W.3d at 841 (finding that where defense counsel exercising a peremptory challenge saves the prosecutors a strike, forcing defendant to use a strike unnecessarily, Article 35.13 is violated and the court must examine for error) (citations omitted).

-89-

When asked whether he believed Article 35.13 provided Mr. Hall with an advantage in jury selection, Mr. Macias was adamant that he did not believe that Article 35.13 would have provided the Petitioner with any advantage:

Q.   But the Code method for conducting a capital voir dire in this instance provides a benefit to the defense, does it not?
A.   No, it doesn't.
Q.   So you don't think requiring the State to exercise challenges before the defense is required to is a benefit for that?
A.   No. I don't think the - - I don't think that the method of choosing a jury in a capital murder case has any benefit to the defendant whatsoever code or no code.
Q.   Do you think the defendant is disadvantaged no matter how you do it?
A.   However you do it in a capital murder trial, the fact that they have to be able to impose the death penalty takes away everything as far as I'm concerned of an advantage to the defendant. I don't see how you could sit there and say that there is any advantage given to the defendant by the Code here in Texas.
Q.   Okay. I need to be more specific about that. Let me ask you to imagine a situation in which the Legislature has said that you get to conduct your jury selection and make your strikes the way you like to do and the way that we all do in non death penalty trials by seeing the whole surviving panel and making our strikes. And suppose the Legislature said but in death penalty cases the State has to make all their strikes first and they have to show them to you before you have to make any of yours. Wouldn't you think that would be better for the defendant?
A.   No let me repeat myself. The fact that the Legislature in Texas has made it that you have to be able to - - that you have to strike those people that can't consider the death penalty gives no advantage to the defendant under any form or shape.

(S.H. Tr. at 115).

When questioned about whether he thought his agreement with the State resulted in the unnecessary loss of two peremptory strikes for Mr. Hall, Mr. Macias further demonstrated his lack of understanding of the implications of his agreement:

Q.   If you wind up exercising 15 challenges, Mr. Macias, and the State winds up exercising 15 peremptory challenges, and you each exercise five peremptory challenges against the same jurors whether it's a death penalty case or not you're losing five peremptory challenges. If somebody gave them back to you, are you telling me that you wouldn't take them?
A.   I think you need to go back and look at the challenges and see if there were any double strikes.
Q.   There were. There were two double strikes in your case.
A.   Okay.
Q.   You lost two peremptory challenges.

-90-

A/73401003.1

> A.   So I lost two peremptory challenges.
> Q.   If somebody were to give those back you're telling me you'd refuse to take them?
> A.   I don't -- I don't recall if I would have taken those two strikes or not.
> Q.   In other words, what you mean is you don't know whether there were two more jurors on that panel that you would have struck if you had two more strikes to use?
> A.   I don't remember.

(S.H. Tr. at 116-17).

Prior to exercising his peremptory strikes, Mr. Macias challenged nine jurors for cause, all of which the court denied. (RR v66 at 12, 15-18). Mr. Macias also requested a total of nine additional peremptory strikes for each of his challenges for cause that the Court denied. (*Id.*). After being denied additional strikes with which to remove the challenged jurors, Mr. Macias moved for a mistrial, citing his inability to properly voir dire the challenged jurors and generally asserting that all of the jurors were improperly qualified. (RR v66 at 23-24). The trial court denied his motion as well. (*Id.* at 24). On direct appeal, appellate counsel challenged three of the denied challenges for cause, asserting that the trial judge improperly limited the voir dire examination of Gloria Lopez, and that another two, Kenneth Sudimack and James Griffith, were openly biased in favor of law enforcement. *Hall v. State*, No. AP-75, 121, 2007 WL 1847314 (Tex. Crim. App. Jun. 27, 2007). Based on his requests for additional strikes, and subsequent motion for a mistrial, it is reasonable to conclude that if Mr. Macias had been given two additional strikes he would have used them to remove at least two of these three veniremembers. Yet, when pressed on the issue during the state habeas proceeding, Mr. Macias did not offer any plausible tactical reason for deviating from the Article 35.13 requirements:

> A.   The State is always in an advantage in a capital murder --
> Q.   Overall.
> A.   -- proceeding.
> A.   And so I decided to do it the way that I did it, and I don't think I would have changed. And I won't change.

