IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

JUSTEN GRANT HALL,                   §
               Petitioner,          §
                         §
v.                                   §     No. 3:10-CV-00213
                         §     (Death penalty case)
RICK THALER, Director, Texas         §     (U.S. Dist. Judge Frank Montalvo)
Department of Criminal Justice,      §
Correctional Institutions Division,  §
             Respondent.          §

## RESPONDENT THALER'S
## ORIGINAL ANSWER WITH BRIEF IN SUPPORT

In a state court, Hall was convicted of capital murder and sentenced to die

for the death of Melanie Billhartz. The prisoner challenges his conviction and

sentence by means of a petition for writ of habeas corpus. The Court has

jurisdiction over the subject matter and the parties. *See* 28 U.S.C. § 2254 (West

2010). The Director through his attorney, the Attorney General of Texas, files

this answer. Except for those allegations supported by the record and those

admitted herein, the Director denies every allegation of fact made by Hall.

Photocopies of the state court records of Hall's appeal and state writ application

have been sent to the Court.

## HALL'S ALLEGATIONS

Hall raises the following grounds for relief:

I.      He was deprived of due process when the prosecutors failed to disclosed
        evidence favorable to the defense (Memorandum in Support of Pet. for
        Writ of Habeas Corpus (Mem.) at 17– 38);

II.     He was deprived of his Fifth Amendment rights when the trial court failed to exclude his pretrial statement (*id.* at 39–48);

III.    He received ineffective assistance when one of the defense attorneys fell asleep during the guilt-innocence phase of trial (*id.* at 49–54);

IV.     He was deprived of his Fifth and Fourteenth Amendment rights when the trial court failed to grant a continuance (*id.* at 55–56);

V.      Insufficient evidence supports the conviction (*id.* at 57–60);

VI.     He received ineffective assistance at punishment when counsel failed to investigate and present certain mitigating evidence (*id.* at 61–75);

VII.    He received ineffective assistance when counsel at punishment argued to the jurors that the petitioner deserved to die for his crime (*id.* at 76–79);

VIII.   He received ineffective assistance when counsel failed to use the juror-selection procedure set out in the state statute, (*id.* at 80–91);

IX.     He received ineffective assistance when counsel agreed with the prosecution to excuse certain jurors, (id. at 92–94); and

X.      He received ineffective assistance when counsel failed to object when the trial judge did not follow certain juror-selection procedures.

## EXHAUSTION

Two issues only—(1) Hall's pretrial statement to police was involuntary and (2) insufficient evidence supported the conviction—were presented to and reviewed on the merits by the state courts. (Appellant's Br. at 10–13, 24-27, *Hall v. State*, No. AP-75121 (Tex. Crim. App. June 7, 2006). No other issue presented to this Court has been adjudicated on the merits by the state courts. Were Hall to return to state court, the court would dismiss the application as abusive.

Hence, save for the two claims mentioned above, all other claims are unexhausted but nonetheless defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).

## STATEMENT OF THE CASE

Hall was convicted of capital murder and sentenced to death in connection with the death of Melanie Billhartz. (4 CR[1] 1189–90.) The conviction and sentence were affirmed on appeal, *Hall v. State*, No. AP-75121, 2007 WL 1847314 (Tex. Crim. App. June 27, 2007), and Hall sought no certiorari review. In accordance with his wishes, his application for state habeas corpus relief was dismissed. *Ex parte Hall*, No. WR-70843-01, 2009 WL 1617087 (Tex. Crim. App. June 10, 2009). This petition follows.

## STATEMENT OF FACTS

### I.    Facts of the Crime

The facts of the offense are taken from the opinion of the Court of Criminal Appeals:

> . . . The victim (Melanie Billhartz) and Ted Murgatroyd were good friends. Murgatroyd and [Hall] were acquainted through mutual friends and because they "[hung] around the same crowd," primarily at a drug house in El Paso. On October 28, 2002, at roughly 4:00 p.m., Murgatroyd encountered Billhartz when she pulled up in front of the drug house. Murgatroyd asked Billhartz to take him to a convenience store, and she let him drive, with her as a passenger.

---

[1] "CR" refers to the clerk's record of papers filed in the trial court followed by the page number.

On the way back from the store, Murgatroyd made a sarcastic comment, and Billhartz "flipped out" and started hitting him and screaming at him to get out of her truck. Murgatroyd stopped the truck, and as he was attempting to leave the vehicle, Billhartz hit him in the face and jumped on him. As he put his hand up, he struck her on the lip. Billhartz then drove to the house, with Murgatroyd following on foot. When he reached the house, Billhartz was sitting in her truck, parked in front of the house.

Murgatroyd's associates, including [Hall], who believed that Murgatroyd had attacked Billhartz, came out to talk to him. While Billhartz remained in the truck, they discussed the situation. The dilemma that this group faced was that Billhartz wanted to call the police and report an assault by Murgatroyd. But when the police were mentioned, [Hall] stated his disapproval of this possibility and his intention to kill the victim. According to Murgatroyd, Billhartz was killed to prevent the discovery of the drug house. Murgatroyd did not see [Hall] again until three to five hours later, when [Hall] pulled up to the drug house in Billhartz's truck, with her body in the back of the cab. Chase Hale testified that after [Hall] returned with Billhartz's truck, [Hall] told Hale to stay away from it because [Hall] had just killed Billhartz. [Hall] then ordered Murgatroyd to pick up a shovel and machete in order to go bury the victim. After driving to New Mexico, [Hall] ordered Murgatroyd to cut off the victim's fingers to prevent any DNA from being found under her fingernails. [Hall] then dumped the body in New Mexico, although Murgatroyd was under the impression that [Hall] took the victim's fingers with him. Later, upon questioning by detectives, Murgatroyd led the authorities to the victim's body and gave them a written statement concerning the preceding events.

[Hall] was apprehended on November 23, 2002, following a routine safety check by Deputy Tommy Baker of the Hale County Sheriff's Office. During the safety check, a license plate check resulted in a "missing or endangered" person report on the victim. Further investigation resulted in a search of the vehicle. While the investigation was being conducted, Baker received a report that the victim's body had been found and that the occupants of the truck were suspects. The occupants were arrested for unauthorized use of a motor vehicle, and [Hall] was later indicted for Billhartz's

murder.

> Dr. Patricia McFeeley, pathologist and assistant chief Medical Examiner, supervised the autopsy of the victim. A power cord was wrapped around the victim's neck three times and tied tightly. Her nasal bones were fractured, and she had multiple fractures of the lower jaw bone, fractures in her right hand, a fractured rib, and fingers missing from her right hand. After [Hall] was arrested for the victim's murder, he confessed to the offense to Detective David Samaniego of the El Paso Police Department.

*Hall v. State*, 2007 WL 1847314, at *1–2.

## II.   Sentencing Evidence

At the sentencing phase of trial, it was shown that Hall murdered Billhartz while he was out on bail after having killed another individual. Hall testified at sentencing and acknowledged shooting Arturo Diaz. Hall said that he picked up Diaz, who was dressed as a woman, at an El Paso convenience store. (84 RR[2] 55–56.) He said he shot Diaz after discovering that Diaz was a man and after Diaz made unwanted sexual advances. (84 RR 73–76.) In fact, he told the El Paso police that he killed Diaz specifically because Diaz was a "faggot." (84 RR 77, 165.) Hall testified that he had been told by El Paso police that if Hall had killed Diaz specifically because Diaz was a homosexual, Hall could be prosecuted in federal court for a hate crime. (84 RR 77–79.) Hall told jurors that because he preferred to spend his time in federal rather than in state

---

[2] "RR" refers to the reporter's record of the trial testimony, preceded with the volume number and followed by the page number.

prison, he told police that he killed Diaz due to Diaz's sexual orientation specifically. (84 RR 77–79.)

The State introduced evidence, though, that Diaz was a homosexual prostitute and that Hall picked up Diaz not at a convenience store but had picked him up for a date from a transgendered support-group meeting that Diaz was attending. (81 RR 174–77.) And another individual, Hector Valles, a former homosexual prostitute, said that shortly before Diaz was shot, Diaz and Hall had come to his house. (81 RR 140.) Valles said after Diaz and Hall walked into his house, he recognized Hall as an individual who had come to his apartment with Diaz about four or five years previously.  He said also that around that same period Hall and he had at least two homosexual encounters. (81 RR 141–42, 144–45.)

Hall also told jurors that he had a long history of illicit-drug use beginning with smoking marijuana at age 12.  (84 RR 5–6.)  He acknowledged using "[c]rystal meth, ecstacy, acid and powder cocaine." (84 RR 71.)  He was expelled from a private school for stealing money collected in a fund-raiser.  (84 RR 9.) He also had run-ins with the justice system as a juvenile and as an adult for criminal mischief, unauthorized use of a motor vehicle, burglary of a building, evading arrest. (84 RR 8–10, 27.)  He spent time in Texas adult prison for burglary of a habitation. (84 RR 30.)  While in prison he was associated with the

white-supremacists gangs.  (84 RR 18, 39.)

## PROCEDURAL BACKGROUND

### I.    Trial and Appellate Proceedings

After Hall was indicted on February 4, 2003 (1 CR 3), the trial court on

February 19, appointed Jaime Olivas as counsel (1 CR 23). On September 6,

2004, Charles McDonald joined the defense as co-counsel.  (2 CR 613.)  On about

September 20, Francisco "Frank" Macias replaced Olivas as lead counsel.  (7 RR,

8 RR 2.)  After Hall was convicted and sentenced to death, the conviction and

sentence were affirmed.  *Hall v. State*, 2007 WL 1847314 (Tex. Crim. App.).

### II.    State Habeas Proceedings

On March 19, 2007, acting through counsel Robin Norris, Hall filed an

application for state habeas corpus relief.  (*Ex parte Hall*, No. 70,834-01, at

20–24 (Tex. Crim. App. June 10, 2009).)  On July 2, 2008, the convicting court

held an evidentiary hearing in connection with Hall's allegation that the

prosecutors offered leniency to certain trial witnesses in exchange for their

testimony and that the prosecutors failed to disclose those offers.  (SHCR

90–227.) Then in August 2008, Hall wrote a letter to the convicting court asking

that he be allowed to abandon all further appeals.  (SHCR 51.)  On September

29, 2008, counsel Norris filed a Motion to Dismiss Application for Writ of Habeas

Corpus and for Competency Evaluation. (*Ex parte Hall*, No. 70,834-01, at 37–40.) The convicting court appointed two mental-health experts to examine Hall to determine whether he was competent to waive further proceedings. (*Ex parte Hall*, No. 70,834-01, at 41–44.)