(S.H. Tr. at 118).

A/73401003.1

The record clearly demonstrates that Macias did not understand the implications of the agreement he was making with the State to forego the Article 35.13 protections and advantages. By exercising two strikes unnecessarily and to the benefit of the State, Mr. Macias deviated from Article 35.13 with no tactical advantage, and hence, prejudiced Mr. Hall by allowing two biased jurors to serve on the jury that sentenced him to death.   This lack of understanding is unreasonable and, when considered within the totality of errors committed by Mr. Macias during both the trial and punishment phase of the trial, constitutes ineffective assistance of counsel. *See Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999) ("When, as here, the same jury considered guilt and punishment, the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable") (*citing Strickland*, 466 U.S. at 687).

## I.   PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH AMENDMENT BECAUSE TRIAL COUNSEL AGREED TO EXCUSE DEATH-QUALIFIED VENIRE MEMBERS WHO WERE OPPOSED TO CAPITAL PUNISHMENT WITHOUT QUESTIONING THEM.

A defendant is deprived of effective assistance of counsel when (1) counsel's performance was objectively deficient; and (2) that but for counsel's deficient performance, there is a reasonable probability that "the jury may have answered the special issues submitted in the punishment phase differently." *Moore*, 194 F.3d at 619 (citations omitted); *see also Strickland*, 466 U.S. at 688-89.

Here, Mr. Macias's deficient performance included his decision to excuse, without questioning, all venirepersons who indicated on their juror questionnaire that they were opposed to the death penalty.  This decision was by no means required – the law provides that: "[a] man who opposes the death penalty . . . can make the discretionary judgment entrusted to him . . . and can thus obey the oath he takes as a juror." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). Thus, these veniremen were not *per se* unqualified.

-92-

During the state habeas proceedings, Petitioner's state habeas counsel informed Mr. Macias that because of the number of death-qualified jurors Mr. Macias agreed to excuse, the State did not raise a single challenge to a juror on the grounds they were not death-qualified. When asked whether his decision to excuse the jurors was strategic or tactical decision, Mr. Macias responded that he did not know:

Mr. Norris:     Would it surprise you -- would it surprise you to know that during the entire jury selection process lasting about six weeks in this case that the State never made in this case a single challenge against any prospective juror upon the grounds that they couldn't consider the death penalty?

Mr. Macias:    I don't remember

Mr. Norris:     And that the reason that they didn't was because they didn't have to. And that the reason they didn't have to is because you already had agreed to let those jurors go. Why would you do that?

Mr. Macias:    (Indicating)

Mr. Norris:     And there were scores of them. Do you recall that in this case that there -- before each mini panel is called in for the day that --that you and Ms. Meraz agreed almost every day -- not every day -- to exclude by agreement certain prospective jurors?

Mr. Macias:    Yes.

Mr. Norris:     There were some days in which you would agree to exclude all of them and didn't have to do any voir dire that day?

Mr. Macias:    I don't -- I don't ever recall doing that.

Mr. Norris:     And a lot of those prospective jurors were people who had scruples against the death penalty, who answered one or more of the questionnaire questions in such a way as to make it appear as though they were against the death penalty in some way. And any one of them that was remotely against the death penalty in any way you agreed to exclude . . . Is that typical of every capital case?

Mr. Macias:    There is more agreements between myself and some attorneys and there is less agreement between myself and some attorneys. I find it easier to negotiate things with Meraz than I did -- than I do with a person by the name of Dixon. And I find it easier to negotiate things with Meraz than I do with some of the other attorneys in the DA's office.

-93-

Mr. Norris:    Why would you agree to exclude those people?  All you need to do is to get one on the jury who won't put somebody to death, and they're already convinced.  They could convince all 12 of those people.  All you need is one.  And you're going to agree with Ms. Meraz to excuse anybody who remotely has opposition to the death penalty?