On March 6, 2009, at a hearing in connection with Hall's motion, Hall told the court that he did not, in fact, wish to abandon his quest for relief but that rather he wished to proceed pro se. (SHCR 12–13.) He asked also that the application filed then in state court, the application filed by Norris, be dismissed and that Hall be allowed to file a new application. (SHCR 13–15, 27.) The court admonished Hall about the perils of pro se representation. (SHCR 25–40.) But the court entered findings of fact and conclusions of law recommending that the Court of Criminal Appeals dismiss Hall's current application, Norris be allowed to withdraw, Hall be allowed to proceed pro se, and Norris act as stand-by counsel. (SHCR 1–4.)

Then in a handwritten letter to the Court of Criminal Appeals, dated March 31, 2009, Hall wrote, "I'm requesting that Judge Moody withdraw [?] his recommendation to dismiss my application for writ of habeas corpus." Hall said he still wanted Norris removed as support counsel. And he asked the court to provide to him a copy of his "case" so "I can prepare to represent myself on appeal."

The Court of Criminal Appeals in an unpublished order filed June 10, 2009, dismissed Hall's application—that application filed by Norris. *Ex parte Hall*, 2009 WL 1617087, at *2. The court acknowledged receiving the letter in which Hall asks that the trial judge withdraw his recommendation that the application be dismissed. *Id.* at *1. The court said, though, "Despite the apparent change in attitude regarding whether the currently filed writ application should be dismissed, [Hall] still maintains in his letter that he wants his attorney dismissed and he wants to be allowed to represent himself." *Id.*

The court noted that under statute, an applicant's initial application must be filed in the trial court not later than the forty-fifth day after the date the state's brief is filed on appeal with the possibility of a one-time ninety-day extension. *Id.* (citing Tex. Code Crim. Proc. art. 11.071, § 4(a), (b) (West 2010).) "Assuming counsel filed a timely motion for an extension, [Hall's] initial application was due in the trial court on or before March 22, 2007. Counsel filed [Hall's] application in the trial court on March 19, 2007." *Id.*

The court said that if Hall intended to start over and file a pro se initial application or to supplement or amend an already-filed application, his request came too late. *Id.* at *2. The court said, "An initial application has been filed, and the statutory time for filing has passed." *Id.* It said that any pro se application now filed, whether replacing, supplementing, or amending the

original application, will be considered a subsequent application subject to review under Article 11.071, § 5. *Id.* The court said, though, that Hall was free to file a subsequent application, and that it would be reviewed under the statute. *Id.* As to whether the application before the court should be dismissed, the court noted that Hall at the trial-court hearing asked that the application be dismissed. *Id.* He persists in asking that appointed counsel be dismissed. *Id.* The experts appointed by trial court found Hall competent to make these decisions. *Id.* The Court of Criminal Appeals said it would defer to the trial court's recommendations and that the application filed by Hall's counsel on March 19, 2007, was dismissed. *Id.*

After the Court of Criminal Appeals dismissed Hall's application on June 10, 2009, Hall on July 16 in that court filed a Suggestion that the Court, on its own Motion, reconsider its June 10, 2009 Order Dismissing Mr. Hall's Application for Post-Conviction Writ of Habeas Corpus. (*Ex parte Hall*, No. WR-70,834-01.) He said that he had asked that counsel Norris be dismissed because he thought that Norris was not doing enough to investigate deals or agreements that the trial prosecutors had with prosecution witnesses. *Id.* at 3–5. Hall said also that he had told the convicting court that he wished to represent himself only because he did not know that he would have been entitled to a different attorney. *Id.* at 5–6. He noted that shortly after the hearing in the convicting

court, he sent a letter to the Court of Criminal Appeals asking that the trial judge withdraw his recommendation that Hall's application be dismissed. *Id.* at 10–11. Hall said also that he was not familiar with state habeas law and that the March 6, 2009 hearing was confusing and he was unaware of the potential danger of asking that his then-current application be dismissed. *Id.* at 6–10.

The Court of Criminal Appeals on August 6, 2009, announced that in connection with Hall's suggestion, no action was taken. *Id.* at cover. This petition followed.

## PROCEDURAL DEFAULT

**I.    Those Claims Not Reviewed on the Merits by the State Courts Are Unexhausted but Nonetheless Defaulted.**

A federal habeas court may not grant relief on a state prisoner's application for a federal writ of habeas corpus unless the applicant has exhausted his state-court remedies. 28 U.S.C. § 2254 (b)(1)(A) (West 2010). To exhaust those remedies, the petitioner must not only have presented the substance of the claim to the state court, he must have presented the substance of the claim fairly. *Nobles*, 127 F.3d at 420 (citing *Picard v. Connor*, 404 U.S. 270, 275–76 (1971)). Where a petitioner raises a claim in state court in a manner that is incorrect procedurally, he has not given the state courts a fair opportunity to address his claims and thus has not exhausted his claims. *See Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). The petitioner must give the

state courts a fair opportunity to review his claims, that is, in a procedural context in which the state courts will be certain to review his claims solely on the merits. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989).

Where a state prisoner seeks federal relief on a claim that has not yet been presented to state courts, the federal habeas court may find the claim barred. *Coleman*, 501 U.S. at 735 n.1. Where a petitioner has failed to exhaust his state-court remedies but where the state court to which he would be required to present his claims would now find those claims barred, federal habeas corpus review is precluded. *See id.*; *Nobles*, 127 F.3d at 423 (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a successive state habeas petition, to be procedurally barred). The Texas Court of Criminal Appeals applies its abuse-of-the-writ rules regularly and strictly. *See* Tex. Code Crim. Proc. art. 11.07, § 5(a) (West 2010); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).

If state prisoner wishes to avoid the bar in federal court, the state prisoner also must show either (1) cause for the default and actual prejudice that is attributable to the default, or (2) that the federal court's failure to consider the claim will result in a miscarriage of justice. *See Coleman*, 501 U.S. at 750.

### A.     Only two claims were presented to the state courts properly.

Only two claims raised in this Court have been reviewed on the merits by the Court of Criminal Appeals.  Those claims are—

·  Hall's pretrial statement to police was involuntary and was taken in violation of his Fifth Amendment privilege against self-incrimination.  (Mem. at 39–46 (Claim B); Appellant's Br. at 24–27); and

·  Insufficient evidence supported the conviction.  (Mem. at 57–61 (Claim E); Appellant's Br. at 10–13).

### B.     Most of claims presented to this Court were never presented to the state court in a manner that would ensure merits review.

The following claims raised in this Court were included in that state application filed by counsel Norris on behalf of Hall:

·  The prosecution failed to disclose agreements it had with witnesses (Mem. at 18–40 (Claim A); SHCR 21 (b));

·  Hall received ineffective assistance at sentencing when counsel failed to investigate and present mitigating evidence (Mem. at 61–77 (Claim F); SHCR 21 (a));

·  Hall received ineffective assistance at sentencing when counsel used an ineffective jury argument (Mem. at 77–81 (Claim G); SHCR 21 (g));

- Hall received ineffective assistance at guilt-innocence when counsel failed to employ the statutory method of exercising peremptory strikes (Mem. at 81–92 (Claim H); SHCR 21 (c));

- Hall received ineffective assistance at guilt-innocence when counsel agreed to excuse certain venire members without questioning them (Mem. at 92–95 (Claim I); SHCR 21 (d)); and

- Hall received ineffective assistance at guilt-innocence when counsel failed to object to the trial court's omission of certain juror instructions (Mem. at 95–101 (Claim J); SHCR 21 (e)).

At Hall's request, the application prepared by Norris was dismissed. *Ex parte Hall*, 2009 WL 1617087, at *1–2. The dismissal was not made up of boilerplate but was accompanied by an opinion in which the court stated expressly that its dismissal did not constitute an adjudication on the merits. *Id.* Were Hall to return to state court now to present the claims, the application would be dismissed. *See Nobles*, 127 F.3d at 423. Because the claims have not been reviewed on the merits and because Hall has no state remedy remaining, the claims are defaulted and federal review is barred. *See Coleman*, 501 U.S. at 735 n.1.

### C.   Hall's continuance-related claim was present to the state court as a state-law, not a constitutional, claim.

A petitioner does not exhaust his federal constitutional claim where in state court he presents a similar state-law claim. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982). He must give the state courts a "fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim. *Id.* (citing *Picard*, 404 U.S. 270). It is not enough that all the facts necessary to support the federal claim were before the state courts, *Picard*, 404 U.S. at 277, or that a somewhat similar state-law claim was made. *Anderson v. Harless*, 459 U.S. at 6. And the exhaustion requirement "is not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition." *Ries v. Quarterman*, 522 F.3d 517, 523 (5th Cir. 2008) (citing *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003)). The exhaustion inquiry is necessarily case- and fact-specific. *Id.* (citing *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005)).

Before this Court, Hall alleges that when the trial court failed to grant his motion for continuance, he was deprived of his due process right to present a defense. (Mem. at 55–57, *citing Washington v. Texas*, 388 U.S. 14, 19 (1967) *and Ungar v. Sarafit*, 376 U.S. 575, 589 (1964).)

Before the state court, Hall argued that the trial court abused its discretion in failing to grant a continuance. (Appellant's Br. at 31–32.) Citing

state law—*Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995); *Rosales v. State*, 841 S.W.2d 368, 372–73 (Tex. Crim. App. 1992); *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996)—Hall alleged that he needed the continuance to have tested newly disclosed DNA evidence and to investigate the gang affiliations of the victim's family members. (Appellant's Br. at 31–32.)

Before this Court, Hall raises a due process claim. (Mem. at 55–57.) Citing *Washington v. Texas*, 338 U.S. 14,[3] and *Ungar*, 376 U.S. 575, Hall alleges that the trial court's failure to grant his continuance deprived him of his right to mount a defense. (Mem. at 55.) He alleges that he needed the delay to develop evidence that his pretrial statement was involuntary. (Mem. at 56–57.)

Hall never raised in state court his continuance claim grounded in due process and never presented to the state court a continuance claim based upon his challenging his confession. (Appellant's Br. at 31–33.) Hence, neither the legal theory nor the factual predicate presented to this Court has been presented to the state court. Because Hall cannot present the claim to the state courts now, the claim is defaulted. *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

---

[3] The due-process issue in *Washington* involved not the trial court's failure to grant a continuance but its failure to let a witness to testify. *See* 388 U.S. at 19.

### D. As for Hall's juror-strike claim, in this Court, Hall raises a constitutional issue; in state court he raised a state-law issue.