Mr. Macias:    I think there was some trading going on, if I recall.

Mr. Norris:    I'm sure there was.

Mr. Macias:    But I don't recall what it was or why.

(S.H. Tr. at 118-120).  When further questioned about why he excused jurors who indicated they were opposed to the death penalty, Mr. Macias still did not offer an explanation for his decisions, and acknowledged that Mr. Hall should raise his odd conduct on appeal:

Mr. Macias:    There were several jurors I said I'm not going to agree to give these up, I want to question them.  Okay?  There were several jurors that I -- we get rid of these.  And she said no, I want to question these, and I said okay.

Mr. Norris:    Right.

Mr. Macias:    The ones we couldn't get rid of I might get -- you know, I saw these people.

Mr. Norris:    All right.

Mr. Macias:    And, you know, I decided to give the certain once-over.  And so I gave up certain ones to be able to get further into the panel.

Mr. Norris:    Okay.

Mr. Norris:    And as a result of that she never -- she never had to challenge for cause on death penalty grounds or a single one of the jurors that you guys have actually venired.

Mr. Macias:    Well-

Mr. Norris:    It sounds like you did her work for her.  All you needed was one of those guys on the jury and Justin Hall would get a life sentence instead of the death penalty.

Mr. Macias:    Put that in the appeal.  I mean you may be right.

Mr. Norris:    I wanted your explanation, if you have one.

-94-

Mr. Macias:    I don't have an explanation.

(S.H. Tr. at 216-17).

Mr. Macias admits that there was no tactical reason or trial strategy that informed his decision to excuse, without questioning, numerous jurors who were opposed to the death penalty, to the detriment of his client.  "The Court is, therefore, not required . . . to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decisions at all."  *Moore*, 194 F.3d at 604.   Taken in tandem with the fact that Mr. Macias was later denied nine challenges for cause and a motion for a mistrial based on the lack of qualified jurors in the jury panel, it is clear that Mr. Macias made an unreasonable decision in failing to question numerous death-qualified jurors before excusing them.   As a result, Mr. Hall was sentenced to death by a jury unnecessarily containing at least one person biased against life imprisonment.

J.    **PETITIONER'S SENTENCE OF DEATH VIOLATES THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE TRIAL COUNSEL FAILED TO OBJECT TO THE COURT'S FAILURE TO INSTRUCT NUMEROUS VENIRE MEMBERS AS REQUIRED BY TEXAS CODE OF CRIMINAL PROCEDURE ART. 35.17(2).**

Under Article 35.17(2), a capital trial court must "propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion." Tex. Code. Crim. Pro. art. 35.17(2).  A court's failure to administer such questions constitutes reversible error when a capital defendant is denied a federal right as a result.  *See Riles v. McCotter*, 799 F.2d 947, 951 (5th Cir. 1986).  In the instant case, when Judge Woodard took over as presiding judge during voir dire examinations, he did not question the jury regarding the Article 35.17(2) principles before allowing the State and Mr. Macias to proceed with voir

dire examinations.   As a result, at least one juror with questions regarding the principle of reasonable doubt was seated on the jury that delivered Mr. Hall's death sentence.

When trial counsel fails to raise an objection during trial proceedings that results in the defendant being denied a federal right, counsel has violated the *Strickland* standard for ineffective assistance of counsel.   *See Tong*, 25 S.W.3d at 712 (addressing ineffective assistance of counsel claim for failure to object to State's mitigation instructions to jury during punishment phase).   Generally, if trial counsel's performance is (1) objectively deficient, and (2) the defendant was prejudiced as a result, he has violated the *Strickland* standard.   *Strickland*, 466 U.S. at 688-89.   Where counsel has failed to object, he violates the *Strickland* standard when the record clearly demonstrates that the decision was not tactical or part of any sound trial strategy. *See Mallet v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) ("any allegation of ineffectiveness must be firmly founded in the record and must demonstrate the alleged ineffectiveness").