As for Hall's claim involving jurors James Griffith and Kenneth Sudimack, in this Court Hall bases his claim on the Sixth Amendment right to effective assistance of counsel. (Mem. at 81.) In his state appeal, Hall raised a claim involving the two jurors but the claim was grounded not in his right to counsel under the Constitution (Mem. at 81–92), but in state law (Appellant's Br. at 29–31, citing *Cannady v. State*, 11 S.W.3d 205 (Tex. Crim. App. 2000)). In the Court of Criminal Appeals Hall complained not of error by counsel but of error by the trial court. (Appellant's Br. at 29–31.) Hall did not exhaust his ineffective-assistance claim by raising in state court a somewhat similar state-law claim. *See Anderson v. Harless*, 459 U.S. at 6. Because Hall cannot present the claim to the state courts now, the claim is defaulted. *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

### E. Hall's sleeping-lawyer claim was never presented to state court.

One issue was never presented to the state court on either appeal or in a habeas application. Hall complains that he received ineffective assistance at guilt-innocence when counsel slept through portions of the trial. (Mem. at 49–55 (Claim C).) This federal constitutional claim has never been raised in state court. Nor has a similar state-law claim been raised. (Appellant's Br. at iii–iv; SHCR 21.) Because Hall never presented this claim to the state court system

and because he cannot do so now, the claim is defaulted.  *See id.* at 423.

### F.      Hall pleads no cause and prejudice or miscarriage of justice.

Although Hall could avoid the default by showing cause and prejudice or a miscarriage of justice, *see Coleman*, 501 U.S. at 750, he pleads neither.

Again, only two issues were presented to and reviewed on the merits by the Court of Criminal Appeals, that is, his privilege against self-incrimination was violated when the trial court failed to exclude his pretrial statement and insufficient evidence supports the conviction.  All other claims have not been presented fairly to the state court system and federal review is barred.  *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

### STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court "may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.' " *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)–(2)).

The Supreme Court has explained that a state-court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.  *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case.  *Id.* at 407–09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Williams*, 529 U.S. at 409–11.  Rather, federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion."  *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002); *Williams*, 529 U.S. at 411.  As the Court has explained,

> the range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As

> a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning."  *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").  Further, reasonableness does not require citation or even awareness of any particular Supreme Court precedent, so long as the result of the state-court decision does not contradict that precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002).

Finally, AEDPA provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## ANSWER

This pleading will address first those claims that have been reviewed on the merits by the state courts.   It then will review on the merits, in the alternative, those claims that are defaulted.  It should be noted that because the state courts had no opportunity to review the defaulted claims, the analysis below cannot refer to the state court pleadings or the federal habeas corpus standard of review, which applies only after an adjudication on the merits. *See* § 2254(d).

## I.    The Record from the Suppression Hearing Does Not Show That Hall's Pretrial Statement Was Involuntary.

Hall alleges that because his pretrial statement was involuntary, when the trial court failed to suppress his statement, his rights were violated under the Fifth and Fourteenth Amendments (Mem. at 40–49.) He alleges that when he spoke with Det. David Samaniego of the El Paso Police Department in Plainview, Texas, on November 25, 2002, Hall, was not in his right mind. (*Id.* at 42–46.) Hall alleges that after he killed Arturo Diaz in April 2002 and while awaiting release on bond, he attempted suicide and spent several weeks in the psychiatric ward of the El Paso Jail. (*Id.* at 42.) He argues that after his release on bond in connection with the Diaz slaying, he had been prescribed Zyprexa for schizophrenia, Zoloft for depression, lithium and Trazodone for mood control, and Clonazepam for anxiety. (*Id.*).  Also, he argues, between his release on in

July 2002, and his arrest in Plainview, he used methamphetamines heavily. (*Id.* at 43.) And he said that when he was arrested in Plainview he had not slept for "in almost a week," due to methamphetamine use. (*Id.*, *citing* 67 RR 18–19.) He alleges that under the influence of methamphetamines he experiences paranoia, hallucinations, and blackouts. (*Id.*, *citing* 46 RR 10.) After he was arrested, he began to undergo methamphetamine withdrawal and was dazed and unable to focus. (*Id.*, *citing* 46 RR 40.) And Hall alleges that while he was in jail in Plainview he was deprived of his prescribed medication. (*Id.* at 44, *citing* 45 RR 131–32.)

### A.   Law

An accused is deprived of due process if his conviction rests wholly or partially on an involuntary confession. *Sims v. Georgia*, 385 U.S. 538, 543–44 (1967). For a confession to be involuntary, there must be coercion by government agents. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The petitioner has the burden of proving facts that would lead the court to conclude that the confession was not voluntary. *Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5th Cir. 1987). The voluntariness of a confession is a mixed question of law and fact. *Evans v. McCotter*, 790 F.2d 1232, 1235 n.1 (5th Cir. 1986). State court's factual findings upon which a finding of voluntariness is based are entitled to a presumption of correctness. *Id.* When reviewing a mixed question of law and

fact under the federal habeas statute, a federal court may grant habeas relief only if it determines that the state court decision rested on an unreasonable application of clearly established federal law, as determined by the Supreme Court, to the facts of the case.  *Nobles*, 127 F.3d at 416 (citing § 2254(d)(1)).

### B.   State court

#### 1.   Trial court

After Hall moved to suppress his pretrial statement, the trial court on July 27, 2004, held a hearing.  (5 RR 16–207.)  On September 3, 2004, the court issued findings of fact and conclusions of law in which the court determined that the statement was voluntary.  (2 CR 399–401.)  On September 17, 2004, Hall filed a second motion to suppress or in the alternative a motion to reopen the matter.  (2 CR 614–16.)  The court on November 22 and 23, 2004, and on January 19, 2005, heard additional testimony.  (45, 46, and 67 RR.)  Ultimately the court denied the motions.  (73 RR 38.)

At the suppression hearing on November 22, 2004, Deputy Tommy Baker, of the Hale County Sheriff's Department, said that after Hall was arrested on November 23, 2002, in Plainview, Hall attempted to commit suicide in the Hale County Jail, was taken to the hospital, and did see a psychiatrist.  (45 RR 31–32.)  Sgt. Henry Cooper, with the Dona Ana (New Mexico) Sheriff's Department testified that on November 24, 2002, detectives from New Mexico

and from El Paso interviewed Hall. (45 RR 90–91.) Hall told that officers that at first he thought he was being accused of unauthorized use of a vehicle because he was driving Billhartz's truck. (45 RR 91, 94.) When he was told that Billhartz was dead, Hall told the officers that he did not know that the owner was dead. (45 RR 91, 94–96.) Cooper said that as Hall began to realize the detectives were accusing him of killing Billhartz, he began to get excited or upset. (45 RR 94–96.)

Cooper said that Hall told the detectives that he was taking medication and asked if he would be able to get the medication. (45 RR 131.) Cooper told Hall to check with the jail officials because they had policies about outside medications. (45 RR 131.) Hall did not tell the detectives that he needed his medication to function, Cooper said. (45 RR 138.) The sergeant said that Hall did not appear to have difficulty concentrating. (45 RR 132.) Cooper said he had no difficulty communicating with or understanding Hall, and Hall did not appear to have difficulty understanding the detectives. (45 RR 137.) Hall participated in the conversation actively. (45 RR 137.) Det. Jesus Pantoja, of the El Paso Police Department, said that while Hall was talking to Cooper and him, Hall did not ask for medication. (45 RR 153.)

While Cooper and Pantoja were interviewing Hall, El Paso Det. Samaniego joined the interview. (45 RR 156.) Samaniego and Hall were acquainted

because Samaniego had been involved when Hall was questioned about the Diaz slaying. (81 RR 93–95.) Hall asked to speak with Samaniego alone. (45 RR 156.) Pantoja and Cooper left the interview room. (45 RR 157.)

Samaniego testified that he and Hall talked for a bit, that Hall said he was hungry, and that Samaniego told the jailers to bring Hall lunch. (5 RR 161.) After some small talk, Hall denied committing the murder and implicated Ted Murgatroyd. (5 RR 162.) Samaniego said, "We started discussing about, you know, how wrong it was to implicate somebody that didn't do it. I asked him if he did it, and he nodded his head. And that's when I Mirandized[4] him." (5 RR 162.)

About thirty minutes later, Samaniego came out of the room and told Cooper and Pantoja that Hall had admitting killing Billhartz. (45 RR 157.)

For his part, Det. Pantoja said that when he and Sgt. Cooper spoke with Hall, the defendant seemed well rested, aware of their presence, and had no difficulty speaking. 45 RR 176.) Hence, Det. Pantajo did not ask Hall if he had slept, was on medication, or had eaten. (45 RR 176.)

Hall testified for purposes of the suppression motion. He said that while he was in Hale County Jail he did not always take his prescribed medication. (46 RR 9.) He said that because he had been taking methamphatamines before

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

he was arrested, he was experiencing paranoia. (46 RR 10.) He thought the deputies were trying to poison him. (46 RR 10.) He said that when Det. Samaniego questioned him about the Billhartz slaying, the detective was "aggressive" and "mean." (46 RR 19.) Hall also said he did not remember confessing to the murder and does not remember signing the confession. (46 RR 69–72.)

### 2. Court of Criminal Appeals

In Court of Criminal Appeals, Hall argued that while he was in jail in Plainview, he was under a suicide watch, that he exhibited psychotic behavior, that El Paso detectives knew of his suicide attempts, that he requested but had not received his medication for his depression, and that before his arrest, he had not slept for six to seven days. *Hall v. State*, 2007 WL 1847314, at *4.

The state court said nothing in the record or anything Hall alleged showed police coercion. *Id.* The court noted that when Det. Pantoja met with the defendant, Hall was advised of his rights, waived his right, and did not request an attorney. *Id.* Pantoja said that while Hall mentioned that he was taking medication, he never requested the medication. *Id.* Pantoja also said that during the conversation, Hall was coherent, seemed to understand what he was saying, and was not emotional or distraught. *Id.* Likewise, the court said, Det. Samaniego said that when Hall spoke with him and when he signed the

-26-

confession, Hall was coherent and stable.  *Id.*  Hall himself testified that because he was paranoid of the deputies, he did not take his prescribed medications.  *Id.*

The Court of Criminal Appeals said that the trial court, as the sole judge of the credibility of the evidence and witnesses, had the discretion to believe or disbelieve Hall's allegations that he was unable to voluntarily make a written confession.  *Id.*  The trial court also had the discretion to believe or disbelieve the officers' testimony that Hall was coherent and able to make a full and voluntary confession.  *Id.*

Moreover, the court said, Hall's conscious choice not to take his medications further demonstrates that his confession was not coerced or involuntary.  *Id.*  When Hall's allegations are considered in the best light possible, because there was no evidence of overreaching by the officers, the confession would not be considered coerced or involuntary.  *Id.*

## C.   Analysis

The trial judge heard the testimony of Sgt. Cooper, Det. Pantajo, and Det. Samaniego, and the testimony of Hall.  The detectives said that Hall during questioning seemed lucid.  He did not tell them he needed his medication to function and did not tell them that he was dysfunctional due to methamphetamine use.  The court was entitled to believe the law officers when then said that no threats were made.  The court was entitled to disbelieve Hall

when he said that he was threatened and when he said he did not recall confessing to the crime and did not recall signing the confession.