The record demonstrates that Mr. Macias's failure to object to the voir dire proceedings was not based on any tactical or strategic reasoning.   Rather, Mr. Macias's belated attempt to move for a mistrial falls far short of the objection that was needed.   As a result, at least one unqualified juror was seated on the panel that ultimately delivered Mr. Hall's death sentence.

### 1.   Judge Woodard Did Not Comply With the Article 35.17(2) Requirements.

Article 35.17(2) requires that a court question the entire panel of prospective jurors on the principles of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion, prior to allowing the State and defendant to proceed with voir dire examination.   Tex. Code. Crim. Pro. art. 35.17(2) (Vernon 1991).   The purpose of voir dire examinations "are to develop rapport between officers of court and jurors, expose juror bias or interest warranting challenge for cause, and elicit information necessary for the defendant to

-96-

intelligently use his peremptory challenges." *S.D.G. v. State*, 936 S.W.2d 371, 380 (Tex. Ct. App. 1996) (citations omitted). While a trial court has discretion in determining how voir dire will run, the exercise of that discretion is "limited by the essential demands of fairness." *Knox v. Collins*, 928 F.2d 657, 661 (5th Cir. 1991). "A voir dire procedure that effectively impairs the defendant's ability to exercise his challenges intelligently is ground for reversal, irrespective of prejudice." *Id.*

In the instant case, Judge Moody was the presiding judge during the initial voir dire examinations. However, shortly after examinations commenced, Judge Woodard served as a substitute judge and presided over much of the remaining voir dire examinations. Judge Moody questioned individual jurors regarding reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion prior to allowing the State and Defense to proceed with their questioning. (RR v8 at 6). Judge Woodard, however, did not engage in any of the questioning called for under Article 35.17(2), and instead allowed the State to proceed with its voir dire examination immediately after each juror was sworn in. (*See* RR vl at 9-66). At no point did Mr. Macias raise an objection regarding Judge Woodward's failure to comply with Article 35.17(2). As a result, at least one juror who did not fully understand the Article 35.17(2) principles of reasonable doubt was seated on the jury panel that delivered Mr. Hall's death sentence. Mr. Macias's failure to object to Judge Woodward's violation of Article 35.17(2) therefore resulted in substantial prejudice to Mr. Hall and violated his Sixth Amendment right to counsel.

A/73401003.1

2.    **Mr. Macias Had No Tactical or Strategic Reasoning For Failing to Raise An Objection To the Omission of the Article 35.17(2) Requirements.**

When questioned during the state habeas proceedings, Mr. Macias was unable to offer any tactical or strategic reason why he failed to object to the deficient voir proceedings.  Indeed, Mr. Macias was unable to recall a single detail regarding the voir dire examination process:

Q.   Okay.  One of the other things I notice about the voir dire in this case is that part of it was conducted by Judge Moody and part of it was conducted by Judge Woodard.

Q.   Judge Moody, when each panel comes in, a mini panel comes in, he goes through the questions and instructions that the Code of Criminal Procedure requires under Article35.17, I think, but Judge Woodard never does.  In fact, not one of the single -- of the mini panels that he presided over in jury selection did he comply with 35.17 Section 2 at all.    Do you recall that?

A.   I don't recall.

Q.   You know that the section of the Code of Criminal Procedure that requires in a capital murder voir dire for the trial judge to first propound questions to the jury and give instructions on certain issues such as reasonable doubt, the death penalty and those things.  And then the Court turns them over to the lawyers to conduct the rest of the Code of Criminal Procedure?

A.   Okay.

Q.   Would it surprise you at all that Judge Moody did that every time, but Judge Woodard never once did.  Do you remember that?

A.   No.

Q.   Why wouldn't you make an objection?  That's a valuable part of the voir dire process, isn't it, including instructions on those things from the Judge?

A.   Perhaps I wanted to instruct them myself.  I don't know.

Q.   You didn't think to object and say, Judge Woodard, I would sure like to get you to comply with 35.17?

A.   No.

Q.   Have you got any reason why you didn't do that?

A.   I don't recall whether I did it or not.  Obviously, I didn't or you wouldn't be asking about it.

(S.H. Tr. at 120-122).