As for the failure of Det. Samaniego to remind Hall of his *Miranda* rights, it was Hall himself who initiated the conversation with the detective.  Hall himself told the detectives he wished to speak with Samaniego alone.  (45 RR 156.)  Also, Hall had previously been told his rights by Cooper and Pantajo. (5 RR 120–21.)  As soon as Hall began telling Samaniego about the Billhartz murder Samaniego reminded Hall of his rights.  (5 RR 161–64.)

The state court's resolution of the issue was based on a reasonable interpretation of the facts.  *See* § 2254(d)(2).  The state court also reasonably applied Supreme Court precedent out in *Sims*, 385 U.S. 543–44 and *Connelly*, 479 U.S. at 167.  *See* § 2254(d)(1).

## II.  Evidence That Hall Killed the Victim to Prevent Her Reporting an Assault Is Sufficient to Support the Capital Murder Conviction.

Hall alleges that insufficient evidence supports the conviction.  (Mem. at 57–61.)  He alleges that insufficient evidence shows that he killed Billhartz in the course of committing or attempting to commit the offense of retaliation.  (Mem. at 57–61.) Hall alleges that the prosecutors argued that he killed Billhartz to prevent her from calling the police because the police, had they come to the house, would have discovered a meth lab.  (Mem. at 59, *citing* 79 RR 95.)  But, Hall alleges, a witness, Jesse Eddy, the meth "cook," testified that as soon

as Billhartz threatened to call police, he, Eddy, could have taken down and removed his equipment and that had the police come to the house, they would have found no lab. (Mem. at 60, *citing* 73 RR 146, 158–59.) Hence, Hall argues, "No rational trier of fact could have found that Mr. Hall killed Melanie Billhartz to prevent her from reporting the existence of the methamphetamine 'lab' as the State contended," because, presumably, had the police come, they would have found no lab. (Mem. at 57–61.)

### A.    Law

When a federal habeas court reviews the sufficiency of the evidence, it views the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In a sufficiency review, the trier of fact has the responsibility to resolve conflicts in the testimony fairly, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See id.* A federal habeas court must give great weight to a state court's determination of the sufficiency of the evidence. *See Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985). Federal review must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16.

Under Texas law, a person commits capital murder if he commits murder in the course of committing or attempting to commit obstruction or retaliation. Tex. Penal Code § 19.03(a)(2) (West 2010).  A person commits the offense of obstruction or retaliation where he intentionally or knowingly harms another by an unlawful act to prevent the service of another as a person who the actor knows intends to report the occurrence of a crime.   Tex. Penal Code § 36.06(a)(2)(B) (West 2010).

## B.    Court of Criminal Appeals

When Hall presented this claim to the Court of Criminal Appeals on direct review, the court noted that Hall argued that in order support his conviction, the evidence must show that he killed Billhartz knowing that she intended to either report the assault or the meth lab.  *Hall v. State*, 2007 WL 1847314, at *2.  He argued, rather, that the evidence showed only that the discovery lab would have been a "collateral consequence" of Billhartz's report.  *Id.*  Hall argued that  because he did not care about Billhartz's reporting the assault but was rather concerned with a collateral consequence of that report, he killed Billhartz to prevent an "inadvertent drawing" of the police to the lab.  *Id.*  He argued that the prosecutors theory was that he killed Billhartz to keep the police away from the lab.  *Id.*  Therefore, Hall argued, he did not kill Billhartz for the specific purpose of preventing her from reporting an assault.  *Id.*

The state court noted the plain reading of the statute showed that the State had to prove that Hall intended to obstruct or prevent Billhartz from reporting a crime.  *Id.*  The statute did not require intent to prevent the reporting of a specific crime.  *Id.*  The court said that Hall's own reasons for committing obstruction, and in this case capital murder by way of obstruction, are relevant to show motive, but they are not an element of the offense.  *Id.*

The court noted that the evidence shows that Hall left the house with Billhartz.  *Id.*  Upon his return, he told Murgatroyd that he had murdered Billhartz and enlisted Murgatroyd's aid in disposing of the body.  Id.  Hall confessed to El Paso detectives that he murdered Billhartz and signed a statement to that effect.  *Id.*  The court determined the evidence was sufficient to support the conviction.  *Id.*

## C.    Analysis

Hall argues, in essence, that Billhartz intended to call police to report an assault, not a meth lab.  (Mem. at 60–61.)  Hall describes the possible discovery of the lab as a "collateral consequence" of Billhartz's assault report.  Further, he argues, that the collateral consequence would not have occurred, because the cook would have removed the lab before police arrived.  (*Id.*)

As noted by the state court, the State had to prove only that Hall killed Billhartz to prevent her reporting a crime. *Hall v. State*, 2007 WL 1847314, at

*2 .  The State did not have to prove that she was going to report a specific crime or report the crime Hall sought to conceal.  *See id.*  Nor was the State required to prove that the crime Hall intended to conceal—the manufacture methamphetamine—would, had Billhartz not been killed, been detected.  And it is of no import that Hall's intended result—the lab's concealment—would not have been the result of his actions.  *Cf. Solomon v. State*, 830 S.W.2d 636, 637 (Tex. App.—Texarkana 1992, no pet.) (finding evidence of obstruction sufficient where  defendant threatened an individual who might be a trial witness where no trial yet scheduled).  It was enough that Hall killed Billhartz because he knew she intended to report a crime, that is, assault.  Donald Frank testified that Hall told him that Billhartz threatened to call police to report an assault and that Hall had killed her because methamphetamines were being manufactured at the house.  (69 RR 19.)  Ted Murgatroyd testified that after Billhartz threatened to call police to report the assault, Hall said he would kill Billhartz because meth was being made in the house.  (72 RR 22–23.)  Hall in his written pretrial statement acknowledged that he killed Billhartz to prevent the discovery of the meth lab.  (SX[5] 61.)  The state court applied the *Jackson* standard reasonably.  *See* § 2254(d)(1).

---

[5]  "SX" refers to the numbered exhibits offered and admitted into evidence at trial by the State.

### III.  On His Prosecutorial-Error Claim, Hall Is Not Entitled to Relief.

Hall alleges that he was deprived of due process because the prosecutors failed to disclose to the defense agreements the prosecutors had with witnesses. (Mem. at 18–40.)  Hall alleges that the prosecutors had agreements with Ted Murgatroyd, Jesse Eddy, Chase Hale, and Tim Ray Davis.  (*Id.* at 25, 33–34, 35–36.)  Hall alleges that the agreements were tacit but can be inferred.

#### A.  Because the state court had no opportunity to review the claim on the merits, the claim is defaulted.

As discussed above, because the state court never had the opportunity to review this claim on the merits and because Hall cannot present the claim now, the claim is defaulted. *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

#### B.  The record does not show that the prosecutors offered undisclosed benefits to the witnesses in exchange for their testimony.

Nonetheless, in the alternative, were this Court to review the claim on the merits, it would not find Hall entitled to relief.

Irrespective of the good faith or bad faith of the prosecution, where evidence is material either to guilt or punishment, the suppression by the prosecution of evidence favorable to an accused after a request violates due process.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To establish such a violation, the petitioner must prove (1) the prosecutor suppressed or withheld

evidence (2) that was favorable and (3) material to the defense. *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972).  The principle applies not only to exculpatory evidence but to impeachment evidence.  *See United States v. Bagley*, 473 U.S.667, 678 (1985).  And the existence of a plea agreement between the State and a witness can constitute such evidence.  *See United States v. Williams*, 343 F.3d 423, 439 (5th Cir. 2003).  The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *See id.* at 684.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.  *Id.* at 678, 684.

When Murgatroyd, Eddy, and Davis testified at trial they denied having been promised leniency or any benefit in exchange for their testimony.  (72 RR 38 (Murgatroyd); 73 RR 135 (Eddy); 74 RR 88 (Davis).)  Hale also testified that he received no deal in exchange for his testimony.  (68 RR 134–35.)  He said, though, that the police offered to drop the charges against him if he gave his statement.  (68 RR 153–54.)  Det. Samaniego denied Hale's allegation.  (73 RR 9–10.)  In postconviction proceedings, the prosecutors denied striking a deal with any witness (SHCR 103, 166, 175, 179–80), and defense counsel[6] was not

---

[6]   At the time of the state habeas hearing, second-chair counsel, Charlie McDonald, had died.  (SHCR 183–84.)  Only lead counsel, Macias, testified.  (SHCR 181.)

asked about any agreement (SHCR 181–226).

Had this matter gone to the state court—again, the issue was never presented there—the court would have been entitled to believe the uncontroverted testimony of Murgatroyd, Eddy, and Davis, and would have been entitled to disbelieve the testimony of Hale.  The court also would have been entitled to believe the testimony of the prosecutors that no deals were offered.

Hall alleges also that the unsigned draft agreements prepared by prosecutors in connection with Murgatroyd and Eddy showed either that the prosecutors and the witnesses had tacit agreements or that unsigned drafts themselves constituted impeachment evidence.

As for the drafts' constituting evidence of agreements, the documents were not signed by either witness.  (PX[7] 3 & 4.)  The prosecutor testified that the drafts were prepared as a contingency lest a witness try to "wiggle out" of testifying.  (SHCR 131.)  And Hall does not show that either draft was shown to either witness.  Hence, Hall does not show that drafts constitute any evidence of any agreement, tacit or otherwise.  *See United States v. Williams*, 343 F.3d at 439.

As to Hall's argument that the drafts themselves constitute impeachment evidence, first, Hall does not show that the drafts were concealed.  *See Moore*,

---

[7]   "PX" refers to the numbered exhibits, or attachments, appended to Hall's petition.

408 U.S. at 794–95.  Although in postconviction proceedings, the prosecutors were questioned about the drafts, Hall did not ask the prosecutors whether the drafts had been disclosed.  And Hall's trial counsel was not asked about the drafts at all, about whether he had seen the drafts before trial.

Before this Court Hall alleges only that in postconviction proceedings the prosecutors gave no indication that the drafts had been disclosed.  (Mem. at 25 n.14.)  In so arguing, Hall tries to shift the burden of proof and production.  In postconviction proceedings, it is not the State but Hall who bears the burden. *See Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000).  Hall could have asked the prosecutors whether they disclosed the drafts.  Indeed, Hall could have asked trial counsel.  He did not.  In fact, the records suggests that the El Paso Country District Attorney's office had an open-file policy.  (SHCR 209–10.)  It would have been Hall's burden to show that the drafts had been withheld from the file.  Because he abandoned his quest for state habeas relief, he did not meet his burden.