Mr. Macias used the deficiency of the voir dire proceedings as the basis for nine challenges for cause and two motions for a new trial.  (RR v66 at 14-17, 24-25; Exhibit 25, Motion for New Trial).  In his oral motion for mistrial, Mr. Macias specifically asserted that the jurors qualified by Judge Moody were "imminently more qualified than those qualified under

-98-

Judge Woodard." (*Id.* at 25). Thus, despite the materiality of the omission of the Article 35.17 safeguards, Mr. Macias could not provide any explanation for his failure to object during the voir dire proceedings.

Further, Mr. Macias exacerbated his failings with a continued lack of diligence. When he orally moved for a mistrial, he stated that he would submit a detailed written memorandum in support of his motion prior to trial. (RR v66 at 24-25). The record does not reflect any written motion or memorandum in support of his oral motion for a new trial filed prior to the commencement of Mr. Hall's trial. Mr. Macias thus failed to follow through and address a clear error on the part of the trial court and his own failure to properly object, although he had an opportunity to do so. This is further and independent evidence of his failure to provide effective assistance of counsel to Mr. Hall and constitutes a violation of Mr. Hall's Sixth Amendment rights.

> **3.    Mr. Hall Suffered Substantial Prejudice From Mr. Macias's Failure to Object Regarding The Improperly Omitted Article 35.17(2) Principles.**

"The object of a voir dire examination of prospective jurors is to cause to be assembled a competent, fair, and impartial and unprejudiced jury to judge the facts of the case. *Yanez v. State*, 677 S.W.2d 62, 65 (Tex. Crim. App. 1986). Mr. Macias's failure to object to Judge Woodard's omission of article 35.17(2) legal principles violated Mr. Hall's right to a trial by a fair and impartial jury because the jurors were not properly instructed.

For example, Judge Moody, who instructed jurors in compliance with Article 35.17(2), provided the following instructions for the principle of reasonable doubt:

Q.    Then the standard that they have to prove, it is beyond a reasonable doubt. . . .So what is beyond a reasonable doubt? It's a very difficult term to define. Most people find it very, very hard to tell you, in words, what is beyond a reasonable doubt. I kind of compare it sometimes to looking at the flag over here and saying

. . . "Okay, now, does everybody see which part of it is red?" Okay. Nobody has any trouble with that. But if you ask them, okay, "Now define red. What is red," that's hard. Because, well, I don't know. It's red, and I know it when I see it because I know what it is, but I'm not sure I can put it into words. . . .It's somewhat like that with a trial . . . the state has to prove beyond a reasonable doubt the defendant committed this offense. Okay. And it's not enough that the state merely shows that the defendant maybe did it, possible did it, even probably did it. That's not enough. On the other hand, they don't have to prove that the defendant did it beyond all doubt whatsoever; there is absolutely not one doubt, because that seems beyond a reasonable doubt, not beyond all doubt whatsoever. . . The burden is not impossible for the state. It's just beyond a reasonable doubt. It's a term that you will have to define in your own heart, in your own mind. But when doing it, you can't set it too high so it's impossible for the state. But, again, you can't set it too low, because then that's not fair to the defense.

(RR v8 at 10-11).

During one of Judge Woodward's examinations, the State, not Judge Woodward, attempted to provide juror Kenneth Sudimack with similar instructions. The State's attempt, however, left Mr. Sudimack confused and without a clear understanding of the definition and scope of "reasonable doubt":

Q.   Reasonable doubt is the highest level. Now, the problem is, I can't define that for you, okay?

A.   Uh-huh.

Q.   I can tell you what it's not. I just cant' tell you what it is. It is not beyond all doubt. It is not beyond a shadow of a doubt. It's beyond a reasonable doubt. And if you have a reasonable doubt, that doubt has to be based on the evidence and the law in front of you. It can't be on something that's kind of in the back of your head or a what-if or something like that. Has to be based on the evidence in front of you, right?

A.   But you can't come up with an example of beyond a reasonable doubt? There is no definition in a law book or anything?