And were this Court to presume that the drafts had been withheld, they were not helpful to the defense.  *See Moore*, 408 U.S. at 794–95. Nothing shows that the drafts were shown to either witness or that drafts memorialized any agreement.  Nothing shows that had defense counsel questioned a witness about the drafts, the witness would have known of their existence.  *Cf. Alexander v.*

*McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (stating that to prevail on ineffective-assistance claim based upon uncalled witnesses, applicant must set out the content of the witness's proposed testimony).

Hall also seems to argue that when the State in November 2004 brought Eddy back to El Paso from Indiana, where he was in prison on an unrelated matter, Eddy's return to El Paso constituted a type of benefit in exchange for testimony. (Mem. at 39.) Even if Eddy's return to El Paso constituted such a benefit, the defense knew of the so-called benefit. *See Moore*, 408 U.S. at 794–95. Indeed, Eddy returned to El Paso to testify in Hall's January 2005 murder trial. ( 73 RR 133–97.).

Hall does not show that any witness received an undisclosed benefit in exchange for testimony. *See Moore*, 408 U.S. at 794–95.

## IV.   On His Sleeping-Attorney Claim, Hall Is Entitled to No Relief.

Hall alleges he received ineffective assistance when lead counsel, Frank Macias, fell asleep during the guilt-innocence phase of trial. (Mem. at 49–55.) Hall offers to this Court two unsworn declarations, given under penalty of perjury, *see* 28 U.S.C. § 1746 (West 2010), from two jurors, Irene Rodriguez (PX 13) and Gloria Lopez (PX 14).

Rodriguez said:

I noticed that lead trial attorney, Frank Macias, was sleeping during one part of the guilt-innocence phase. Do you know how you

nod off sometimes?  This wasn't just nodding-off.  He had his head down for a while.  The other jurors brought it up later.  One of the other jurors said, "Poor kid.  He's life's on the line and his lawyer's sleeping."  It was during a part of the trial that was really boring.  It was while a witness was being questioned.

(PX 13 at 1–2).

Lopez said:  "I remember that the lead trial attorney, Frank Macias, was asleep during portions of the guilt-innocence phase of trial.  He would put his head down on his chest, and there would be no motion for several minutes.  I believe this happened more than once."  (PX 14.)

## A.   Because Hall never presented this claim to the state courts, the claim is defaulted.

As discussed above, because Hall never presented either the claim or the evidence to the state court system, the claim and the evidence are defaulted.  *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

## B.   Even if one attorney fell asleep, Hall was never deprived of counsel.

A petitioner who wishes to show he received ineffective assistance of counsel must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Hall makes no such showing.

First, the declarations should not be taken at face value.  They were made in 2010, more than five years after the trial.  (PX 13 & 14.)  Memories may not be accurate.  Further, the subject of the attorney's dozing did not arise during

the state habeas hearing.  Giving testimony at the state hearing were the trial prosecutors and defense counsel Macias himself.  And the same judge, the Hon. William Moody, presided over both the trial and the state habeas hearing.  (1 RR at cover; SHCR 87.)  No one mentioned Macias's dozing.  And although jurors Rodriguez and Lopez were in the jurors' box observing those at the defense table, Hall had an even better view.  Had Hall seen Macias fall asleep, one might presume that he would have mentioned something either to the trial judge, to appellate counsel, or to state habeas counsel.  Because the issue was not raised on appeal or in state habeas proceedings, one might presume that Hall did not.

Second, even if it is presumed that the jurors' recollections are accurate, their perspective may not have shown the whole truth.  Although they said they saw Macias with his head on his chest, even if counsel did, in fact, have his head on his chest, counsel may have been reading or thinking. And even if it is assumed that counsel was in a reverie, the portion of the trial at issue may have been one in which second-chair counsel, Charlie McDonald, was taking the lead. It is not clear from the declarations that Macias's full attention was at that moment required.  Hence, even if counsel Macias was asleep, and the evidence does not so show, Hall was not deprived of counsel.  No allegation of inattention has been leveled against McDonald.

And *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001), does not support Hall's argument.  In *Burdine* the state court record showed that defendant's counsel was at times asleep.  *Id.* at 340.  The federal courts were required to presume that the state-court findings were correct.  *Id.*  Here, no state court findings show that Macias slept.  The lack of findings must be laid at the foot of Hall, who did not raise the issue in state court.

Also, Burdine's trial involved a single prosecutor and a single defense attorney.  When defense counsel fell asleep, Burdine was, in fact, deprived of counsel.  Here, if one assumes that Macias fell asleep, Hall, represented by two attorneys, was not deprived of counsel.  No one lodges a sleep-related claim against defense counsel McDonald.  Indeed, the Fifth Circuit majority in *Burdine* said, "The unconscious attorney is in fact no different from an attorney that is physically absent from trial since both are equally unable to exercise judgment on behalf of their clients."  *Id.* at 349.  Thus, had Macias left the courtroom for a brief period to attend to other business and had only counsel McDonald been present, Hall could not argue that he was deprived of counsel.

Third, the Fifth Circuit has declined "to adopt a per se rule that any dozing by defense counsel during trial merits a presumption of prejudice."  *Id.*  Other circuits also are reluctant to presume prejudice.  *See, e.g., Tippins v. Walker*, 77 F.3d 683, 686 (2d Cir. 1996) ("Ordinarily, episodes of inattention or slumber are

perfectly amenable to analysis under the *Strickland* prejudice test.")  And the Ninth Circuit presumes prejudice when counsel sleeps through a "substantial portion" of the trial.  *Javor v. United States*, 724 F.2d 831, 834 (1984).  Had this case come before this Court for a merits review under the federal habeas corpus standard of review, in the absence of clearly established Supreme Court precedent, Hall would not, per se, be entitled to relief.  *See* 28 U.S.C. § 2254 (d).

## V.   On His Continuance-Related Claim Hall Is Entitled to No Relief.

Hall alleges that he was deprived of his rights under the Fifth and Fourteenth Amendments when the trial court denied his motion for a continuance.  (Mem. at 55–57.)  He alleges that the lack of a continuance deprived him of his right to present a defense.  (Mem. at 55, *citing Washington v. Texas*, 338 U.S. at 19; *Ungar*, 376 U.S. at 589.)

At trial, as the juror-selection process was winding down, the defense on January 11, 2005, moved to delay the start of the guilt-innocence phase from January 25 to February 21.  (65 RR 4.)  Lead counsel Macias told the court that a judge had suggested he, Macias, attend a juvenile-justice seminar.  (65 RR 5.)  And, he said, he wished to attend a second seminar, related to capital murder.  (65 RR 6.)  He said that he would have completed the capital-murder seminar by about February 22.  (65 RR 6.)  Also, Macias said, a capital murder case such as Hall's requires much investigation.  "[W]e have done a lot of the investigation.

Some of it remains to be done." (65 RR 10.) The defense said also that it needed additional time to find and interview both expert- and fact-witnesses and to arrange for additional DNA testing. (65 RR 16–20.)

The State objected. (65 RR 7.) The prosecutor said that when McDonald had joined the defense in September 2004 the State had offered to agree to a continuance but that the defense had declined. (65 RR 7.) The State said that postponing the trial would pose a hardship upon the jurors. (65 RR 8.) The court agreed that the "jury pool has been very weak. A lot of complaints. Some [jurors] that I actually had to release with the consent of the parties." (65 RR 8.) The court said among the jurors there had been serious illnesses and at least one change of address. (65 RR 8.) The court feared that delaying the trial a month would lead to the loss of additional jurors. (65 RR 8.) In the end, the court denied the motion. (66 R 28–29.)

On state appeal, Hall alleged that he needed the continuance (1) to investigate and evaluate newly revealed claims regarding problems with DNA laboratory work and (2) to investigate new claims that Billhartz's family was involved with criminal gangs. As for the DNA-related complaint, Hall alleged that the prosecutors had not turned over to the defense certain DNA evidence. (Appellant's Br. at 34, *citing* 73 RR 51.) And as noted by the state appellate court, the gang-related complaint was not presented to the trial court. *Hall v.*

*State*, 2007 WL 1847314, at *6 n.27.

The state appeals court construed Hall's DNA-related complaint as a *Brady* claim.  *Id.* at *6.  The state court noted that Hall in his continuance-related complaint did not show how the trial court's denial of his motion prejudiced his defense, that is, this *Brady* claim.  *Id.*  The court noted that Hall did not recite for the court which DNA tests were questionable.  *Id.*  Neither did he show that the prosecutors withheld DNA evidence, that the evidence was favorable to the defense, or that the evidence was material.  *Id.*  The court noted that Hall argued only that the DNA evidence contained that of an unidentified third person.  *Id.*  But, the court said, the third-person evidence was not material because the issue of whether Hall had been in Billhartz's truck was not disputed and there was no evidence as to where the unidentified DNA was deposited.  *Id.*

As for the gang-related claim, the court said, Hall offered no evidence supporting the allegation, offered no authority or argument suggesting that the presumed evidence was material, and did not show that the lack of a continuance prevented him from developing the presumed evidence.  *Id.*

### A.    Because Hall never presented a constitutional claim to state court, the claim is defaulted.

As discussed above, because Hall presented his continuance-related claim to the state court as a state-law issue, not a constitutional issue, the issue presented to this Court is unexhausted but nonetheless defaulted.  *See Coleman*,

501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

> **B.    Hall does not show that a continuance was required.**

In the alternative, were this Court to review the claim on the merits, it would not find Hall entitled to relief.   The matter of a continuance is traditionally within the discretion of the trial judge.   *Ungar*, 376 U.S. at 849. Not every denial of a request for more time violates due process even if the party fails to offer evidence.   *Id.*   "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.   The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."   *Id.* at 850.

Here, Hall was indicted on February 4, 2003.   (1 CR 3.)   Counsel was appointed on about two weeks later, on February 19.   (1 CR 23.)   McDonald joined the defense as co-counsel on September 6, 2004.   (2 CR 613.)   On about September 20, Frank Macias replaced Jaime Olivas as lead counsel.   (7 RR, 8 RR 2.)   When counsel was replaced, the State offered to agree to a continuance.   (65 RR 7.)   The defense declined.   (65 RR 7.)

Then as the juror-selection process was winding down, the defense asked for a continuance.   (65 RR 4.)   It gave the trial court as reasons some legal seminars and DNA evidence that the defense said was newly disclosed. (65 RR

5, 6, 16–20.)  The trial court was concerned that if the start of trial were delayed, more jurors would drop out and that the parties would have to undertake additional juror selection.  (65 RR 8.)  The trial court was never told that the defense needed the continuance to gather evidence about Hall's pretrial statement.  *See Ungar*, 376 U.S. at 850.  Further, Hall had more than a year to prepare for trial and had already declined an offer of additional time.  The trial court acted within its discretion in denying Hall's motion for a continuance.