Q.   That's right. It's kind of a you know it when you see it. I mean, I can give you an example.

Q.   But if I ask you to define "black," well how do you define "black?"

Q.   Darker than dark, dark, dark, dark gray. You know, you could it, maybe, but it's going to be difficult.

Q.   Well it's kind of the same thing with beyond a reasonable doubt. You will know it when you get there.

Q.   You, as the juror, have to define what beyond a reasonable doubt means to you, and I can only tell you what it's not, what it isn't. What it is to you is what it is.

(RR v39 at 73-74).  Mr. Macias objected and asked the court to provide the juror with a proper

definition of reasonable doubt, but was unsuccessful:

Mr. Macias:    Your Honor, I would object at this point.  I think the juror asked a question, and I think it has to be answered for him truthfully.  On the federal side, there is a definition of what "reasonable doubt" is.

Mr. Hicks:     Your Honor, I'm going to object.  This is not the federal side.  This is the State of Texas.

Mr. Macias:    We don't have it anymore.  You need to tell him that.

The Court:     Reasonable doubt means reasonable doubt.

(RR v39 at 75).

To a juror such as Mr. Sudimack, who had sincere and important questions that would

have been covered by Article 35.17(2) safeguards, the State's view of "reasonable doubt" should

not be given the same weight as Article 35.17(2) principles properly covered by the Court.

Instead of fulfilling his Article 35.17 responsibilities, Judge Woodard provided Mr. Sudimack

with a non-responsive definition that "reasonable doubt means reasonable doubt," failing to

provide the clarity needed and reasonably requested by Mr. Sudimack.

The Court's failure to administer the Article 35.17(2) requirements constituted reversible

error as an unqualified juror served on the panel that delivered Mr. Hall's death sentence,

violating Mr. Hall's Sixth Amendment right to trial by an impartial juror.  The denial of this

federal right was a direct result of Judge Woodard's omissions.  Mr. Hall was further prejudiced

by his trial counsel's failure to object to this glaring omission.

A/73401003.1

## V.     PRAYER FOR RELIEF

WHEREFORE, Justen Grant Hall prays that this Court:

1.      Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.      Grant him further discovery and an evidentiary hearing at which he may present evidence in support of his claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and law raised by this Petition or such hearing;

3.      Direct that, under Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts, the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in the volume of exhibits filed with this Petition; and

4.      Grant such other relief as law and justice require.

Dated: June 10, 2010

By: _____

Kathryn M. Kase, Member of the Bar of this Court
Texas Defender Service
1927 Blodgett
Houston, TX 77004
Phone: 713.222.7788
Fax: 713.222.0260

William S.D. Cravens, admitted *pro hac vice*
Goutam Patnaik, admitted *pro hac vice*
Bingham McCutchen, LLP
2020 K Street NW
Washington, DC 20002
Phone: 202.373.6000
Fax: 202.373.6001

Counsel for Petitioner Justen Grant Hall

-102-

<u>VERIFICATION</u>

I, William S.D. Cravens, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.  I declare under penalty of perjury that the foregoing is true and correct. Executed on June 10, 2010

William S.D. Cravens

A/73401651.1

## CERTIFICATE OF SERVICE

I, Stephanie J. Brett, HEREBY CERTIFY that on this 10th day of June, 2010, copies of the foregoing Brief in Support of Petition for Habeas Corpus were served upon the following parties as indicated:

**Via Federal Express:**

**Thomas M. Jones**                    **1 Copy**
Assistant Attorney General
Postconviction Litigation Division
P.O. Box 12548
Capitol Station
Austin, TX 78711
Phone: 512/936-1400
Fax: 512/936-1280
Email: thomas.jones@oag.state.tx.us
*LEAD ATTORNEY*

**Edward L. Marshall**                    **1 Copy**
Assistant Attorney General
State of Texas
P.O. Box 12548
Capitol Station
Austin, TX 78711-2548
(512) 936-1400
Fax: (512) 936-1280
Email: edward.marshall@oag.state.tx.us

Stephanie J. Brett

A/73401651.1