## VI.   On His Mitigation-Related Claim, Hall Is Entitled to No Relief.

Hall alleges that he received ineffective assistance when counsel at the sentencing phase of trial failed to investigate and present certain mitigating evidence.  (Mem. at 61–77.)

### A.   Because Hall never presented the claim to the state court properly, the claim is defaulted.

As discussed above, Hall's state habeas application was dismissed.  *Ex parte Hall*, 2009 WL 1617087.  Because he cannot present the claim to the state court now, the claim is defaulted.  *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

Further, although Hall in his state application alleges that trial counsel failed to investigate and present certain mitigating evidence, Hall does not describe the missing evidence.  (SHCR 21.)  This Court cannot determine whether the factual predicate Hall intended to raise in state court corresponds

to that factual predicate raised in this Court.  (SHCR 21; Mem. at 68–77.)

## B.   The evidence proffered to this Court duplicates that given at trial.

In the alternative, were this Court to review Hall's claim on the merits, it would not find him entitled to relief.  Hall alleges that the performance of counsel was deficient because counsel did not discover and present testimony about his childhood hardship.  (Mem. at 68.)  Hall alleges also that counsel should have presented evidence of his cognitive and emotional deficiencies. (Mem. at 68.)  In support of his claim, Hall offers affidavits or statements from Marilu Folmer (PX 16), Becky Garcia (PX 17), Gloria Meinert (PX 18), Ted Meinert (PX 19), Jane Morgan (PX 20), Susan Wohleking (PX 21), Deborah Hall (PX 22), and Dr. Gilbert Martinez (PX 15).

Again, to show himself entitled to relief, Hall must meet the standard set out in *Strickland*, 466 U.S. at 687.  He must show that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687–88.  In evaluating such a claim, a reviewing court must be "highly deferential" to counsel's conduct. *Id.* at 689.  The court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id.* at 690. The petitioner must overcome the presumption that under the circumstances the challenged action might be considered sound trial strategy.  *See id.*  Moreover, a conscious and informed decision on trial tactics and strategy cannot be the

basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *St. Aubin v. Quarterman*, 470 F.3d 1096, 1102 (5th Cir. 2006).

A reviewing court need not consider the deficiency prong if it concludes that the petitioner has shown no prejudice. *Strickland*, 466 U.S. at 697. Moreover, the petitioner may not simply allege, but must "affirmatively prove" prejudice. *Id.* at 693. To show prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The burden of proof in a habeas corpus proceeding attacking the effectiveness of trial counsel is upon the petitioner. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000).

To assess prejudice during the sentencing phase of a capital proceeding, the court "reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). To find prejudice, there must be a reasonable probability that, absent the error, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland*, 466 U.S. at 695.

Hall argues that counsel should have discovered and presented evidence of his childhood hardship and of his mental health. (Mem. at 68–77.) He offers to this Court affidavits alleging that he had difficulty in school (PX 16 at 1, para. 3; PX 21 at 2, paras. 11 &12; PX 20 at 2, para. 8); that he came to school ill-kempt (PX 16 at 1, para. 5; PX 17 at 1, para. 3; PX 19 at 2, para. 11; PX 21 at 1, para. 7); that he sometimes was not well fed (PX 17 at 1, para. 4; PX 18 at 2, para. 13; PX 19 at 2, para. 14); that his father was a drug abuser (PX 18 at 1, para. 6); that his first stepmother was a drug abuser and prostitute (PX 18 at 1, para. 6; PX 19 at 2, para. 10); that when Hall's father was out of town on business, Hall's natural mother went with other men (PX 19 at 1, para. 6); and that at times Hall received special-education services in school (PX 21 at 3, paras. 16–18). Hall alleges also that counsel should have offered testimony from Dr. Martinez, who would have said that Hall had deficits in "verbal memory, sustained and focused attention, mental control, and mental shifting" (PX 15 at 13); that Hall's history of attention deficit, hyperactivity disorder "must be considered a contributing factor to his current deficits in attention mental control and shifting, as evidenced by his impaired cognitive test performance" (*id.*); that Hall abused many drugs, including cocaine, marijuana, methamphetamines and hallucinogens; and that drug abuse is associated with brain damage (*id.* at 14). The psychologist would have recommended continued

medical intervention.  (*Id.*).

Hall's counsel mounted a sentencing-phase defense based upon his childhood hardship, good character, lack of future dangerousness, and residual doubt.  The defense presented testimony from the petitioner's father, Jimmy Donald Hall (81 RR 16–37); Justen Hall's second stepmother, Teresita Hall (81 RR 39–43); his stepsister, Amber Torres (81 RR 44–46); a neighbor, Mario Escobedo (83 RR 81–87); a former girlfriend, Toni Rose Anderson (83 RR 100–103); a juvenile probation employee, Candace Lee Galaviz (83 RR 104–08); two psychiatrists, Drs. Victor Gutierrez (83 RR 111–68) and Walter Aeschbach (85 RR 5–110); and from Justen Hall himself (84 RR 4–216).

Jimmy Hall said that he used drugs—crystal meth, marijuana, cocaine, and heroine—around his son when his son was seven or eight (81 RR 16–18.) When Justen was 19 or 20, his father asked him to sell drugs.  (81 RR 20.)  His father saw his son begin to use drugs when Justen was about 18 or 19 and they started using crystal meth together when Justen was about 20 (81 RR 25–26.) Dr. Gutierrez said that Justen Hall had abused marijuana and methamphetamines and had supplied his father with meth that he, Justen, had made.  (83 RR 133.)  Justen said that he saw a lot of drugs and drug paraphernalia around the house when he was young and smoked his first marijuana joint when he was 12.  (84 RR 5–6.)  He had gotten thrown out of Job

Corps for smoking marijuana. (84 RR 12.) He had used marijuana, crystal meth, ecstasy, acid, and powder cocaine. (84 RR 71.)

Hall also was abused as a child. His father blamed himself for his son's troubles. "Justen never had a chance," he said. (81 RR 19). "I would say 90 percent of it was my fault," he said. (81 RR 19.) While Justen Hall was living in Alabama with his natural mother, she put him outside in the cold wearing a diaper and beat him with a belt buckle. (81 RR 19.) He himself said that his childhood home was not a good environment. (84 RR 5.)

The jurors heard testimony that Hall, nonetheless, had good qualities. His second stepmother, Teresita Hall, said that she saw him as her son, that he had never hit her or been disrespectful. (81 RR 40–41.) She said the Justen Hall treated her daughters, his stepsisters, well. (81 RR 41.) Indeed, his stepsister, Amber Torres, agreed that Justen Hall had treated her well. And, she said, he was smart. (81 RR 45.) Hall's former girlfriend, Toni Rose Anderson, said that when she was depressed because her grandmother fell ill, Hall helped her. (83 RR 101.) And, she said, he was beloved by her grandmother. (83 RR 103.) A neighbor, Mario Escobedo, said that when he learned of Hall's legal problems and told Hall not to come around, Hall reacted calmly and did not display anger. (83 RR 82–83.) Candace Lee Galaviz, a worker with juvenile probation, said that Hall had treated her with respect. "I think he was just kind of confused. I don't

think he had anywhere to go or anybody to turn to.  He was always very polite and very respectful to me." (83 RR 106.)

And the jurors heard of Hall's psychological difficulties.  Dr. Gutierrez, a psychiatrist who treated Hall after Hall attempted suicide in Plainview, said that Hall told him that he experienced hallucinations, that he heard a voice from "Joseph" telling him to commit suicide.  (83 RR 116.)  Dr. Gutierrez said that Hall suffered from a major depression with psychotic features.  (83 RR 121–22.) Hall was medicated with Zyprexa, an antipsychotic to control hallucinations; Zoloft, an antidepressant; Trazodone, also an antidepressant that also alleviates insomnia; and Konopin, an antianxiety medication.  (83 RR 135–36.)

Another psychiatrist, Dr. Aeschbach, agreed that Hall had a major depressive disorder.  (85 RR 37.)  Dr. Aeschbach said that children who grown up without discipline are likely not to learn discipline.  And learning discipline later in life requires extra effort, he said.  (85 RR 27.)  He said that Hall had no "self-worth," and did not believe that there was a possibility of a good future.  (85 RR 42.)  Dr. Aeschbach said that Hall's two drugs of choice, marijuana and amphetamine, made "perfect sense."  He said, "Marijuana numbs the pain, makes him feel more comfortable.  Amphetamine helps the attention deficit disorder, in small amounts." (85 RR 45.)  Dr. Aeschbach said that many people try mood-altering drugs.  "But the addictive personality, the person with an

addictive personality, then becomes addicted.  It takes on a life of its own.  And it is then really a condition that needs treatment in itself." (85 RR 46–47.)

In connection with slaying of Diaz and evidence that Hall engaged in homosexual activities, Dr. Aeschbach said that all people have some homosexual tendencies.  But people with a "low level of differentiation, particularly people with schizophrenic disorders, and also people with personality problems, are terrified of these homosexual tendencies." (85 RR 49–60.)  As for the slaying of Billhartz, the doctor said that it was possible that Hall did not remember the killing at all.  (85 RR 66–67.)

Dr. Aeschbach said also that Hall could be rehabilitated in prison, that there existed treatments for individuals with antisocial personalities.  (85 RR 71–72.)

The defense also presented evidence suggesting that Billhartz was killed not by Hall but by Ted Murgatroyd.  (83 RR 88–90.)

In his closing statement, counsel argued that the shooting of Diaz may have been accidental (86 RR 62) and that Billhartz may have been killed not by Hall but by Tim Davis or Ted Murgatroyd.  (86 RR 63–64.)  Counsel argued that Hall acted under the influence of drugs, could not control his impulses, had low moral development, and was sexually confused.  (86 RR 48–49.)  They argued that because of poor upbringing, Hall had not developed morally.  (86 RR 65–66.)

He would pose no danger in prison, counsel said.  (86 RR 70.)

Again, Hall presented a mitigation case based upon evidence of good character, childhood hardship and poor upbringing, drug-use and psychological difficulties, future peaceableness, and residual doubt.  Hall argues that counsel should have discovered and presented additional evidence of childhood hardship and psychological difficulty. (Mem. at 68–77.)  Hall argues, in essence, that even though counsel presented some evidence of childhood hardship and psychological difficulties, counsel should have presented this particular evidence.  There must come a point at which counsel must say "enough," must say that the case has been developed, that additional similar evidence will tire and perhaps alienate the jurors.  As for Hall's argument that counsel should have presented evidence of childhood hardship and poor mental health, counsel did present such a case.  The additional evidence that Hall proffers would have covered the same ground covered by the trial witnesses.  Hall does not show that counsel's performance was deficient and does not show that the additional evidence would have led to a different outcome.  *See Strickland*, 466 U.S. at 697.

## VII.  As for His Jury-Argument Claim, Hall Is Not Entitled to Relief.

Hall argues that he was deprived of effective assistance at sentencing when counsel told the jurors that Hall deserved to die.  (Mem. at 77–81.)  Hall criticizes certain closing arguments of counsel Charlie McDonald.

In closing McDonald said (the criticized statements in italics):

We all have reservations about putting someone in jail for the rest of their lives, taxpayers assuming responsibility for caring for that person, when the reason that they are in prison is because they have killed.

*Justen has killed; why shouldn't we kill him?  Why shouldn't we kill him?*

*He doesn't need your sympathy.  He showed no sympathy for those two people.  Why shouldn't we kill him?*

You've heard how Justen is able to function in prison.  You have heard that's he's broken rules.  He had a shank.  But you also heard, even from the gentleman who came in from TDC, that that's not unusual in the prison environment.  It's common.

The rules that he broke, that he was unable to follow, weren't major infractions.  Justen explained to you that he—the possession of the shank, it was an attempt to get him back into the free world.  It wasn't done.  The consequences of him having a shank were relatively minor.

(86 RR 51.)

Later in speaking to the jurors, McDonald argued:

And you-all can think about the evidence and determine on your own, in your own mind, whether there is something, some reason, not to kill him.

*He doesn't deserve not to be killed*, but you don't have to kill him.  He can be put into a structure.

(86 RR 57.)

First, as discussed above, because the state court never reviewed this claim on the merits, the claim is defaulted.  *See Coleman*, 501 U.S. at 735 n.1;

*Nobles*, 127 F.3d at 420

Second, in the alternative, were this Court to review the claim on the merits, it would not find Hall entitled to relief.  In evaluating defense counsel's closing remarks, a reviewing court must consider the remarks in context with the remainder of counsel's closing argument.  *See Rushing v. Butler*, 868 F.2d 800, 805 (5th Cir. 1989).  Counsel may make a strategic decision to acknowledge a defendant's culpability and may even concede that the jurors would be justified in imposing the death penalty in order to establish credibility with the jury.  *See Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997); *Kirkpatrick v. Butler*, 870 F.2d 276, 284–85 (5th Cir. 1989) (finding no ineffective assistance when counsel told jurors they might feel "justified" in imposing death; counsel felt it necessary to walk "fine line"); *also see United States v. Short*, 181 F.3d 620, 624–25 (5th Cir. 1999) (finding no ineffective assistance with counsel reasonably tried to establish credibility with jurors by implying client's involvement with the drug trade).  By conceding the weak points of his case, thereby establishing credibility with the jurors, counsel increases the chances that the jurors will find his other arguments persuasive.  *See id.*  at 25 (stating that by trying to establish credibility, counsel enhanced his chances that jurors would accept his arguments); *United States v. Wilks*, 46 F.3d 640, 644 (7th Cir. 1995) ("In conceding [defendant's] guilt with respect to the one ounce transaction, counsel

lent credibility to his argument that [defendant] was only a small fish in the drug world."); *United States v. Tabares*, 951 F.2d 405, 409 (1st Cir. 1991) (find that counsel's concession was tactical, designed to lead the jury towards leniency on the other charges and to provide basis for later argument leniency).

Hall confessed to two murders, the second committed while he was out on bond for the first. He had a long history of drug abuse and criminal activity. By trying to establish credibility with the jurors, counsel sought to enhance his ability to persuade jurors that Hall was not a lost cause, that the jurors need not sentence him to death. *See Short*, 181 F.3d at 625. Such a concession, when viewed with the closing argument as a whole, was reasonable and does not display ineffective assistance. *See Carter*, 131 F.3d at 466.

## VIII.  On His Juror-Strike Claim, Hall Is Entitled to No Relief.

Hall alleges he received ineffective assistance when counsel during juror selection agreed with the prosecution to exercise simultaneous peremptory strikes. (Mem. at 81–92.)

Under state law in a death-penalty case, a qualified juror "shall be passed for acceptance or challenge first to the state and then to the defendant." Tex. Code Crim. Proc. art. 35.13 (West 2010). The trial court has some discretion: It may require the State to exercise both causal and peremptory challenges before the defense exercises both its challenges. Or the court may requires both parties

to exercise their causal challenges first, with the State preceding the defense, before both parties proceed to the peremptory challenges, again with the State preceding the defense. *See Bigby v. State*, 892 S.W.2d 864, 890–91 (Tex. Crim. App. 1994) (White, J., with four judges concurring).  But the system is not mandatory and can be waived by the defense.  *See Busby v. State*, 990 S.W.2d 263, 269 (Tex. Crim. App. 1999).

Rather than employ the statutory system, the prosecutors and defense counsel agreed to follow a different procedure, as follows:

1      A juror shall be questioned by both parties.

2      Upon completion of the examination of a jury by both sides, the State shall makes its challenge(s) for cause, if any.

3      If the State has no challenge for cause or said challenge is denied, the Defense shall then make its challenge(s) for cause, if any.

4      Once there are at least 48 qualified jurors, the parties would request that the court summon the qualified jurors to court to ensure they are still qualified and have not had any intervening events to prevent them from serving.

5      If there are at least 46 jurors still qualified, the State and Defense shall then exercise their peremptory strikes.  Each side will have a list of qualified jurors and makes their strikes independently.

6      If there are not 46 jurors qualified, then the questioning would continue.

(PX 23.)

Hall alleges that during the simultaneous-peremptory strike process, the defense used two strikes on panel members who also were struck by the State. (Mem. at 83–84.)  Had defense counsel followed the procedure set out in the statute, the defense would have had, in essence, two additional peremptory strikes.  (*Id*.)  By forfeiting these two strikes, Hall argues, the jury panel contained two individuals—James Griffith and Kenneth Sudimack—who were unfavorable to the defense. (Mem. at 85–89.)  Hall says that counsel has no strategic or reasonable explanation for his action.  (Mem. at 89–92.)

As for the two objectionable jurors, Hall alleges that Griffith stated that he would have difficulty believing a confession could be coerced by anything other than physical force.  (16 RR 46–48.) As for Sudimack, Hall alleges that the juror said that he disfavored life imprisonment for murders—"People like Charles Manson"—because imprisonment imposed a financial burden on the taxpayers.  (39 RR 101.)

### A. Because Hall never gave the state court a fair opportunity to review the claim, the claim is defaulted.

First, as discussed above, because in state court Hall raised a claim implicating state law rather than the Constitution and because the state court never had the opportunity to review the claim, the claim is defaulted.  *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

Second, although Hall in state habeas proceedings raised a Sixth Amendment ineffective-assistance claim (SHCR 21, para. 3.©), he did not receive an adjudication on the merits in state court because, at his request, his application was dismissed. *Ex parte Hall*, 2009 WL 1617087. Because he cannot raise the claim in state court now, the claim is, although unexhausted, nonetheless defaulted. *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

Third, to the extent that Hall raised this ineffective-assistance claim in his subsequently dismissed state habeas application, he did not present to the state court his specific allegations about jurors Griffith and Sudimack. When Hall took evidence in the state habeas hearing, he did not take evidence from trial counsel about the two jurors. Hence, the state court could not have evaluated the arguments before this Court in connection with those two. The factual predicate was never placed before the state court and was never discussed by defense counsel in state habeas proceedings. *Ries v. Quarterman*, 522 F.3d at 523.

### B.   Defense counsel had sound strategic reasons for using the juror-strike method employed.

Were this Court to review the claim on the merits, it would not find Hall entitled to relief. Again, because Hall alleges ineffective assistance he must show that counsel's performance was objectively deficient and that the deficient

performance prejudiced his case.  *See Strickland*, 466 U.S. at 687.  And a reviewing court must presume counsel's actions and decisions were reasonable under an objective standard.  *Id.* at 690.

Here, instead of using the statutory system, the parties exercised their causal strikes, with the State acting first, after questioning each venire panel member.  At the end of the individual-questioning process, the parties, acting simultaneously and without knowledge of each other's actions, exercised their peremptory strikes.  As a result of this process, two panel members—Edmundo Puga and Lucila Menchaca—that were stricken by both the defense and the state.  (4 CR 968–69.)  Hall argues that had counsel used the statutory system and had the State exercised its peremptory strikes first, the defense would not have had to use its peremptory strikes on Puga and Menchaca and could have used its strikes on Griffith and Sudimack.  (Mem. at 83–84.)

In state habeas proceedings, counsel said he employed the system used because he was familiar with it and had always employed it.  (SHCR 198.) Asked why he preferred his system to the statutory system, counsel said, "Because I'd rather see the jury selection the same way I do it in normal jury selection and have my notes and everything and do my strikes all at one time." (SHCR 199.)

Hence, not only was defense counsel more comfortable with the agreed-upon system than with the statutory system, the agreed-upon system offered advantages over the statutory system.  Under the statutory system, defense counsel is required to use his peremptory strikes piecemeal.  Counsel risks exhausting his peremptory strikes on panel members that are somewhat objectionable and before he encounters panel members that ultimately may prove more objectionable.  By viewing the entire panel of potential jurors before using his strikes, defense counsel ensures that he can strike those panel members he finds most objectionable.

And in state habeas proceedings, defense counsel was not asked whether, had he two additional strikes, he would have used those strikes on Griffith and Sudimack.  Counsel had also sought additional peremptory strikes in connection with Gloria Lopez (66 RR 18), Richard Gavaldon (14 RR 101), and Myrna Enriquez Herres (43 RR 148–49), and a strike for cause in connection with Alfred Amparan (13 RR 84), all of whom sat on the jury.  Had counsel two additional strikes, counsel may have exercised the strikes on two of those four.  Considering that counsel did not challenge Sudimack for cause (39 RR 155), one might infer that counsel did not rank Sudimack with the most objectionable.

And counsel may well have preferred Griffith and Sudimack to others.  Griffith understood the state's burden (15 RR 74–75), admired John Kennedy (15

RR 90), had a master's degree in business administration (15 RR 94), recognized the value of psychiatric treatment (15 RR 96), had been in the past shocked by racial segregation (15 RR 103), stated that he was aware that police were capable of lying (15 RR 110), could follow the instructions on sentencing (15 RR 125–27), had served as a second-lieutenant in Vietnam (16 RR 15–16), and understood that sleep deprivation could undermine performance (16 RR 46).  As for Sudimack, although he still proclaimed his innocence, Sudimack had in the 1970s been fined for marijuana possession (39 RR 66), agreed that police could be mistaken or could lie (39 RR 84), agreed that psychiatrists could help predict future behavior (39 RR 125–26), agreed that capital punishment was a disgrace in a civilized society (39 RR 136–37), and could consider the whole range of punishment (39 RR 144–45).

Considering that the juror-selection system used yielded certain defense benefits, considering that jurors Griffith and Sudimack had certain defense benefits, and considering Hall does not show that had counsel two additional strikes, counsel would have used them to remove Griffith and Sudimack, Hall does not show that counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 697.  Hall also offers nothing but speculation that had Griffth and Sudimack been removed that results would have been more to Hall's liking. *See id.*  Hall does not show that Griffith and

Sudimack's replacements, if the replacements are presumed to be the alternative jurors, William Steven Harmon and Rene Caro (4 CR 969), would have been more defense-friendly. *See id.*

## IX.   As for His Juror-Dismissal Claim, Hall Is Entitled to No Relief.

Hall alleges that at the juror-selection phase, defense counsel agree with the prosecutor to dismiss certain venire panel members who on their questionnaires had said that they were opposed to the death penalty. (Mem. at 92–95, *citing Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).) Hall alleges he was deprived of effective assistance when counsel agreed to the panel members' dismissal without questioning them. (*Id.*)

### A.   Because the claim was not adjudicated on the merits in state court, the claim is defaulted.

As with other claims raised before this Court, this claim was never adjudicated on the merits by the state courts. *Ex parte Hall*, 2009 WL 1617087. Because Hall cannot raise the issue in state court now, the claim is, though unexhausted, nonetheless defaulted. *See Coleman*, 501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

### B.   The claim should be rejected for inadequate briefing.

But were this Court to review the claim on the merits, it would not find Hall entitled to relief. A petition must specify the grounds for relief available to the petitioner and state the facts supporting each ground. *See* § 2254 Rule 2©;

*Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) (holding that to comply with § 2254 Rule 2© petitioner must state specific, particularized facts entitling him to habeas relief for each ground specified; facts must consist of sufficient detail to allow court to determine whether petition merits further review from face of petition alone); *Wacht v. Cardwell*, 604 F.2d 1245, 1247 (9th Cir. 1979) (failing to grant relief where, after alleging he was prejudiced by state trial judge's actions, petitioner failed to support allegation with facts); *May v. Maschner*, 668 F. Supp. 1305, 1307 (W.D. Mo. 1987) (holding that court may not consider ground for habeas relief where ground included in petition "attachment"). *See also Blackledge v. Allison*, 431 U.S. 63, 75–76 (1977) (stating that petitioner's allegation plea was involuntary not "vague or conclusory" where petition alleged facts, including terms of unkept promise inducing plea; where, when and by whom promise made; and identity of witness to communication); *Donahue v. Cain*, 231 F.3d 1000, 1003 (5th Cir. 2000) (holding that where issue not exhausted and not asserted in federal petition, issue not properly before district court).

Hall has failed to cite to the record those agreements between defense counsel and prosecutor that he alleges constituted ineffective assistance. (Mem. at 92–95.)  Although Hall cites to the reporter's record from the state habeas proceedings, he does not cite to the trial record of juror selection.  This Court

cannot determine which defense-prosecution agreements that Hall finds objectionable.  And although Hall alleges that the excused jurors had on their questionnaires expressed opposition to the death penalty, Hall neither cites to the record nor includes with his petition-attachments the questionnaires showing that the unnamed panel members expressed opposition to the death penalty.  Hall pleads insufficient facts to allow this Court to evaluate his claim.  *See* § 2254 Rule 2©; *Adams*, 897 F.2d at 334.

### C.  Counsel had sound reasons for dismissing panel members.

Several times during the juror-selection process, the defense and the prosecution agreed to excuse groups of potential jurors.  Neither the prosecutors nor defense counsel stated on the record their reasons.  (16 RR 7, 23 RR 8, 36 RR 7, 49 RR 7, 62 RR 8.)  In state habeas proceedings, when trial counsel was asked why he had agreed to excuse the panel members, panel members not otherwise identified for defense counsel, the defense counsel said, "I think there was some trading going on, if I recall. . . . But I don't recall what it was or why." (SHCR 206.)  He said he may have agreed to excuse certain jurors because after going through their questionnaires, "[I]f I decided I didn't like them, I'd agree to excuse them." (SHCR 215.)  He also said that he agreed to some dismissals "to be able to get further into the panel."  (SHCR 217.)  Counsel said Hall's case was his fifth capital murder trial and that over the years he had questioned thousands

of prospective jurors in capital trials. (SHCR 219.) Counsel agreed with the trial court that he had a "good feel" for selecting jurors and did not feel that he had to question every potential juror. (SHCR 220.)

A reviewing court must presume that counsel's decisions were reasonable. *See Strickland*, 466 U.S. at 689, 690. Hall has the burden of showing that counsel's performance was objectively deficient. *Id.* at 690. The record before this Court does not demonstrate any counsel deficiency. *See id.* at 687. Given the sketchy information given by Hall's state habeas counsel during questioning, trial counsel gave reasonable reasons for his actions, that is, counsel could tell by a panel member's questionnaire that the member would be objectionable or counsel agreed to certain group-dismissals to get farther into the panel. (SHCR 215, 217.)

As for the deficiency prong, Hall does not show that any of the dismissed jurors, jurors not identified by Hall, would have been more defense-friendly and that their selection would have led to a more-favorable result. *See id.*

## X.    Hall Is Entitled to No Relief on His Juror "Propoundment" Claim.

Hall alleges that he received ineffective assistance when trial counsel stood silent when one of the presiding judges failed to instruct certain potential jurors as required by article 35.17(2) of the Code of Criminal Procedure. (Mem. at 95–101.)

A.    **The claim is defaulted.**

Again, because this claim was not adjudicated on the merits by the state

courts, *Ex parte Hall*, 2009 WL 1617087, and because Hall cannot receive such

an adjudication now, the claim is unexhausted but yet defaulted, *see Coleman*,

501 U.S. at 735 n.1; *Nobles*, 127 F.3d at 420.

B.    **Hall shows neither counsel deficiency nor prejudice.**

Were this Court to review Hall's claim on the merits, it still would not find

him entitled to relief.   Under state law

> [I]n a capital felony case in which the State seeks the death penalty,
> the court shall *propound* to the entire panel of prospective jurors
> questions concerning the principles, as applicable to the case on
> trial, [1] of reasonable doubt, [2] burden of proof, [3] return of
> indictment by grand jury, [4] presumption of innocence, and [5]
> opinion. Then, on demand of the State or defendant, either is
> entitled to examine each juror on voir dire individually and apart
> from the entire panel, and may further question the juror on the
> principles propounded by the court.

Tex. Code Crim. Proc. art. 35.17.2 (West 2010) (italics and bracketed numbers

added).   The requirement that the court "propound" to the panel members

"questions concerning the principles" applies to death penalty cases only.   The

statute does not dictate the content of the trial court's "propoundment."   For

example, the statute does not require the trial court to define terms for the

prospective jurors.   *Staley v. State*, 887 S.W.2d 885, 897 (Tex. Crim. App. 1994).

And the defendant can waive any such "propoundment."   *Edwards v. State*, 660

S.W.2d 622, 626 (Tex. App.—Corpus Christi 1983, pet. ref'd).  The trial court's failure to "propound" is subject to harm analysis.  *See Harris v. State*, 790 S.W.2d 568, 582–83 (Tex. Crim. App. 1989).

The juror-selection portion of trial was overseen by two different judges, the Hon. William Moody and the Hon. Jerry Woodard.  Judge Moody propounded upon the issues listed in article 35.17.2 not when he addressed each panel of potential jurors but rather each individual potential juror before allowing the attorneys to question the juror.  (8 RR 7–17 (Soto), 20 RR 4–13 (Patterson), 21 RR 4–14 (Rodriguez), 22 RR 45–58 (Powell), 33 RR 4–14 (Davilla), 37 RR 5–15 (Cooper), 38 RR 5–37 (Hernandez), 42 RR 52–72 (Trevizo), 47 RR 4–21 (Puga), 51 RR 9–24 (Ontiveros), 55 RR 5–23 (Harper), 55 RR 51–56 (Salais), 56 RR 4–12 (Gomez), 56 RR 22–24 (Champion), 57 RR 11–23 (Harmon), 57 RR 91–107 (Menchaca), 58 RR 36–52 (Caro), 60 RR 4–27 (Gacharno), 61 RR 4–16 (James), 61 RR 84–90 (Gonzales-Graells), 63 RR 70–74 (Jaramillo).)  It does not appear that Judge Woodard addressed his panels or the individual potential jurors but rather allowed the attorneys to begin individual juror questioning.  (16 RR 7–8, 23 RR 8, 26 RR 7–8, 49 RR 7–8.)

When in state habeas proceedings, defense counsel was asked why he did not object to the Judge Woodard's omission, counsel said "Perhaps I wanted to instruct them myself.  I don't know."  (SHCR 208.)

Regardless of what the trial judges did nor did not tell the jurors during the selection process, the relevant law and terms were given to the jurors both orally and in writing at both guilt-innocence and sentencing. (79 RR 4–18, 4 CR 1154–61(guilt-innocence), 86 RR 14–22, 4 CR 1179–83 (sentencing).)

Hall fails to show counsel performed deficiently. Counsel said he may have wanted to "propound" himself. (SHCR 208.) Or counsel may have thought that the trial court's instructions at the beginning of juror-selection was not crucial and did not aid his client's case. The instructions would be given later, when they were more likely to be remembered. Hall shows not counsel deficiency. *See Strickland*, 466 U.S. at 687. Even if counsel's deficient performance is assumed, Hall shows no prejudice. *See id.* The jurors were instructed by the court orally and in writing. Hall does not show that an additional oral "propoundment" would have aided his client.

As for Hall's new-trial motions, none was based on the lack of "propoundment" by the trial court. (66 RR 14–17, 24–25, PX 25.) As for the lack of a reasonable-doubt instruction from Judge Woodard, a judge in his propoundment is not required to define "reasonable doubt," *see Staley*, 887 S.W.2d at 897; Article does 35.17.2 does not define "reasonable doubt"; and nothing suggests that had Judge Woodard propounded under article 35.17.2, he would have given such a definition. And whatever confusion was shown by juror

Sudimack, Hall does not show that the confusion would have been cured by a "propoundment" at the juror-selection phase. *See Strickland*, 466 U.S. at 687.

## CONCLUSION

This Court should deny relief in connection with Hall's federal petition for writ of habeas corpus and should deny a certificate of appealability with regard to all issues here raised.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
 for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


 /s/ Thomas M. Jones
THOMAS M. JONES*
\*Attorney-In-Charge          Assistant Attorney General
Postconviction Litigation Division

State Bar No. 00784357

P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
Fax No. (512) 936-1280
E-mail: Thomas.Jones@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on the September 21, 2010, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to the following:

Counsel for Hall:

Kathryn M. Kase
Texas Defender Service
1927 Blodgett
Houston TX 77004

William S.D. Cravens
Bingham McCutchen, L.L.P.
2020 K Street NW
Washington DC 20002

 /s/ Thomas M. Jones
THOMAS M. JONES
Assistant Attorney General